## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AMERICANS FOR PROSPERITY**, | |
| Plaintiff, | Civil Action No. 3:19-cv-14228 |
| v. | |
| **GURBIR GREWAL**, in his official capacity as Attorney General of New Jersey, **ERIC H. JASO**, in his official capacity as Chairperson of the New Jersey Election Law Enforcement Commission, **STEPHEN M. HOLDEN**, in his official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, and **MARGUERITE T. SIMON**, in her official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, | Oral Argument Requested

Motion Date:   August 5, 2019 |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Kevin H. Marino
John A. Boyle
**MARINO, TORTORELLA & BOYLE, P.C.**
437 Southern Boulevard
Chatham, NJ 07928
(973) 824-9300

OF COUNSEL:
Derek L. Shaffer[*]
William A. Burck[*]
Keith H. Forst[*]
**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Plaintiff Americans for Prosperity*

---

[*] *Pro hac vice* applications to be submitted.

# TABLE OF CONTENTS

Introduction ................................................................................. 1

Background ................................................................................. 5

    I.    Americans For Prosperity ("AFP"). ...................................... 5

    II.    Senate Bill No. 150. ........................................................ 6

        A.    Statutory Scheme. ..................................................... 6

        B.    Legislative History. .................................................. 9

    III.    The Act's Effect On Americans For Prosperity................... 13

Legal Standard ........................................................................... 16

Argument................................................................................... 18

    I.    AFP Is Likely To Prevail On The Merits ........................... 18

        A.    The "Political Information" Provision Has Already Been Ruled Unconstitutional By This Court. ................................. 22

        B.    The "Influencing Legislation" Provision Is Unconstitutional. .24

        C.    The "Influencing Elections" Provision Is Unconstitutional Because It Regulates Communications Outside Any Election. 27

        D.    The Act Is Unconstitutionally Underinclusive Because It Limits Coverage To Only 501(c)(4) And 527 Organizations. .............. 31

        E.    The Act Is Unconstitutional As Applied To AFP. .................... 33

    II.    Irreparable Harm Will Result Absent An Injunction........................... 37

    III.    The Equities Tip Sharply For AFP. ...................................... 38

    IV.    An Injunction Serves The Public Interest. ........................... 39

Conclusion ................................................................................. 40

# TABLE OF AUTHORITIES

**Page**

## Cases

*ACLU v. Ashcroft*,
   322 F.3d 240 (3d Cir. 2003),
   *aff'd and remanded*, 542 U.S. 656 (2004) ...................................................40

*ACLU of New Jersey v. New Jersey Election Law Enforcement Commission*,
   509 F. Supp. 1123 (D.N.J. 1981) ........................................... 3, 21, 22, 23, 24

*Americans for Prosperity Found. v. Harris*,
   809 F.3d 536 (9th Cir. 2015)...........................................................................36

*Americans for Prosperity Found. v. Becerra*,
   903 F.3d 1000 (9th Cir. 2018)........................................................ 15, 36, 37

*Americans for Prosperity Found. v. Becerra*,
   919 F.3d 1177 (9th Cir. 2019)........................................................................36

*Americans for Prosperity Foundation v. Harris*,
   182 F. Supp. 3d 1049 (C.D. Cal 2016) .........................................................35

*Ashcroft v. ACLU*,
   542 U.S. 656 (2004)........................................................................................18

*Austin v. Michigan Chamber of Commerce*,
   494 U.S. 652 (1990).......................................................................................32

*Bates v. Little Rock*,
   361 U.S. 516 (1960).......................................................................................18

*Buckley v. Valeo*,
   424 U.S. 1 (1976).................................................................................. *passim*

*Buckley v. Valeo*,
   519 F.2d 821 (D.C. Cir. 1975) .......................................................................24

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993).......................................................................................32

*Citizens United v. FEC,*
    558 U.S. 310 (2010)................................................................. 19, 34

*Davis v. FEC,*
    554 U.S. 724 (2008)................................................................. 19, 34

*Delaware Strong Families v. Attorney General of Delaware,*
    793 F.3d 304 (3d Cir. 2015).................................................... 30, 31

*Doe v. Reed,*
    561 U.S. 186 (2010)........................................................... 19, 34, 37

*Elrod v. Burns,*
    427 U.S. 347 (1976)................................................................. 37, 38

*FCC v. League of Women Voters of California,*
    468 U.S. 364 (1984).......................................................................32

*FEC v. Wisconsin Right To Life, Inc.,*
    551 U.S. 449 (2007)........................................................... 20, 24, 28

*First National Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978).......................................................................28

*Gibson v. Florida Legislative Investigation Committee,*
    372 U.S. 539 (1963).......................................................................38

*Glossip v. Gross,*
    135 S. Ct. 2726 (2015)...................................................................17

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, et al.,*
    546 U.S. 418 (2006).......................................................................17

*Hollingsworth v. Perry,*
    558 U.S. 183 (2010).......................................................................38

*K.A. ex rel. Ayers v. Pocono Mountain School District,*
    710 F.3d 99 (3d Cir. 2013)...................................................... 37, 39

*Klein v. City of San Clemente,*
    584 F.3d 1196 (9th Cir. 2009).......................................................38

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004)..........................................................................39

*Mariani v. United States*,
    212 F.3d 761 (3d Cir. 2000).........................................................................32

*McCauley v. University of the Virgin Islands*,
    618 F.3d 232 (3d Cir. 2010).........................................................................27

*McConnell v. FEC*,
    540 U.S. 93 (2003)......................................................................... 28, 31, 34

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995)........................................................................... 18, 19

*Minnesota Citizens Concerned for Life, Inc. v. Kelley*,
    698 N.W.2d 424 (Minn. 2005)......................................................................29

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958)...............................................................11, 18, 19, 33

*New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement
    Commission*,
    411 A.2d 168 (N.J. 1980)........................................... 3, 21, 24, 25, 26

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017)
    *as amended* (June 26, 2017) ................................................... 17, 18

*Ruckelshaus v. Monsanto Co.*,
    463 U.S. 1315 (1983) ................................................................................38

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006)......................................................................................18

*Salvation Army v. Department of Community Affairs of State of New Jersey*,
    919 F.2d 183 (3d Cir. 1990).........................................................................38

*Stilp v. Contino*,
    613 F.3d 405 (3d Cir. 2010)................................................................. 37, 38

*Swartzwelder v. McNeilly*,
    297 F.3d 228 (3d Cir. 2002).........................................................................39

*Talley v. California,*
    362 U.S. 60 (1960)........................................................................24

*United States v. Harriss,*
    347 U.S. 612 (1954)............................................ 19, 20, 24, 25, 26

*United States v. Mendoza,*
    464 U.S. 154 (1984)........................................................................40

*Virginia Society for Human Life, Inc. v. Caldwell,*
    500 S.E.2d 814 (Va. 1998)..........................................................29

*Winter v. Natural Resource Defense Council, Inc.,*
    555 U.S. 7 (2008)............................................................................17

## **Statutes**

15 Del. C § 8002(10)(a) ...............................................................30

15 Del. C § 8002(27)......................................................................30

15 Del. C. § 8031(a).......................................................................30

N.J.S.A. 19:44A-1 *et seq.* ..............................................................6

N.J.S.A. 19:44A-3(h) ............................................... 7, 14, 22, 23

N.J.S.A. 19:44A-3(i) .....................................................................33

N.J.S.A. 19:44A-3(n) ....................................................................33

N.J.S.A. 19:44A-3(t) ................................................ 6, 14, 22, 25

N.J.S.A. 19:44A-3(u) ....................................................................30

N.J.S.A. 19:44A-8(d)(1) ...........................................................7, 8

N.J.S.A. 19:44A-10........................................................................11

N.J.S.A. 19:44A-21(b) .............................................................9, 38

N.J.S.A. 19:44A-22(a)(1).............................................................8

N.J.S.A. 47:1A-1 *et seq.* ................................................................8

N.J.S.A. 52:13C-18 .................................................................................26

## Regulations

N.J.A.C. 19:25-17.3 .................................................................................8

N.J.A.C. 19:25-2.4(a) ......................................................................... 7, 38

## Other Materials

*3rd District Race May Be Most Expensive Legislative Race in U.S. History*, N.J.
      Election Law Enf't Comm'n (Dec. 1, 2017), *available at*
      https://www.elec.state.nj.us/pdffiles/press_releases/pr_2017/pr_
      12012017.pdf ...................................................................................10

S2430, 217th Leg. (as introduced in the Senate, June 27, 2016), *available at*
      https://www.njleg.state.nj.us/2016/Bills/S2500/2430_I1.PDF.......................9

S1500, 218th Leg. (as reported by the Senate Budget and Appropriations
      Committee on January 17, 2019), *available at* https://www.njleg.state.nj.us/
      2018/Bills/S1500/1500_R1.PDF ............................................. 9, 10

S1500, N.J. Office of Legis. Serv., *available at* https://www.njleg.state.nj.us/
      bills/BillView.asp?BillNumber=S1500 ........................................11

Conditional Veto from Governor Philip Murphy to N.J. Senate (May 13, 2019),
      *available at* https://www.njleg.state.nj.us/2018/Bills/S1500/
      1500_V1.PDF .......................................................................11, 12

Governor's Statement Upon Signing Senate Bill No. 150 (June 17, 2019),
      *available at* http://d31hzlhk6di2h5.cloudfront.net/20190617/d5/6c/b5/d7/
      94c04a9f14b0b88b6254ca19/S150.pdf........................................13

Matt Arco, *Murphy and Top Democrat Clash Over Deal That Avoided Veto
      Override — A Day After They Announced It*, NJ.com (June 11, 2019),
      *available at* https://www.nj.com/politics/2019/06/murphy-says-top-
      democrat-is-wrong-about-deal-that-just-avoided-veto-override-of-dark-
      money-bill.html ...............................................................................13

Matt Arco, *Murphy-Sweeney Feud Helped Fuel Legislation to Expose 'Dark
      Money' in Jersey Politics. It's Now on the Governor's Desk.*, NJ.com (Mar.
      26, 2019), *available at* https://www.nj.com/politics/2019/03/murphy-

sweeney-feud-helped-fuel-legislation-to-expose-dark-money-in-jersey-politics-its-now-on-the-governors-desk.html. ....................................9, 10, 11

Matt Arco, *N.J. Democrats Planned to Override Murphy. But a Last-Minute Deal Changed Things.*, NJ.com (June 10, 2019), *available at* https://www.nj.com/politics/2019/06/top-nj-democrats-wont-vote-to-override-murphy-as-both-sides-reach-last-minute-deal.html........................12

Matt Friedman, *NJEA Contributed $2.5M to Murphy-Aligned 'Dark Money' Group*, Politico.com (May 20, 2019), a*vailable at* https://www.politico.com/states/new-jersey/story/2019/05/16/njea-contributed-25m-to-murphy-aligned-dark-money-group-1019137 ..............10

Statement to S1500, 218th Leg. (as reported by the New Jersey Senate on March 25, 2019), *available at* https://www.njleg.state.nj.us/2018/Bills/S1500/1500_S5.PDF ...............................................................................................33

## INTRODUCTION

The First Amendment safeguards individuals' rights to associate privately and advocate anonymously throughout the United States.   Any restriction on these rights is subject to "exacting scrutiny."   Courts applying this standard draw a clear line between electioneering communications and issue advocacy, with attempts to regulate the latter strongly disfavored.   Protecting the integrity of elections may be a sufficiently important reason to justify, under exacting scrutiny, regulation of electioneering communications, but the same is not true of issue advocacy. Rammed through in a rush to exact political revenge, Senate Bill No. 150 ("S150" or "the Act") obliterates this fundamental distinction and oversteps constitutional bounds by subjecting *issue advocacy* to the formidable regulations and burdens properly reserved for *electioneering*.   Only by granting preliminary relief can this Court vindicate the First Amendment liberties at stake and protect against damaging chill and irreparable harm to donors nationwide.

Despite signing S150 into law, New Jersey Governor Phil Murphy conditionally vetoed the *identical* bill less than a month earlier on multiple constitutional grounds, then reiterated those same concerns when signing S150. Governor Murphy recognized that, by regulating and imposing disclosure requirements on some (but not all) types of entities engaged in legitimate policy-based advocacy, S150 transgressed the bright line repeatedly enforced by both the

Supreme Court and this Court.    Specifically, S150 regulates and imposes disclosure requirements on Independent Expenditure Committees ("IECs"), which the Act defines as 501(c)(4) or 527 corporations (but not myriad other types of entities) that raise or spend an aggregate of $3,000 annually on any of the following activities: (1) influencing elections; (2) influencing legislation; or (3) providing "political information."   "Political information," in turn, is defined to include any statement made through any medium that reflects the organization's opinions *or* which conveys *facts* on any candidate or public question, legislation, or regulation.   There is no other limit to the breathtaking sweep of this law—for example, nothing in the Act requires that a communication occur within a certain temporal window before an election, use certain media, reach a certain number of people, or even target any recipient in New Jersey in order to trigger stringent regulation.

Any group that engages in these constitutionally-protected activities is required to file quarterly reports disclosing any donor, nationwide, who contributes more than $10,000 and any expenditure in excess of $3,000.   Disclosure is required whether or not that donor intended their donation to be used for issue advocacy in New Jersey, or has any other connection with New Jersey.   The reports are then posted publicly on the New Jersey Election Law Enforcement Commission ("ELEC") website.   Failure to report can result in civil penalties, and deliberate failure to do so is a crime.

This stunningly broad reach of S150 leaps far beyond anything the First Amendment permits. If the law takes effect, merely stating facts or offering opinions about laws, or even regulations, will trigger invasive disclosure requirements and daunting burdens of the sort reserved for regulating elections. No such bid by the government to equate mere conveyance of factual information and issue advocacy with electioneering can possibly withstand exacting scrutiny.

Remarkably, New Jersey enacted S150 even though virtually identical provisions in prior statutes were struck down as unconstitutional or drastically limited in order to salvage them. In *ACLU of New Jersey v. New Jersey Election Law Enforcement Commission*, 509 F. Supp. 1123 (D.N.J. 1981), a three-judge panel of this Court struck down a disclosure requirement that was virtually identical to this Act's "political information" provision, holding that "[t]he broad language" of the statute was "susceptible to no narrowing reading which would obviate its constitutional problems." *Id*. at 1132–33. Similarly, in *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Commission*, 411 A.2d 168 (N.J. 1980), the New Jersey Supreme Court had to perform "judicial surgery" to rescue a statutory provision effectively identical to this Act's "influencing legislation" provision, sharply limiting that statute such that it could reach only direct attempts to influence legislators. *Id*. at 181. There is no reason why the provisions at issue should fare any better this time around.

The Act's "influencing elections" provision sweeps far too broadly as well.  Unlike other federal and state campaign finance regimes that have been upheld as constitutional, S150 has no guardrails to ensure that the speech it regulates actually connects to any New Jersey election.   S150 imposes no limitations as to time, medium, audience, or subject matter, nor is its coverage limited to advocacy.   A group risks compelled disclosure if it makes a mere *factual* statement over a year before an election via a newsletter sent to members outside New Jersey concerning an issue that relates, even tangentially, to a New Jersey officeholder or issue.   Where campaign-finance regimes omit such guardrails, courts have confined those laws to regulating only express advocacy for the sake of avoiding unconstitutional overreach.   *See Buckley v. Valeo*, 424 U.S. 1, 80 (1976).

Beyond being facially unconstitutional, the Act is also unconstitutional as-applied to Americans for Prosperity ("AFP").   AFP's views are not universally popular, and experience has (unfortunately) shown that its donors face threats, harassment, and reprisals if their names are disclosed.   Those supporters of AFP who have become publicly known (by choice or otherwise) have faced repercussions ranging from threats to kill or maim to boycotts, firings, and public shaming.   Not surprisingly, many donors insist their personal information be kept private, and AFP zealously protects donors' confidentiality to ensure their safety.   Disclosure will

discourage individuals from donating and chill their exercise of First Amendment rights to associate freely and advocate for issues that matter to them.

Faced with the Hobson's choice of suffering imminent, profound and irreversible First Amendment harms from the public disclosure of its donors or facing civil and criminal penalties, AFP respectfully requests that the Court enter a preliminary injunction to preserve the status quo.   There is a substantial likelihood that AFP will prevail on the merits; indeed, provisions indistinguishable from those in S150 have already been invalidated as unconstitutional.   Absent relief, AFP faces the irreparable harm of either losing First Amendment freedoms (if it complies) or civil and criminal penalties (if it does not).   In contrast, preliminary relief poses no appreciable harm to New Jersey:   it has *never* obtained this information before, nor has it even attempted to do so in the decades since this Court struck down a precursor statute, nor is there any reason to believe it has a sudden, urgent need for this information now.   Finally, whereas there is no public interest in enforcing a law that even the Governor recognizes is unconstitutional, there is a vital public interest in preserving the constitutional rights and robust political dialogue at stake here.

## BACKGROUND

### I.   Americans For Prosperity ("AFP").

AFP is a Washington, D.C. corporation headquartered in Arlington, Virginia; it qualifies as a social welfare organization under 26 U.S.C. § 501(c)(4).   Compl.

¶ 12.    AFP's mission is to inspire people to embrace and promote principles of economic freedom and liberty, and to educate citizens to advocate for the ideas, principles, and policies of a free society at local, state, and federal levels.    Compl.

¶ 13.    Two of its co-founders are Charles Koch and David Koch.    Compl. ¶ 13.

## II.    Senate Bill No. 150.

### A. Statutory Scheme.

Senate Bill No. 150 regulates and requires disclosure by any organization that qualifies as an Independent Expenditure Committee ("IEC"), which the Act defines as any Section 527 or 501(c)(4) organization that:

> engages in influencing or attempting to influence the outcome of any election or the nomination, election, or defeat of any person to any State or local elective public office, or the passage or defeat of any public question, legislation, or regulation, or in providing political information on any candidate or public question, legislation, or regulation, and raises or expends $3,000 or more in the aggregate for any such purpose annually.[1]

N.J.S.A. 19:44A-3(t).[2]    "Political information" includes "any statement . . . which reflects the opinion of the members of the organization on any candidate or candidates for public office, on any public question, or which contains facts on any

---

[1]    There are two limited exceptions to this definition—a 501(c)(4) does not qualify as an IEC if it (1) "fall[s] within the definition of any other organization subject to the provisions of P.L. 1973, c.83 (C.19:44A-1 *et seq.*)" or (2) "coordinate[s] its activities with any candidate or political party as determined by the Election Law Enforcement Commission."    N.J.S.A. 19:44A-3(t).

[2]    Citations to provisions of the Campaign Contributions and Expenditures Reporting Act, N.J.S.A. 19:44A-1 *et seq.*, are to those as amended by S150.

such candidate, or public question whether or not such facts are within the personal knowledge of [the organization's] members."   N.J.S.A. 19:44A-3(h).   The law covers statements that are made in *any* form, "including, but not limited to, press releases, pamphlets, newsletters, advertisements, flyers, form letters, Internet or digital advertisements, or radio or television programs or advertisements."   *Id.*

Simply put, the Act requires disclosure by groups that discuss in any way, any issue or fact that touches on a New Jersey election, legislation, or regulation.   Its astonishingly broad terms ensnare not just pure issue advocacy, but also transmission of mere "*facts*" related to "any candidate or public question, legislation, or regulation."   The Act does not require that covered communications occur within a certain time period before an election, or be broadcast over certain media, or go to a certain number of people, or even that the communications be directed towards anyone living or voting in New Jersey.   A communication could be directed solely towards a small group of people who live outside New Jersey, but nonetheless trigger disclosure merely because it mentions a New Jersey election, candidate, legislation, or regulation, and entails expenditure of at least $3,000.

Under S150, each IEC must submit "a cumulative quarterly report" to ELEC "not later than April 15, July 15, October 15 and January 15 of each calendar year." N.J.S.A. 19:44A-8(d)(1).   After submission, the report is uploaded to ELEC's website where it is made publicly accessible.   *See* N.J.A.C. 19:25-2.4(a); *see also*

N.J.S.A. 47:1A-1 *et seq.*   Each quarterly report must detail "all contributions received in excess of $10,000."   N.J.S.A. 19:44A-8(d)(1).   For each such contribution over $10,000, the IEC must disclose the donor's "name and mailing address," and, if the donor is an individual, the individual's "occupation" and "the name and mailing address of the individual's employer."   *Id.*   Reports must disclose this same information for groups or individuals who co-sign an IEC's loans or receive its expenditures.   *Id.*   The Act includes no "earmarking" provision, whereby only those individuals who earmark their donations for spending on covered activities would be disclosed, nor does it require any other nexus to New Jersey; any donor nationwide who donates more than $10,000 must be disclosed, regardless of whether the donor has ever had anything to do with New Jersey or even directed a contribution for use elsewhere.   In addition, an IEC must disclose "all expenditures in excess of $3,000."   *Id.*   The report must further specify the "purpose" of each expenditure.   *Id*.

Failure to comply with S150's reporting requirements results in civil and even criminal penalties.   Any person responsible for preparing a quarterly report who inadvertently fails to comply can face a civil penalty of up to $8,600 for the first offense and up to $17,200 for the second and each subsequent offense.   *See* N.J.A.C. 19:25-17.3; *see also* N.J.S.A. 19:44A-22(a)(1).   Deliberate failure to comply with the reporting requirements is a crime of the fourth degree, including (1)

as to "[a]ny person who purposely files or prepares or assists in the preparation for filing or purposely acquiesces in the preparation or filing of any report required under this act which the person knows is false, inaccurate or incomplete in any material particular"; or (2) as to any person "who purposely fails or refuses to file any such report when required to do so pursuant to the provisions of this act." N.J.S.A. 19:44A-21(b).

## B.    Legislative History.

Although it purports to be a "good government" bill, the origins of S150 are far from the ideals of Schoolhouse Rock.   According to public reporting, the Act grew out of a personal feud between Governor Phil Murphy and Senate President Stephen Sweeney.   *See* Matt Arco, *Murphy-Sweeney Feud Helped Fuel Legislation to Expose 'Dark Money' in Jersey Politics. It's Now on the Governor's Desk.*, NJ.com (Mar. 26, 2019).[3]   Prior to that feud, the Act had languished in the Senate for over two years without so much as a hearing.   *See* S2430, 217th Leg. (identical bill initially introduced in the Senate, June 27, 2016)[4]; S1500, 218th Leg. (as reported by the Senate Budget and Appropriations Committee on January 17, 2019).[5]

---

[3]  *Available at* https://www.nj.com/politics/2019/03/murphy-sweeney-feud-helped-fuel-legislation-to-expose-dark-money-in-jersey-politics-its-now-on-the-governors-desk.html.

[4] *Available at* https://www.njleg.state.nj.us/2016/Bills/S2500/2430_I1.PDF.

[5] *Available at* https://www.njleg.state.nj.us/2018/Bills/S1500/1500_R1.PDF.

The Act's precursor, Senate Bill No. 1500 ("S1500"), was pushed by Senator Sweeney only after New Direction New Jersey, a 501(c)(4) organization with close ties to the Governor, "angered Sweeney" by "running ads advocating for the Democratic governor's agenda during tense budget negotiations last summer with Democratic leaders in the Legislature." Arco, *supra.* New Direction's leadership—including the Governor's former campaign manager, Brendan Gill— promised to disclose their donors by the end of 2018. *Id.* Among the biggest donors was New Jersey Education Association, New Jersey's largest teachers' union, which, through an affiliate, spent historic sums to defeat Senator Sweeney in 2017. *See* Matt Friedman, *NJEA Contributed $2.5M to Murphy-Aligned 'Dark Money' Group*, Politico.com (May 20, 2019)[6]; *3rd District Race May Be Most Expensive Legislative Race in U.S. History*, N.J. Election Law Enf't Comm'n (Dec. 1, 2017).[7]

When New Direction failed to follow through, Senator Sweeney "called for legislation" that would "require disclosure **retroactive** to January 2018." Arco, *supra* (emphasis added).   Consistent with this demand, an early version of S1500 mandated retroactive disclosure.   S1500, 218th Leg. (as reported by the Senate Budget and Appropriations Committee on January 17, 2019).   While this provision

---

[6]  *Available at*  https://www.politico.com/states/new-jersey/story/2019/05/16/njea-contributed-25m-to-murphy-aligned-dark-money-group-1019137.

[7]  *Available at*  https://www.elec.state.nj.us/pdffiles/press_releases/pr_2017/pr_12012017.pdf.

was eventually stripped from S1500, S150 still prohibits officeholders from any involvement in "the management or control of any independent expenditure committee," N.J.S.A. 19:44A-10, which has been described as "a clear swipe at Gill, who is an Essex County freeholder," Arco, *supra*.   The New Jersey legislature passed S1500 on March 25, 2019.   *See* S1500, N.J. Office of Legis. Serv.[8]

On May 13, Governor Murphy conditionally vetoed S1500, citing serious doubts about its constitutional validity.   *See* Conditional Veto from Governor Philip Murphy to N.J. Senate (May 13, 2019) ("Conditional Veto").[9]   In his statement explaining the conditional veto, Governor Murphy first noted how, under binding Supreme Court precedent, laws compelling disclosure of a group's members or donors burden First Amendment rights and are subject to exacting scrutiny.   *Id.* at 2–4 (citing *Buckley v. Valeo*, 424 U.S. 1 (1976) and *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)).   Governor Murphy acknowledged that courts have held that disclosure laws have met the exacting scrutiny standard when they apply to groups engaged in electioneering activity.   *Id.* at 3.   As Governor Murphy noted, however, S1500 compelled disclosure for groups that attempt to influence, or provide public information about, legislation or regulation that is wholly

---

[8] *Available at* https://www.njleg.state.nj.us/bills/BillView.asp?BillNumber=S1500.

[9] *Available at* https://www.njleg.state.nj.us/2018/Bills/S1500/1500_V1.PDF.

unconnected to any election or candidate. *Id.* He therefore "recommend[ed] revisions to eliminate [S1500's] references to legislation and regulation." *Id.* at 5.

The Conditional Veto sought to correct several other flaws in S1500. It addressed two "loophole[s]" in the disclosure requirements. *Id.* at 5–6. First, under S1500, only 527s and 501(c)(4)s were treated as IECs. Accordingly, entities could circumvent disclosure by organizing as a limited liability corporation or adopting "other for-profit corporate forms." *Id.* at 5. Second, S1500 defined IEC to exclude groups that coordinate their activities with a candidate or political party. *Id.* at 6. As a result, an organization could hide "merely by coordinating its legislative and regulatory advocacy with a candidate." *Id.* Governor Murphy therefore recommended closing both loopholes. *See id.* In addition, Governor Murphy recommended changes to "correct multiple apparent drafting errors," including fixing "inconsistent" instructions on "how independent expenditure committees are to make reports" and clarifying the proper "reporting schedule." *Id.*

Despite these shortcomings and constitutional defects pointed out by the Governor, the New Jersey Assembly and Senate threatened to override his conditional veto. Matt Arco, *N.J. Democrats Planned to Override Murphy. But a Last-Minute Deal Changed Things.*, NJ.com (June 10, 2019).[10] According to

---

[10] *Available at* https://www.nj.com/politics/2019/06/top-nj-democrats-wont-vote-to-override-murphy-as-both-sides-reach-last-minute-deal.html.

public reporting, the Governor ultimately agreed to sign an **identical** bill, S150, while holding to his view that the law is unconstitutional.   Matt Arco, *Murphy and Top Democrat Clash Over Deal That Avoided Veto Override — A Day After They Announced It*, NJ.com (June 11, 2019).[11]   The Assembly and Senate passed S150 in an emergency session on June 10, 2019.   In signing the bill on June 17, 2019, Governor Murphy issued a signing statement reiterating his view that S150 "may infringe upon constitutionally protected speech and association rights" and contains "various apparent drafting errors."   Governor's Statement Upon Signing Senate Bill No. 150 (June 17, 2019).[12]   Accordingly, the Governor stated he was signing the bill "based on an express commitment" from the Legislature to "pass legislation removing advocacy in connection with legislation and regulations from its parameters, thereby ensuring that the bill's disclosure requirements apply to election-related advocacy, and making previously recommended technical revisions."   *Id.*   To date, no such corrective legislation has been enacted.

## III.   The Act's Effect On Americans For Prosperity.

The extraordinarily broad reach of S150's provisions directly menaces AFP. AFP regularly spends more than $3,000 per year engaging in issue advocacy that

---

[11]   *Available at* https://www.nj.com/politics/2019/06/murphy-says-top-democrat-is-wrong-about-deal-that-just-avoided-veto-override-of-dark-money-bill.html.
[12]    *Available at* http://d31hzlhk6di2h5.cloudfront.net/20190617/d5/6c/b5/d7/94c04a9f14b0b88b6254ca19/S150.pdf.

triggers disclosure.    AFP has a New Jersey chapter that regularly engages in issue advocacy, including on state policies that enjoy widespread, bipartisan support. Declaration of Erica Jedynak ("Jedynak Decl.") ¶¶ 3–4.    By way of example, AFP's New Jersey chapter advocated for the Dignity for Incarcerated Primary Caretaker Parents Act, which sought to end New Jersey's practice of shackling incarcerated pregnant women while in labor.    Jedynak Decl. ¶¶ 5–6.    Such advocacy could be characterized as "attempting to influence" proposed legislation under S150; at the very least, it constitutes a public communication that contains "facts" and "reflects [AFP's] opinion" concerning the bill.    *See* N.J.S.A. 19:44A-3(h), (t).    The same holds true for AFP's advocacy related to New Jersey pension reform.    Jedynak Decl. ¶ 10.

The New Jersey chapter also publishes a "NJ Taxpayer Scorecard" tracking legislators' voting records on key issues ranging from criminal justice reform to occupational licensing.    Jedynak Decl. ¶ 14.    Although the report focuses squarely on the issues, the scorecard conveys facts and opinions, and it could conceivably be characterized as influencing the electoral chances of each and every legislator mentioned therein.    AFP's New Jersey chapter has not, however, engaged in traditional electioneering communications that advocate for or against any particular candidate for office.    Jedynak Decl. ¶ 3; Declaration of Emily Seidel ("Seidel Decl.") ¶ 5.    Thus, AFP would be required to disclose its donors and expenditures

under the Act, even though it does not typically engage in "electioneering" activity in New Jersey as it would be defined under federal laws and the laws of other States.

Compelled disclosure will chill the associational activity of AFP and its donors, because they reasonably fear that threats, harassment, and reprisals will result from any disclosure of their donations.   AFP and its associates are by no means universally popular.   Indeed, "some individuals publicly associated with [AFP] have been subjected to threats, harassment or economic reprisals." *Americans for Prosperity Found. v. Becerra*, 903 F.3d 1000, 1015 (9th Cir. 2018). Among other things, AFP New Jersey's state director has received numerous death threats, and her husband was depicted as a Nazi in a video criticizing his purported connections to AFP.   Jedynak Decl. ¶ 20–23; Jedynak Decl., Ex. A.   Other AFP members have suffered cyberattacks, Ex. 1 at 60:9–19[13]; Ex. 2 at 29:19–30:16; Ex. 3 at 127:2–15; Ex. 4, bomb threats Ex. 1 at 73:1–5, 74:15–18; Ex. 5, and death threats against them and their families Ex. 2 at 31:3–14.   Knife-wielding protestors tore down a tent atop AFP activists at a rally in Michigan.   Ex. 6 at 50:16–52:7.   At an AFP event in Washington, D.C., other violent protestors sent an elderly attendee tumbling down the stairs.   Ex. 7 at 49:3–8; Ex. 8.   And in 2011, AFP members

---

[13]   "Ex." refers to the exhibits attached to the Declaration of Keith H. Forst.

discovered an online video game that enables players to murder AFP employees at its national headquarters.   Ex. 7 at 26:1–7; Ex. 9.

Accordingly, donors to AFP frequently—and understandably—insist that their personal information be kept private.   Declaration of Nicholas Dunn ("Dunn Decl.") ¶ 8; Seidel Decl. ¶ 10; Jedynak Decl. ¶ 17; Ex. 10 at 214:8–17.   And AFP zealously protects donor confidentiality.   Dunn Decl. ¶¶ 12–25; Seidel Decl. ¶¶ 17–20; Jedynak Decl. ¶ 18; Ex. 6 at 40:17–25.   Among other things, AFP restricts access to its highly-secure donor database to only those individuals who have a need to know that information.   Dunn Decl. ¶¶ 15–20; Seidel Decl. ¶ 18; Jedynak Decl. ¶ 18.   Some donors will refrain from giving to the extent doing so exposes them the risk of public disclosure.   Dunn Decl. ¶ 11; Seidel Decl. ¶ 21; Jedynak Decl. ¶ 27. Because public disclosure will discourage donations, it will drain donations and resources otherwise available to sustain AFP's continuing expression and activities—and may potentially result in AFP closing its New Jersey chapter.   Dunn Decl. ¶¶ 26–27; Seidel Decl. ¶¶ 21, 23–26; Jedynak Decl. ¶ 29.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must show:   "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

injunction is in the public interest." *Glossip v. Gross*, 135 S. Ct. 2726, 2736 (2015). (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

The Third Circuit employs a "balancing" approach, *see Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017), *as amended* (June 26, 2017), under which a plaintiff "must meet the threshold for the first two 'most critical' factors," *id.* at 179 (footnotes omitted). Upon such a showing, the Court "then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

Under the first factor, a plaintiff must merely "demonstrate that it can win," not make a "more-likely-than-not showing of success." *Id.* at 179 n.3. This requirement is further relaxed if the balance of harms favors plaintiff. *Id.* at 178.

The State bears the burden of showing that a challenged law withstands First Amendment scrutiny. "[T]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, et al.*, 546 U.S. 418, 429 (2006). Whereas "plaintiffs normally have the burden of demonstrating a sufficient likelihood of prevailing on the merits," *Reilly*, 858 F.3d at 180, that burden shifts in cases like this: "[I]n First Amendment cases where 'the [g]overnment bears the burden of proof on the ultimate question of [a statute's] constitutionality, [plaintiffs] must be deemed likely to prevail [when considering a

preliminary injunction] unless the Government has shown that'" the statute withstands scrutiny. *Id.* (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)).

## ARGUMENT

### I.   AFP Is Likely To Prevail On The Merits

The First Amendment protects the right to advocate anonymously, *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), and to associate privately, *see NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958). "The right to speak is often exercised most effectively by combining one's voice with the voices of others." *Rumsfeld v. FAIR*, 547 U.S. 47, 68 (2006) (citation omitted). The First Amendment therefore protects a "right to associate for the purpose of speaking," *id.*, and the Supreme Court has held unconstitutional laws "that require disclosure of membership lists for groups seeking anonymity." *Id.* at 69 (citation omitted). Such laws "ma[k]e group membership less attractive" and violate the First Amendment by "affecting the group's ability to express its message." *Id.*

"It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute an effective restraint on freedom of association." *Bates v. Little Rock*, 361 U.S. 516, 523 (1960) (brackets, ellipsis, & citation omitted). As "famously embodied in the Federalist Papers," there is a long and "respected tradition of anonymity in the advocacy of political causes" in this

country.   *McIntyre*, 514 U.S. at 343 & n.6.   For government to take the opposite approach by "[c]ompell[ing] disclosure of membership in an organization engaged in advocacy of particular beliefs" is akin to it "requir[ing] that adherents of particular religious faiths or political parties wear identifying arm-bands."   *NAACP*, 357 U.S. at 462 (citation & quotation marks omitted).   Nor is it less problematic to compel disclosure of an organization's *donors* as opposed to its *members*:   the Supreme Court has "not drawn fine lines between contributors and members," but instead "treated them interchangeably."   *Buckley v. Valeo*, 424 U.S. 1, 66 (1976).

Because forcing disclosure of donors imperils the freedom of association secured by the First Amendment (made applicable to the States by the Fourteenth Amendment), the Supreme Court applies "exacting scrutiny" to any such compulsion.   *Id.* at 64.   To satisfy this test, the State must show "a substantial relation between the disclosure requirement and a sufficiently important governmental interest."   *Doe v. Reed*, 561 U.S. 186, 196 (2010) (quoting *Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010)).   Additionally, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."   *Id.* (quoting *Davis v. FEC*, 554 U.S. 724, 744 (2008)).

The Supreme Court has identified a narrow set of circumstances where disclosure demands meet this standard:   electioneering—particularly around *candidates*—and direct lobbying.   *See, e.g.*, *Buckley*, 424 U.S. at 66–67; *United*

19

*States v. Harriss*, 347 U.S. 612, 625 (1954).   In the elections context, the Supreme Court has recognized that disclosures can further important government interests by informing the electorate about a candidate's interests more than "party labels and campaign speeches" alone could, protecting against corruption and the appearance thereof by publicizing large contributions to candidates that may be made for "improper purposes," and helping authorities police contribution limits.   *Buckley*, 424 U.S. at 67.   Similarly, requiring disclosures of direct lobbying can further the important government interest in enabling representatives "to properly evaluate" the "myriad pressures to which they are regularly subjected."   *Harriss*, 347 U.S. at 625.

S150 falls far outside those established bounds.   Indeed, it obliterates the line between campaign advocacy and issue advocacy that is embedded in First Amendment bedrock—then goes even further by regulating the provision of mere political ***information***.   As the Supreme Court has instructed, courts must "draw such a line" between campaign advocacy and issue advocacy, "because we have recognized that the interests held to justify the regulation of campaign speech and its 'functional equivalent' 'might not apply' to the regulation of issue advocacy." *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 457 (2007).   To be sure, New Jersey can properly require some measure of disclosure in the ***campaign advocacy*** context, as it already does, just as New Jersey can regulate ***lobbying***, as it already does.   But

S150 breaks new, unconstitutional ground by imposing the same onerous regulations upon pure *issue advocacy* and dissemination of mere *political information*.

The three ways in which S150 ensnares organizations—for providing political information, for influencing legislation and regulation, and for influencing candidate and public question elections—are all unconstitutional. The "political information" provision is effectively identical to provisions that were previously struck down by this Court as unconstitutional. *See ACLU of N.J. v. N.J. Election Law Enf't Comm'n*, 509 F. Supp. 1123, 1131–33 (D.N.J. 1981). The "influencing legislation" provision is effectively identical to an earlier New Jersey provision, the terms of which the New Jersey Supreme Court found so constitutionally offensive that it had to perform "judicial surgery" to salvage any shred of constitutional regulation. *See N.J. Chamber of Commerce v. N.J. Election Law Enf't Comm'n*, 411 A.2d 168, 177–80 (N.J. 1980). Finally, the "influencing elections" provision expands the meaning of campaign advocacy far beyond what the Supreme Court has indicated is constitutionally acceptable.

Notably, the Legislature was expressly warned of these constitutional defects yet did nothing to address them in threatening to override Governor Murphy's conditional veto, which correctly pointed out that the law as drafted was unconstitutional. While the Legislature (and eventually the Governor) blew through the constitutional stop sign, this Court should not. It rightly falls to the

Judiciary to curb unconstitutional acts by the elected branches.   Consistent with that duty, Plaintiffs respectfully urge the Court to enjoin preliminarily enforcement of S150, pending final adjudication on the merits.

### A.   The "Political Information" Provision Has Already Been Ruled Unconstitutional By This Court.

S150's political information provision is unconstitutional because it expressly sweeps in pure issue advocacy, and even mere dissemination of information.   The dragnet of governmental compulsion and regulation is being cast indiscriminately. The law requires no nexus to an election or to lobbying, nor does it limit the type of communication that triggers its coverage.   It is indifferent to what type of media is used, the size of the audience, or even if the communication is directed at New Jersey itself.   Indeed, it does not even require *advocacy* of *any* kind to trigger disclosure: its definition of "political information" includes any statement "which contains *facts*" concerning "any candidate or public question, legislation, or regulation." N.J.S.A. 19:44A-3(h), (t).   S150 thereby equates providing political information with engaging in electioneering by subjecting the former to the onerous regulation reserved for the latter.   As a result, any group that so much as informs members about pending legislation or regulations would be swept up by this provision.

This Court has already held that a nearly identical New Jersey provision violated the First Amendment.   In *ACLU of New Jersey v. New Jersey Election Law Enforcement Commission*, this Court struck down a disclosure requirement that

applied to "political information organizations."   509 F. Supp. at 1131–33.   The provision defining the relevant conduct was the same provision as under the current law (N.J.S.A. 19:44A-3(h)) and used nearly identical language.   Specifically, a group qualified as a "political information organization" subject to disclosure if it provided "political information," which the statute defined as:

> any statement . . . which reflect (sic) the opinion of the members of the organization on any candidate or candidates for public office, on any public question, or any legislation, or which contain (sic) facts on any such candidate, public question or legislation whether or not such facts are within the personal knowledge of members of the organization.

*ACLU*, 509 F. Supp. at 1131.

This Court held the law's sweep "plainly unconstitutional":   "The clear import of this language is that an organization which furnishes any information on public questions to the electorate must comply with the reporting and disclosure provisions of the Act.   Even if the section did not apply to the most neutral conveyances of information, such a requirement is plainly unconstitutional."   *Id.* And the Court pinpointed the precise problem S150 poses:

> The activities of groups like the ACLU and the League of Women Voters . . . are at the core of the First Amendment.   The bulk of these groups' activities is not aimed at the legislature but is intended to educate the public generally.   The interest of the state in the regulation of such speech is diminished, and any attempt to regulate speech which might inhibit the protected communications of ideas relating to political issues must be drawn quite carefully.   ***The broad language in the New Jersey statute, however, is susceptible to no narrowing reading which would obviate its constitutional problems.***

*Id.* at 1132–33 (emphasis added).

The Court's holding was supported by, *e.g.*, the D.C. Circuit's opinion in *Buckley v. Valeo*, which struck down the Federal Election Campaign Act ("FECA") in relevant part because it included reporting requirements for groups not engaged in express advocacy.   *Id.* at 1132 (citing *Buckley v. Valeo*, 519 F.2d 821, 869–78 (D.C. Cir. 1975)).   As this Court noted, that portion of the D.C. Circuit's holding in *Buckley* "was not appealed to the Supreme Court," *id.*, and remains good law today. Moreover, *ACLU*'s holding respects the line between issue advocacy and electioneering activity that has been repeatedly reinforced as necessary, *see, e.g.*, *Wisconsin Right To Life*, 551 U.S. 449, and aligns with cases recognizing the right to engage in anonymous issue advocacy, *see, e.g.*, *Talley v. California*, 362 U.S. 60 (1960), as categorically distinct from direct lobbying, *see Harriss,* 347 U.S. 612; *New Jersey Chamber of Commerce*, 411 A.2d 168.

In sum, the "political information" provision disregards the constitutional line cabining disclosure requirements to electioneering and resurrects the predecessor provision struck down by this Court in *ACLU*.   There is a high likelihood, therefore, that AFP will succeed in invalidating this provision on the merits.

### B. The "Influencing Legislation" Provision Is Unconstitutional.

S150's "influencing legislation and regulation" provision is likewise unconstitutional, because, yet again, the language sweeps so broadly that the purest

issue advocacy would trigger disclosure.   If an organization expresses its opinion (or just conveys facts) on a piece of legislation or a regulation, that expression could be characterized as "influencing or attempting to influence . . . the passage or defeat of any . . . legislation or regulation."   N.J.S.A. 19:44A-3(t).

On this score, too, precedent establishes that S150 is unconstitutional.   The New Jersey Supreme Court and the United States Supreme Court have both considered substantively equivalent disclosure requirements for influencing legislation and have both enforced the same constitutional line.   *See Harriss,* 347 U.S. 612; *N.J. Chamber of Commerce*, 411 A.2d 168.   At a minimum, the same protection extends to public expression in connection with *regulations*.

In *New Jersey Chamber of Commerce*, the New Jersey Supreme Court held that the statutory phrase "to influence the content, introduction, passage or defeat of legislation" covered only "activity which consists of *direct, express, and intentional communications with legislators* undertaken on a substantial basis by individuals acting jointly for the specific purpose of seeking to affect the introduction, passage, or defeat of, or to affect the content of legislative proposals."   411 A.2d. at 177, 179 (emphasis added).   The court recognized that "[t]he act would be overreaching if its terms were to be enforced literally and inflexibly."   *Id*. at 176.   "[T]he oppressive effect of the statute on virtually all individuals engaging in nonpartisan as well as political conduct would far exceed the outermost bounds of its legitimate

governmental purpose." *Id*.   To rescue the statute, the court had to engage in what it referred to as "judicial surgery," by dramatically narrowing the otherwise overbroad sweep of "influence." *Id*. at 179.   But the Legislature has now added the "influencing legislation" provision *back* to S150 even while the preexisting lobbying provision remains on the books.   N.J.S.A. 52:13C-18, *et seq*.

In *Harriss*, the U.S. Supreme Court held that the phrase "[t]o influence, directly or indirectly, the passage or defeat of any legislation" reached only "*direct communication with members of Congress*."   347 U.S. at 619, 623 (emphasis added).   This narrowing construction was required because any broader interpretation would raise "reasonable fears." *Id*. at 626.   Observing that "[t]he legislative history of the Act makes clear that, at the very least, Congress sought disclosure of such direct pressures," the Supreme Court found it "clear that Congress would have intended the Act to operate on this narrower basis." *Id*. at 620–21.

In sum, both the New Jersey and United States Supreme Court reached the same conclusion by the same means.   Each court held that the meaning of the phrase "influence . . . the passage or defeat of any . . . legislation" must be limited to direct communications with public officials, *i.e.*, direct lobbying.   To do so, each court engaged in what the New Jersey Supreme Court referred to as "judicial surgery" to limit the otherwise overbroad meaning of "influence" based on each court's understanding of the legislative intent.

Yet S150 by its terms disregards the constitutional line these cases draw:   it uses the same unconstitutional language that required "judicial surgery" before.   To the extent that S150 bids to change New Jersey's current law, as its terms indicate, it is doing so in precisely the way that courts have held constitutionally foreclosed. Nor is there any occasion for a federal court to rewrite a bill that New Jersey's Legislature enacted, with eyes wide open to the instant concerns, in order to transgress constitutional lines.   Alternatively, even if a judicial rewrite *were* appropriate (and it is not in federal court), a preliminary injunction should still be in place until the law can be rendered constitutionally compliant.

### C. The "Influencing Elections" Provision Is Unconstitutional Because It Regulates Communications Outside Any Election.

S150's "influencing elections" provision is also unconstitutional, because it regulates speech far beyond the confines of any election.   Although courts have recognized the facial validity of disclosure requirements attaching specifically to ***electioneering*** communications, S150 is overinclusive because it is ***not*** so limited. "A regulation of speech may be struck down on its face if its prohibitions are sufficiently overbroad—that is, if it reaches too much expression that is protected by the Constitution," such that "there is a likelihood that the statute's very existence will inhibit free expression' to a substantial extent."   *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 241 (3d Cir. 2010) (internal quotation omitted).

In particular, the Supreme Court draws lines between *campaign* and *issue* advocacy, recognizing that the government's regulatory interests differ. "In drawing that line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *Wis. Right To Life*, 551 U.S. at 457. "However weighty [a government's] interests may be in the context of partisan candidate elections," they may not be as weighty or apply at all outside that context. *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 787–88 (1978).

Where legislatures take care to draw a considered line, courts tend to respect it. *See McConnell v. FEC*, 540 U.S. 93, 189–92 (2003) (upholding definition of "electioneering communication" in in the Bipartisan Campaign Reform Act, or BCRA, as defined to include (1) "any broadcast, cable, or satellite communication" that (2) "refers to a clearly identified candidate for Federal office"; (3) is made within 60 days before a general election or 30 days before a primary election; and (4) "is targeted to the relevant electorate").

Where legislatures fail to draw such a line, however, courts step in to ensure regulation does not sweep beyond true electioneering. In *Buckley v. Valeo*, the Supreme Court construed the definition of expenditure "'for the purpose of . . . influencing' an election or nomination" in Section 434(e) of FECA, such that it "impose[d] independent reporting requirements on individuals and groups . . . only . . . when they make expenditures for communications that expressly advocate the

election or defeat of a clearly identified candidate."  424 U.S. at 79–80.  Express advocacy, in turn, was famously limited to "communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'"  *Id.* at 44 n.52, 80 n.108.  The Court adopted this construction in order to avoid "serious problems of vagueness, particularly treacherous where, as here, the violation of its terms carries criminal penalties and fear of incurring these sanctions may deter those who seek to exercise protected First Amendment rights."  *Id.* at 76–77; *see also Minn. Citizens Concerned for Life, Inc. v. Kelley*, 698 N.W.2d 424, 430 (Minn. 2005); *Va. Soc. for Human Life, Inc. v. Caldwell*, 500 S.E.2d 814, 817 (Va. 1998).

New Jersey seems determined to blow past any such line.   Despite nominally regulating speech that influences or attempts to influence elections, S150 has no limitation that is sensitive to whether the communication is, in fact, tied to an election.   The Act's disclosure requirement is not limited to communications that reference a clearly-identified candidate.   The Act does not limit its scope to the kinds of media most often used in electioneering, such as broadcast or cable.   The Act's disclosure requirements apply regardless of whether a communication is sent to only a handful of potential voters—or even to no New Jersey voters.   Perhaps most telling, unlike BCRA or other States' laws, the Act omits any temporal limitation in defining an IEC.   While S150 defines "electioneering

communication" as a communication "made within the period beginning on January 1 of an election year and the date of the election," N.J.S.A. 19:44A-3(u), that year-long period has nothing to do with whether IECs must disclose their donors.   Even if it did, New Jersey holds elections every year and the Act does not connect the "candidate" and the "election year"; that is, there is no requirement even that the covered "candidate" (which most every elected officeholder is in some sense) actually be running in the covered "election year."

In short, the provisions cover any reference to any officeholder or potential candidate, on any day, in any month, of any year.   This astonishing breadth differentiates this law from the Delaware law upheld in *Delaware Strong Families v. Attorney General of Delaware*, 793 F.3d 304 (3d Cir. 2015).   Under the Delaware law, any person who made aggregate expenditures for third-party advertisements in excess of $500 during an election period was required to file a "third-party advertisement report."   15 Del. C. § 8031(a).   A "third-party advertisement" was defined to include an "electioneering communication," *id.* § 8002(27), which required the communication "refer[] to a clearly identified candidate" and be distributed "within 30 days before a primary election . . . or 60 days before a general election to an audience that includes members of the electorate for the office sought." *Id.* § 8002(10)(a).   Thus, unlike S150, Delaware's "disclosure requirements are

similar in structure and language to those of the analogous federal law." *Del.*

*Strong Families*, 793 F.3d at 310.

Most importantly, the court held the voter guide at issue properly fell within

Delaware's definition of "electioneering communication," because it "mention[ed]

candidates by name close to an election," *i.e.*, within 60 days of the general election,

and was distributed to the electorate, "similar" to the definition of "electioneering

communication" upheld in *McConnell*.   *Id.* at 309.   Similarly, the types of media

covered—"television, radio, newspaper or other periodical, sign, Internet, mail or

telephone"—tracked the specific media associated with electioneering in Delaware.

*Id.* at 311.   No such limitations—pegged to timing, audience, medium, or anything

else—constrain the relevant provisions of S150.

Because the Act fails to draw lines designed to isolate upon election-related

speech, it sweeps in wide swathes of non-electioneering speech.   As such, AFP is

likely to prevail on the merits as to this provision, too.

### D. The Act Is Unconstitutionally Underinclusive Because It Limits Coverage To Only 501(c)(4) And 527 Organizations.

In addition to being fatally overinclusive by indiscriminately regulating

constitutionally protected speech, S150 is also fatally *under*inclusive because it

applies only to 501(c)(4) and 527 organizations.   There is no principled reason to

require the disclosure of donors to a 501(c)(4) or 527 organization, but not to other

organizations, including (to name one other type) unions organized under 501(c)(5).

A law is underinclusive if its reach is too short, regulating some activities while failing to cover others that are necessary to further the government's interest.   *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). This "analysis serves to 'ensure that the proffered state interest actually underlies the law.'"   *Mariani v. United States*, 212 F.3d 761, 773–74 (3d Cir. 2000) (quoting *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 677 (1990) (Brennan, J., concurring)).   Courts will invalidate a law whose "underinclusion is substantial [and] not inconsequential."   *Church of the Lukumi Babalu Aye*, 508 U.S. at 543; *see also FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 385–85, 396–98 (1984).

S150 is likewise underinclusive because it regulates only 501(c)(4)s and 527s, but not myriad other groups that may engage in the very same types of communications.   Other groups, including unions (501(c)(5)s), obviously spend vast amounts on elections.   Indeed, the Governor identified this exact problem in the Conditional Veto, only to have it go unaddressed.   Conditional Veto at 6.

There is no reason why the definition of IEC should, from a "good government" perspective, be gerrymandered as it is to exempt **certain** corporate electioneering.   The gerrymandering here is all the more glaring considering that preexisting New Jersey campaign finance law broadly defines "political committees" and "continuing political committees" to include "**any** two or more persons acting jointly, or **any** corporation, partnership, or **any** other incorporated or

unincorporated association" that engages in specified activities.    N.J.S.A. 19:44A-3(i), (n) (emphasis added).    Notably, 501(c)(6) organizations were included in predecessor bill S1500's coverage before being stripped out at the last minute.    *See* Statement to S1500, 218th Leg. (as reported by the New Jersey Senate on March 25, 2019). [14]    The only explanation for why 501(c)(4)s are included, while other organizations are not, is that the Governor's former campaign manager runs a 501(c)(4).

This underinclusiveness and lack of fit between the law's chosen means and avowed ends is proof positive that it cannot satisfy exacting scrutiny.    For this reason, too, AFP is likely to prevail on the merits.

### E.  The Act Is Unconstitutional As Applied To AFP.

Even apart from its facial shortcomings, the Act is invalid as applied to AFP given the demonstrated reality that AFP's donors face threats, harassment, and reprisals if their names are publicly disclosed.    Where "compelled disclosure" of a plaintiff's membership "may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure," the State must put forward a "compelling" interest in disclosure.    *NAACP*, 357 U.S. at 462–63. Such a chill is shown where there is "a reasonable probability that the compelled

---

[14]    *Available at* https://www.njleg.state.nj.us/2018/Bills/S1500/1500_S5.PDF/.

disclosure [of personal information] will subject [the donors] to threats, harassment, or reprisals from either Government officials or private parties." *Buckley*, 424 U.S. at 74.    Here, in light of the serious harms facing AFP's donors should their identities be disclosed, the strength of New Jersey's purported interests does not "'reflect the seriousness of the actual burden on First Amendment rights.'"    *Reed*, 561 U.S. at 196 (quoting *Davis*, 554 U.S. at 744).

Unlike the challengers in cases such as *Buckley*, *McConnell*, *Reed*, and *Citizens United*, AFP has amply demonstrated the real specter of threats and harassment against its members and donors.    AFP's opponents regularly strive to identify the organization's donors in order to threaten, attack and intimidate those who support organizations like AFP.    Dunn Decl. ¶ 13; Ex. 6 at 69:17–25.    If outed publicly, donors face boycotts, character assassinations, and threats.    Ex. 1 at 63:3–17; Ex. 6 at 42:25–43:22.

These threats can be disturbing and extreme.    The New Jersey chapter's former director, Erica Jedynak, received numerous harassing messages, and her husband has even received death threats.    Jedynak Decl. ¶ 20–22.    Indeed, the FBI has investigated (and deemed credible) numerous unhinged death threats against AFP's associates and even a threatened terroristic attack.    Ex. 2 at 30:17–31:24; *see also* Ex. 1 at 73:1–74:2.    Charles and David Koch themselves have received numerous death threats leveled against them and their families, including their

grandchildren.    Ex. 2 at 31:3–10.    AFP has suffered a cyberattack, Ex. 1 at 60:9–

19; Ex. 2 29:19–30:16; Ex. 3 at 127:2–15; Ex. 4, received a bomb threat, Ex. 1 at

73:1–5, 74:15–18; Ex. 5, and discovered a fire bomb outside a field office, Ex. 11 at

100:22–24.

AFP has likewise suffered appalling attacks on the Internet.    In 2018, former

New Jersey director Erica Jedynak's husband was depicted as a Nazi in an online

video denouncing his connections to AFP.    Jedynak Decl. ¶ 23; Jedynak Decl., Ex.

A.    In September 2011, AFP personnel discovered an online first-person shooter

video game that encouraged players to murder AFP employees inside the national

offices.    Ex. 7 at 26:1–7; Ex. 9.

Beyond threats, AFP faces violent protests.    At one gathering in Washington,

D.C., protestors tried to shove their way inside, blocked attendees from exiting, and

even knocked an elderly attendee down the stairs.    Ex. 7 at 47:7–15, 49:3–8.    At

an outdoor event in Lansing, Michigan, protestors wielding knives rushed AFP's

gathering and tore down a tent on top of several activists.    Ex. 6 at 50:16–52:7,

56:7–12.    In light of these events, AFP's donors reasonably fear violence and

harassment if their identities are publicly disclosed.    Dunn Decl. ¶¶ 9–10; Ex. 12 at

48:15–49:20; Ex. 6 at 69:17–25.

Lest there be any doubt, in *Americans for Prosperity Foundation v. Harris*,

182 F. Supp. 3d 1049 (C.D. Cal 2016), *rev'd and vacated sub nom. Americans for*

*Prosperity Found. v. Becerra*, 903 F.3d 1000 (9th Cir. 2018), the Central District of California held, after a multi-day trial, that it had heard "ample evidence establishing that AFP, its employees, supporters and donors face public threats, harassment, intimidation, and retaliation once their support for and affiliation with the organization becomes publicly known."   *Id.* at 1055.   Accordingly, the court ordered a permanent injunction forbidding even collection of donor information from AFP's 501(c)(3) sister organization, the AFP Foundation.   *Id.* at 1059.

Although the Ninth Circuit reversed the judgment, it did not disturb the finding that the Foundation's donors would face threats and harassment once disclosed.   *See Americans for Prosperity Found.*, 903 F.3d at 1015 ("The Foundation's evidence undeniably shows that some individuals publicly associated with the Foundation have been subjected to threats, harassment or economic reprisals."); *see also Americans for Prosperity Found. v. Becerra*, 919 F.3d 1177, 1178 (9th Cir. 2019) (Ikuta, J., dissenting from the denial of rehearing *en banc*).

Rather, the Ninth Circuit determined that there was no significant risk that the donors' identities would be disclosed in the first place.   *Americans for Prosperity Found.*, 903 F.3d at 1017.   Importantly, the Ninth Circuit had previously entered a *preliminary* injunction preventing the California Attorney General from publicly releasing the Foundation's donor information, given the threat donors would face. *Americans for Prosperity Found. v. Harris*, 809 F.3d 536, 543 (9th Cir. 2015).

Whatever the merits of the Ninth Circuit's latest decision (which will be the subject of a forthcoming petition for certiorari, *see* Order Granting Application to Extend Time to File Petition for a Writ of Certiorari, *Americans for Prosperity Found. v. Becerra*, 903 F.3d 1000 (9th Cir. 2018) (Nos. 16-55727 & 16-55786), ECF No. 139), the prospect of disclosure is a ***certainty*** here:   the whole purpose of the law is to publicize the information submitted to ELEC by posting it to an online database.   Weighed against these serious and documented threats, New Jersey's purported interest in publicizing donor information cannot win the day.   "[W]hen speakers are faced with a reasonable probability of harassment or intimidation, the State no longer has *any* interest in enabling the public to locate and contact supporters of a particular measure—for in that instance, disclosure becomes a means of facilitating harassment that impermissibly chills the exercise of First Amendment rights."   *Reed*, 561 U.S. at 208 (Alito, J., concurring).

## II.   Irreparable Harm Will Result Absent An Injunction.

The "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"   *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).   Accordingly, "injunctive relief [is] 'clearly appropriate' where 'First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought.'"   *Stilp v. Contino*, 613 F.3d 405,

409 n.4 (3d Cir. 2010) (quoting *Elrod*, 427 U.S. at 373).   First Amendment interests are threatened by disclosure that has a "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association."   *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 557 (1963); *see also Salvation Army v. Dep't of Cmty. Affairs of State of N.J.*, 919 F.2d 183, 201 (3d Cir. 1990) ("[F]orced disclosure may chill individuals from associating with a group engaged in expression protected by the First Amendment.").

The Act thus poses irreparable harm.   On pain of criminal penalty, *see* N.J.S.A. 19:44A-21(b), it requires AFP to disclose top donors, thereby "seriously infring[ing] . . . the First Amendment."   *Buckley*, 424 U.S. at 64.   Moreover, once donor information is publicized by ELEC, *see* N.J.A.C. 19:25-2.4(a), it cannot be clawed back, *see Hollingsworth v. Perry*, 558 U.S. 183, 195–96 (2010); *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, J., in chambers).

## III.   The Equities Tip Sharply For AFP.

Where First Amendment rights are at stake, the "balance of equities" "tip[s] sharply in favor of" enjoining the offending governmental action.   *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).   The Act's disclosure requirements threaten to chill the associational rights of AFP's donors and in turn to deprive AFP of its "lifeblood."   Seidel Decl. ¶ 9.   Still worse, the disclosure New Jersey demands would destroy the anonymity of AFP's donors ***throughout the***

*United States*, without regard for the protections in place in other States—after which there would be no clawing donor identities back from the public domain. The status quo should be preserved while important constitutional questions are adjudicated.

In contrast to the risk of irreparable injury looming over AFP and its donors, New Jersey faces no appreciable harm from an injunction.   The legislative record reveals no pressing need for 501(c)(4) donor information.   Indeed, the disclosures at issue have never been sought previously by New Jersey, which apparently has never perceived harm from their absence.   To the extent New Jersey might nonetheless argue that some "significant interest" hangs in the balance, "a preliminary injunction leaves the [state] free to attempt to draft new regulations that are better tailored to serve those interests."   *Swartzwelder v. McNeilly*, 297 F.3d 228, 242 (3d Cir. 2002).   Moreover, "[o]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties."   *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 729 (3d Cir. 2004).   By granting a preliminary injunction, this Court would maintain the state of affairs that existed for decades prior to the Act's passage.

## IV.   An Injunction Serves The Public Interest.

Injunctive relief here promotes the public interest "because the enforcement of an unconstitutional law vindicates no public interest."   *Ayers*, 710 F.3d at 114;

*see also ACLU v. Ashcroft,* 322 F.3d 240, 251 n.11 (3d Cir. 2003), *aff'd and remanded,* 542 U.S. 656 (2004) ("[N]either the Government nor the public [have] an interest in enforc[ing] an unconstitutional law.") (citation & quotation marks omitted).

A preliminary injunction would serve the public interest in yet another respect. Because the threatened disclosure is nationwide in scope and donor information can never thereafter be clawed back, New Jersey's unprecedented demand would supersede and moot decisions that are being made by governments and courts around the country.   The public interest is served by having important legal issues decided by courts, precisely as the requested preliminary relief will permit.   *See United States v. Mendoza*, 464 U.S. 154, 160 (1984) ("Government litigation frequently involves legal questions of substantial public importance" and "the development of important questions of law" should not be "thwart[ed]").

## CONCLUSION

For the foregoing reasons, Plaintiff Americans for Prosperity respectfully requests that the Court grant a preliminary injunction prohibiting Defendants from enforcing the Act's disclosure requirements pending final resolution of the merits.

Dated:   June 25, 2019

Respectfully submitted,

MARINO, TORTORELLA & BOYLE, P.C.

/s/ Kevin H. Marino
Kevin H. Marino
John A. Boyle
437 Southern Boulevard
Chatham, New Jersey 07928
(973) 824-9300

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Derek L. Shaffer*
William A. Burck*
Keith H. Forst*
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000

Attorneys for Plaintiff
Americans for Prosperity

_____

* Pro hac vice applications to be submitted.