# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **AMERICANS FOR PROSPERITY**, | |
| Plaintiff, | Civil Action No. 3:19-cv-14228 |
| v. | ECF Case |
| **GURBIR GREWAL**, in his official capacity as Attorney General of New Jersey, **ERIC H. JASO**, in his official capacity as Chairperson of the New Jersey Election Law Enforcement Commission, **STEPHEN M. HOLDEN**, in his official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, and **MARGUERITE T. SIMON**, in her official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, | Return Date: August 5, 2019<br><br>**<u>Oral Argument Requested</u>**<br><br>Document Electronically filed. |
| Defendants. | |

# DECLARATION OF KEITH H. FORST

I, Keith H. Forst, declare as follows:

1.     I am a partner of the law firm of Quinn Emanuel Urquhart & Sullivan, LLP, attorneys for Americans for Prosperity ("AFP" or "Plaintiff") in the above-captioned matter.

2.      I respectfully submit this declaration in support of Plaintiff's Motion For a Preliminary Injunction, and to transmit to the Court true and correct copies, to the best of my knowledge, of the documents described below and annexed hereto.

3.      Unless otherwise specified, I have personal knowledge of the facts set forth in this declaration, and, if called upon as a witness, I could and would testify to such facts under oath.  I am familiar with the matters set forth in this declaration based on my personal knowledge and/or a review of the files in the possession of my firm.

4.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the trial testimony of Christopher Fink in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.), dated February 23, 2016.

5.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the trial testimony of Mark Holden in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.), dated February 23, 2016

6.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the deposition of Tim Phillips in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.), dated December 22, 2015.

7.      Attached hereto as Exhibit 4 is a true and correct copy of an email from Tracy Henke dated March 7, 2011, submitted as trial exhibit TX347 in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.).

8.     Attached hereto as Exhibit 5 is a true and correct copy of an email from Tracy Henke dated August 22, 2011, submitted as trial exhibit TX306 in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.).

9.     Attached hereto as Exhibit 6 is a true and correct copy of excerpts from the trial testimony of Lucas Hilgemann in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.), dated February 23, 2016.

10.     Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the trial testimony of James Arthur Pope in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.), dated February 24, 2016.

11.     Attached hereto as Exhibit 8 is a true and correct copy of a screenshot of a YouTube video titled "Occupy DC Pushes Grandma Down Stairs," posted on November 5, 2011, submitted as trial exhibit TX684 in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.).

12.     Attached hereto as Exhibit 9 is a true and correct copy of a screenshot of a YouTube video titled "Tea party Zombies Must Die game is Propaganda!" posted on September 7, 2011, submitted as trial exhibit TX378 in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.).

13.     Attached hereto as Exhibit 10 is a true and correct copy of excerpts from the deposition of Christopher Fink in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.), dated November 13, 2015.

14.     Attached hereto as Exhibit 11 is a true and correct copy of excerpts from the trial testimony of Teresa Oelke in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.), dated February 23, 2016.

15.     Attached hereto as Exhibit 12 is a true and correct copy of excerpts from the trial testimony of Paul Schervish in *Americans for Prosperity Foundation v. Harris*, Case No. 14 Civ. 09448 (C.D. Cal.), dated February 25, 2016.

\*     \*     \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on ___6/25___, 2019 in Washington, D.C.

Keith H. Forst

# Exhibit 1

1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE MANUEL L. REAL

4      UNITED STATES DISTRICT JUDGE PRESIDING

5

6   AMERICANS FOR PROSPERITY FOUNDATION,  )
                                         )
7                      Plaintiff,        )
                                         )
8        vs.                             )  CASE NO. CV 14-9448-R
                                         )
9   KAMALA HARRIS, in her Official       )      Volume I
    Capacity as Attorney General of the  )   (Pages 1 - 116)
10  State of California,                 )
                                         )
11                     Defendant.        )
    _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS
               JURY TRIAL - DAY ONE
15            LOS ANGELES, CALIFORNIA
             TUESDAY, FEBRUARY 23, 2016
16
                  1:08 P.M.
17

18

19

20

21

22   _____

23          CAROL ZURBORG, CSR, CCRR
          FEDERAL OFFICIAL COURT REPORTER
          312 NORTH SPRING STREET, ROOM 414
24         LOS ANGELES, CALIFORNIA 90012
                (213) 894-3539
25

1                    **APPEARANCES OF COUNSEL:**

2

**FOR THE PLAINTIFF:**

3

    QUINN EMANUEL URQUHART & SULLIVAN LLP
4       BY:  DEREK SHAFFER
        BY:  WILLIAM BURCK
5       BY:  ERIC C. LYTTLE
        BY:  KEITH H. FORST
6            Attorneys at Law
        777 Sixth Street NW, 11th Floor
7       Washington, D.C. 20001
        (202) 538-8000

8

9   **FOR THE DEFENDANT:**

10      STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
        OFFICE OF THE ATTORNEY GENERAL
11      BY:  ALEXANDRA ROBERT GORDON
        BY:  EMMANUELLE SARAH SOICHET
12      BY:  JOSE A. ZELIDON-ZEPEDA
             Attorneys at Law
13      455 Golden Gate Avenue, Suite 11000
        San Francisco, California 94102
14      (415) 703-5509

15

        STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
16      OFFICE OF THE ATTORNEY GENERAL
        BY:  KEVIN A. CALIA
17           Attorney at Law
        1300 I Street
18      Sacramento, California 95814
        (916) 322-6114

19

20  **ALSO PRESENT:**

21      SCOTT DUVAL
        EMILY GARGUILO

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1   Being Program.  We have been working with inner-city
 2   communities, trying to get people to understand that there are
 3   free-market solutions that could help better their lives.  And
 4   then a lot of times it's big government that's part of the
 5   problem in the first place.
 6        And there was some politically charged articles about
 7   that.  They weren't very happy with our efforts, and
 8   essentially accused Americans for Prosperity of trying to win
 9   the minority vote.  So one, it was foundation events that
10   doesn't do any political activity, but again, the articles just
11   mix and match Americans for Prosperity and the foundation.  If
12   you look at some of the protests and the chants at our events,
13   they don't necessarily recognize it's a foundation event, where
14   Americans for Prosperity, they generally just refer to us as
15   Americans for Prosperity.
16   Q    Now, Mr. Fink, in your time at the foundation, have you
17   ever encountered efforts from individuals or entities outside
18   of the foundation to identify perceived supporters of the
19   foundation that would otherwise be anonymous?
20   A    Absolutely.  I mean, just going back in the time order of
21   my mind, just earlier this year at an event in California we
22   had people outside of the event, outside of the resort with
23   cameras essentially trying to take pictures of individuals and
24   license plates to try to identify perceived supporters leaving
25   the events.
```

1    We have had people bring audio-recording devices into

2  different events to record talks or speeches, trying to get

3  access to donors' names.  We have people scouring our events.

4  When we are trying to raise money we generally try to -- we

5  actually try to buy out the hotel in a lot of places or buy out

6  the area where this is happening, but we have had situations

7  where people have scoured our conference rooms and found

8  documents.

9    We have had attacks on our databases from outside groups.

10  We had an attack from a group called Anonymous that tried to

11  get access to our database and discovered in that way.

12  Q    And just -- we have had some testimony about Anonymous and

13  what hactivists tried to do.  Mr. Fink, just for clarity of the

14  record, what are you referring to when you talk about trying to

15  access the database?  What is your understanding around that?

16  A    So my understanding from our security team was that they

17  were able to shut our website down for a number of hours, but

18  that they also tried to gain access to our database and were

19  unsuccessful.

20  Q    And what would be inside that database?

21  A    The lists of our donors and contributions and their

22  contact information and details about the relationship between

23  them and the foundation and Americans for Prosperity.

24  Q    Any other efforts to penetrate foundation or AFP events or

25  the events of related entities in order to identify people who

1   are there or what was said or what occurred at those events?

2   A     Yeah.  You asked about the interests, I mean, so part of

3   the interest, too, is we have seen from the President of the

4   United States going around the country asking about who are our

5   donors and essentially calling out, "We don't know who the

6   supporters for Americans for Prosperity are."  You also saw

7   Harry Reid on the senate floor doing very similar things in

8   terms of our events.  We have had to do pretty crazy things to

9   try to prevent it.

10        One situation when we are outside, we have actually got

11  white noise machines surrounding our outside areas.  We have

12  had people trying to listen in from listening devices from a

13  distance to gain access to our supporters there as well.

14  Q     And if I could ask you to turn to what's I believe already

15  been admitted into evidence, Exhibit 503.  Should be the first

16  one in the binder in front of you.

17  A     Okay.

18  Q     Mr. Fink, do you recognize this article?

19  A     I do.

20  Q     Is it correct, it is an article that appeared in Mother

21  Jones in February of 2013?

22  A     That's correct.

23  Q     And please, if you could summarize for the Court, what

24  your understanding is of what the article's reporting.

25  A     Yeah.  The article is reporting on a document that was

```
 1   discovered after one of our events that listed information

 2   about our perceived donors and staff at Americans for

 3   Prosperity Foundation, Americans for Prosperity, Freedom

 4   Partners and some other like-minded organizations.

 5   Q    Were you able to ascertain how Mother Jones obtained the

 6   materials in question?

 7   A    Yeah.  I believe they actually state they found the

 8   document in the conference room or one of the conference rooms

 9   at the resort.

10   Q    And I would ask you, please, to turn to what's also been

11   admitted into evidence as Exhibit 59.

12   A    Okay.

13   Q    Have you seen this document before?

14   A    I have.

15   Q    Could you please tell us what this document is.

16   A    Yes, this was a meeting schedule for the Palm Springs

17   event.

18   Q    And do you appear anywhere in this document?

19   A    I do.

20   Q    Is that towards the middle of the page?

21   A    I see it --

22              THE COURT:  Six down.

23              MR. SHAFFER:  His Honor is correct.

24              THE WITNESS:  That's correct.

25   BY MR. SHAFFER:
```

1   Q    And, Mr. Fink, were you present at this event?

2   A    Yes.

3   Q    Now, as you look at this list, do you see any individuals

4   who subsequently reported that they suffered negative

5   repercussions as a result of having been associated on this

6   list and in the Mother Jones article?

7   A    Yes.

8   Q    Is that one or a couple of individuals?  How many, sir?

9   A    I would say six.

10  Q    And what sort of negative repercussions did they report?

11  A    We had reports anywhere from their businesses being

12  audited or investigated to articles that were posted in local

13  newspapers, essentially character assassinations for the

14  individuals, calling for boycotts on their businesses, things

15  of that nature.

16  Q    What, if anything, did the foundation and AFP and any

17  affiliated entities do in the aftermath of this episode?

18  A    So the first thing we did was members of the Freedom

19  Partners fundraising team contacted everyone on this list and

20  let them know their information had been exposed.  They let

21  them know we take this very seriously.  It is obviously part of

22  our donor pitch that we were going to guard your

23  confidentiality.  After that, it was mainly working with the

24  supporters, alleviate the best we could the risks or future

25  risks.

1   Q     And how do you do that?

2   A     I mean, essentially you can tell them about more

3   precautions you are going to take to help better safeguard.  So

4   if, for example, we used to have recording devices or cell

5   phones in our conference rooms, now we make all our prospects

6   and supporters and staff check their cell phones at the door

7   prior to going in.  So we have actual checking stations for

8   phones.

9        We generally don't have any printed copies.  If there are

10  any scheduling, the scheduling is done on an individual basis

11  so that information is much smaller kept, but generally you

12  won't find any more printed materials floating around our

13  events.

14       We can also talk about security with databases and that

15  sort of thing.  Essentially we try to assure them that

16  obviously this is unfortunate, there is nothing we can do to

17  undo the harm that's already occurred, but we can try to

18  prevent in the future.

19  Q     Talking about donors and your pitches to donors, at your

20  time at the foundation how many donors or potential donors

21  would you estimated you interacted with personally one on one?

22  A     Hundreds and hundreds of them.

23  Q     And give us a sense, please, of what your initial

24  interaction with a potential donor would consist of.

25  A     Sure.  So generally when I meet with a prospect, the first

1   five or ten minutes are spent on pleasantries, just getting to

2   know the person.  After that I generally ask them questions

3   about their business, about their philanthropy giving, where

4   else they support, what are their goals, what are they trying

5   to accomplish with their giving, just trying to get a better

6   feel for what they are trying to accomplish with their donor

7   dollars.

8        After that I then try to tailor my pitch for Americans for

9   Prosperity and Americans for Prosperity Foundation to match up

10  with the goals they are trying to accomplish to the extent they

11  do match up.

12       After I give the pitch or the presentation, I then

13  generally ask if they have any questions, concerns, you have

14  comments.  My basic goal is to make sure if there are any

15  objections or any concerns, that we alleviate that before I ask

16  them to go partner with us.  So hopefully I overcome any

17  objections or alleviate any concerns.  I then ask them to

18  consider partnering with us at a significant level.

19  Q    When it comes to you soliciting any questions or concerns

20  from prospective donors, is there one that occurs more

21  frequently than any other?

22  A    Yes.

23  Q    And what is that, sir?

24            MR. CALIA:  Objection; hearsay.

25            THE COURT:  The objection is overruled.  Not for the

1  truth of it, but what he heard.

2          THE WITNESS:  So generally, the number one concern

3  is about being disclosed, about their information or their

4  identity, in connection with Americans for Prosperity, the

5  information being exposed.

6  BY MR. SHAFFER:

7  Q    What are they conveying to you about why they fear

8  disclosure?

9  A    You know, it's different, circumstances are different.

10  There's a few common themes.  Generally it's they are afraid to

11  have their information in the hands of state government or a

12  federal government or in the hands of the public.

13          So I will give you an example on the state side.  I have

14  met with some business owners or small business owners, many

15  who have said that they contribute to both Republicans and

16  Democrats equally, and they try to keep their head down.  They

17  are afraid if they are associated with our foundation or

18  Americans for Prosperity, their businesses would be targeted or

19  audited from the state government.

20          We also have people that are concerned about the federal

21  government, especially with the IRS, recent leaks or scandals

22  that happened there, that has come up more and more.  And then

23  also people are concerned about their information getting out

24  in the public, that they are supporters for Americans for

25  Prosperity and Americans for Prosperity Foundation as well.

1  Q    Why do they indicate they fear their information becoming

2  public?

3          MR. CALIA:  Objection; hearsay.  This is a statement

4  of belief by the declarant.

5          THE COURT:  The objection is overruled.

6          THE WITNESS:  So I think they believe and they have

7  seen other perceived reporters be attacked.  They have seen

8  what happened to Charles and David Koch.  They have seen what

9  happened to other supporters, the threats on their life and

10 safety, and they just don't want that for their family or their

11 business.

12 BY MR. SHAFFER:

13 Q    Would you say you have been hearing more or less of this

14 concern, the concern of governmental or public disclosure, in

15 recent years?

16 A    More.

17 Q    Is there a particular point in time when you noticed the

18 concerns spiking?

19 A    Yes.  I think the IRS scandal was a big uptake at that

20 point.  They also -- I remember when the CEO of Mozilla Firefox

21 was forced to resign after it became clear or the information

22 was leaked that he had made a contribution towards an issue he

23 cared about but that was unpopular in the state of California.

24     But I think as the political runner has gotten louder and

25 louder, people have become more and more sensitive to that and

1    more and more concerned about being identified as a supporter

2    of our foundation or Americans for Prosperity.

3    Q    When actual or potential donors expressed to you their

4    concerns about potential disclosure, how do you respond?

5    A    I mean, I generally respond by explaining all the

6    different measures we take to protect their identity.  I talk

7    about, you know, our database and how we keep that information

8    confidential.  I talk about how we don't share our donor

9    information with anyone that we are not legally obligated to.

10          And so generally I walk through some of those measures

11   depending on how much level of detail they want to get into.  I

12   try to read a little bit of their body language, if I am at all

13   easing their discomfort.

14          And after I kind of walk through our security measures, I

15   also try to give them a little bit of a rah-rah speech.  This

16   is obviously critical, and there is a reason we are being

17   targeted, and it's because we are effective, and I try to get

18   them a little bit inspired to help them overcome that anxiety

19   or fear as well.

20   Q    Does that rah-rah speech always work?

21   A    No.

22   Q    Now, you mentioned what you do to protect your database.

23   Could you explain what, if anything, the foundation or AFP does

24   in order to protect the database that would contain donor

25   information?

1   A     Sure.  So we've moved to a database called Sales Force,

2   and part of the reason we moved to Sales Force is it allows you

3   to have different levels of security so essentially people can

4   have different levels of access.  And what we've done from the

5   database side, we have about 750 staff, and we have limited

6   access to our supporters to roughly 20, mainly on the

7   development team.

8        And then in other cases where people need access, what we

9   are able to do is only give them access to certain components

10  of the database.  So, for example, I believe there's only one

11  state director out of our 35 states that has access to Sales

12  Force, and they only have access because they are very much

13  involved in the donation process and raising money, and they

14  have access to their particular supporters in their state.  So

15  if anything were to happen, they couldn't get access or

16  potentially leak other documents.  We also tend to not present

17  or share those lists.

18  Q     Do you tend to have in your possession a list of the

19  foundation or AFP's major donors?

20  A     No.

21  Q     I think you said that there are 20 people who have access

22  to the Sales Force database.  That's 20 out of how many

23  full-time employees of the foundation and AFP?

24  A     We have roughly 735 to 750 employees.

25  Q     I'm sorry to switch gears back, but when you talk about

1    donors' concerns and what they indicate to you about their fear

2    of what government officials might do in particular, are there

3    any particular government officials at the state level whom

4    donors expressed concerns about?

5              MR. CALIA:  Objection; hearsay.

6              THE COURT:  The objection is sustained.

7    BY MR. SHAFFER:

8    Q    And have you had any communications with actual or

9    potential donors about this lawsuit and the issues it raises?

10   A    I have had some, yes.

11   Q    And what do those communications tend to consist of?

12   A    Mostly it was at a donor prospect conference earlier this

13   year where people were aware of the case.  They were asking how

14   it was going.  They were concerned about the repercussions of

15   this case, wanted to know what my thoughts were.

16   Q    Can I ask you, please, to turn further in the binder, just

17   for identification purposes, I would mark Exhibit 335.

18             THE COURTROOM DEPUTY:  335 is identified and placed

19   before the witness.

20        (Exhibit 335 for identification.)

21             THE WITNESS:  Okay.  Got it.

22   BY MR. SHAFFER:

23   Q    Do you see at the top there is an e-mail from Robert

24   Heaton to Clay Gordon, dated July 15th, 2015?

25   A    Yes.

1    Q     Who is Robert Heaton?

2    A     Robert Heaton is our CFO.

3    Q     And to whom -- do you interact with Mr. Heaton?

4    A     Yes.  Mr. Heaton reports to me.

5    Q     And do you understand what Mr. Heaton was reporting in

6    this particular e-mail thread?

7    A     Yes.

8    Q     What was -- what's your summary of that, please?

9    A     Yeah, so Clay's one of our -- Clay Gordon, who the e-mail

10   is from, is one of our junior fundraisers, was asking Robert

11   Heaton on behalf of a donor essentially how they could avoid

12   being disclosed to the IRS or what those levels were they could

13   give under that would not put them on our 990s, Schedule Bs.

14   Q     Did you have an understanding as to why that donor wanted

15   to avoid being on the Schedule B?

16   A     I mean, yeah, based on the e-mail and based on the

17   conversations, they were worried about being targeted.

18           MR. SHAFFER:  Your Honor, we would respectfully move

19   into evidence Exhibit 335.

20           MR. CALIA:  We have no objection.

21           THE COURT:  335 in evidence.

22         (Exhibit 335 received.)

23   BY MR. SHAFFER:

24   Q     Can you tell us, please, Mr. Fink, what exactly, as COO,

25   is your involvement with the security issues?  I think you

**UNITED STATES DISTRICT COURT**

1   indicated you have responsibility for security.  Could you just

2   explain what that is?

3   A    Sure.  Currently our security team works for Freedom

4   Partners.  They report up through my chief operating officer.

5   And generally, it just depends.  So before major donor events,

6   I sit down with the security team.  They brief me on the

7   perceived threats.  They walk through past threats and what

8   steps we're taking to alleviate that.

9        They will go through permits and let us know about

10  potential protests or what they believe to be potential

11  significant risks in those different areas.  They also alert us

12  on a fairly regular basis to threats that they deem more likely

13  to be followed through on in terms of threats on the office,

14  threats on our staff, threats on our supporters, et cetera.

15  Q    And what sorts of measures does the foundation take when

16  it comes to security?

17  A    We take every measure possible.  So, for example, we've

18  got the elevators in our office building at the national office

19  have key cards, so you can't get up the elevator to our office

20  floor without key cards.  The doors all have the same key cards

21  that are there.  At our donor events we typically try to buy

22  out the entire hotels.  We have security staff that's spread

23  out across the whole grounds of the resorts, generally to try

24  to protect our people.  You know, we try to do what we can to

25  keep our people safe.

1   Q     What types of threats have you encountered over your --

2   over the course of your time at AFP and Americans for

3   Prosperity Foundation?

4   A     Sure.  A lot.  We have had things -- we have had a bomb

5   threat -- we have had a bomb threat at the national office.  We

6   have had fire-bombing at one of our state offices.  We have had

7   numerous threats via social media, e-mail, phone-in threats.

8         We have had someone who worked for an IT consultant who

9   our security team identified as being a potential threat on

10  social media or stating aggressive behavior about the

11  foundation, and then they located -- or they found out where he

12  was located.  He was actually located in our office.  We have

13  since moved to internal IT capabilities, not outside sources.

14        We have had employees threatened.  We have had stalkings.

15  We have had violent protests at our events.  We have had

16  employees' tires slashed.  At one point I remember we had feces

17  sent in by mail to our office.  So yeah, quite a bit.

18  Q     Do you mean that to be an exhaustive list what you just

19  recited?

20  A     No.  Those are just things off the top of my head.

21  Q     Do you or your security team maintain a record of the

22  threats that the foundation receives?

23  A     Yes, the security team does.

24  Q     And are those conveyed to you in some way?

25  A     Just generally I'm given reports or updates on what the

1    current status is or significant threats that are facing the

2    organization.

3    Q    May I ask you, please, to turn to what we will mark for

4    identification purposes as Exhibit 306.

5             THE COURTROOM DEPUTY:  Exhibit 306 is identified and

6    placed before the witness.

7        (Exhibit 306 for identification.)

8             THE WITNESS:  Okay.

9    BY MR. SHAFFER:

10   Q    Mr. Fink, do you see an e-mail here from Tracy Henke sent

11   on 8/22/2011?

12   A    Yes.

13   Q    Who is Ms. Henke?

14   A    She was our former chief operating officer.

15   Q    And do you know what Ms. Henke was reporting in this

16   e-mail?

17   A    Yes.  She was reporting on a bomb threat that was called

18   in to our office in Arlington.

19            MR. SHAFFER:  Your Honor, we would respectfully ask

20   to move Exhibit 306 into evidence.

21            MR. CALIA:  No objection.

22            THE COURT:  306 in evidence.

23       (Exhibit 306 received.)

24   BY MR. SHAFFER:

25   Q    Would you please turn, Mr. Fink, to what we will mark for

1   identification purposes as Exhibit 318.

2          THE COURTROOM DEPUTY:  318 is identified and placed

3   before the witness.

4          (Exhibit 318 for identification.)

5   BY MR. SHAFFER:

6   Q    Do you see in front of you, Mr. Fink, this exhibit which

7   reflects an e-mail from Eric Bott, dated June 25th, 2015?

8   A    Yes.

9   Q    Can you tell us, please -- maybe we should adjust the

10  language -- what you recall from this e-mail being reported?

11  A    Yes.  This was an e-mail back to one of our Wisconsin

12  staff, essentially a threat saying that they would be glad to

13  execute all of you.  We will just switch "people" in there for

14  the two words he used.

15         MR. SHAFFER:  We would respectfully ask to move into

16  evidence No. 318.

17         MR. CALIA:  No objection.

18         THE COURT:  318 in evidence.

19         (Exhibit 318 received.)

20  BY MR. SHAFFER:

21  Q    Could you turn, please, for identification purposes to

22  what we will mark as Exhibit Number 314.

23         THE COURTROOM DEPUTY:  314 is identified and placed

24  before the witness.

25         (Exhibit 314 for identification.)

# Exhibit 2

1              **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3            **HONORABLE MANUEL L. REAL**

4       **UNITED STATES DISTRICT JUDGE PRESIDING**

5

6  **AMERICANS FOR PROSPERITY FOUNDATION,**  )
                                      )

7                   **Plaintiff,**     )
                                      )

8      **vs.**                      )  **CASE NO. CV 14-9448-R**
                                      )

9  **KAMALA HARRIS, in her Official**     )      **Volume I**
    **Capacity as Attorney General of the**  )   **(Pages 1 - 116)**

10  **State of California,**             )
                                      )

11                  **Defendant.**    )
    _____)

12

13

14          **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
              **JURY TRIAL - DAY ONE**

15            **LOS ANGELES, CALIFORNIA**
           **TUESDAY, FEBRUARY 23, 2016**

16
                 **1:08 P.M.**

17

18

19

20

21

22     _____

23            **CAROL ZURBORG, CSR, CCRR**
         **FEDERAL OFFICIAL COURT REPORTER**
        **312 NORTH SPRING STREET, ROOM 414**

24        **LOS ANGELES, CALIFORNIA 90012**
             **(213) 894-3539**

25

1      **APPEARANCES OF COUNSEL:**

2

 **FOR THE PLAINTIFF:**

3

  QUINN EMANUEL URQUHART & SULLIVAN LLP
4  BY:  DEREK SHAFFER
  BY:  WILLIAM BURCK
5  BY:  ERIC C. LYTTLE
  BY:  KEITH H. FORST
6    Attorneys at Law
  777 Sixth Street NW, 11th Floor
7  Washington, D.C. 20001
  (202) 538-8000

8

9 **FOR THE DEFENDANT:**

10  STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
  OFFICE OF THE ATTORNEY GENERAL
11  BY:  ALEXANDRA ROBERT GORDON
  BY:  EMMANUELLE SARAH SOICHET
12  BY:  JOSE A. ZELIDON-ZEPEDA
    Attorneys at Law
13  455 Golden Gate Avenue, Suite 11000
  San Francisco, California 94102
14  (415) 703-5509

15

  STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
16  OFFICE OF THE ATTORNEY GENERAL
  BY:  KEVIN A. CALIA
17    Attorney at Law
  1300 I Street
18  Sacramento, California 95814
  (916) 322-6114

19

20 **ALSO PRESENT:**

21  SCOTT DUVAL
  EMILY GARGUILO

22

23

24

25

      **UNITED STATES DISTRICT COURT**

1  arrests.

2       So again, it's over the past -- I'd say from 2010 forward,

3  2011 for sure and forward, we have continually tried to improve

4  our security at the seminar to make it a safe environment and

5  an environment where our donors can, you know, relax and have

6  conversations, private conversations.  So what we've done is

7  various things like buying out the hotel where the event will

8  be held the night before it starts, because what we've seen

9  over the last couple of years is some people -- again, they

10 have the right to do it.  They can get a hotel room for that

11 night before and then overstay the next day, get a late

12 checkout.  And we have had them photographing donors as they

13 came in and somewhat harassing them, so we try to avoid that.

14       We also do security sweeps both for any type of dangerous

15 detonated device, bombs or anything like that in our facilities

16 or at the hotel, and we also sweep for bugs.  We also require

17 people to turn in their phones before certain presentations so

18 they can't tape or record.

19       We have a lot of different contractors who are hired on as

20 part of the sessions to help with the production, and we

21 require them -- we do background checks, and we require them to

22 sign on disclosure agreements because we have had situations

23 where they have taped the information and given it out to the

24 public as well.  So we had situations like that.

25 Q    You mentioned threats and other attacks on donors, on AFP.

1    A    Well, there have been events where it's gotten, you know,

2    out of hand, and the police were called to restore order back

3    in 2011 at a seminar in Palm Springs, yeah.

4    Q    Why don't you give us an example of a threat or an attack

5    on AFP that you are aware of, not a donor, but on AFP.

6    A    I guess one that comes to mind would have been 2011 in

7    Wisconsin.  That was the time there was a lot of unrest up

8    there over -- the governor was instituting a budget law that

9    was unpopular, and it led to a lot of unrest and protests, and

10   it started to get linked in the media to Americans for

11   Prosperity and then to Koch, Carlos Koch and David Koch.

12        And we had a lot of different things happen at that event.

13   We had people show up at an office of Koch and harass -- a

14   flash mob to harass our employees in Madison, Wisconsin.  We

15   had -- it was being stirred up by international unions and

16   other activist groups.  And around that time there was an

17   announcement by the activist/hactivist group Anonymous.

18   Q    The hactivist?

19   A    Activist, and they call it a hactivist because they are

20   computer hackers, the terminology.  I have seen Anonymous, that

21   they were going to launch an attack against Koch Industries,

22   and they mentioned AFP and part of why they were doing it and

23   what was going on in Wisconsin.  That happened at the end of

24   February 2011.

25   Q    And did you report this hactivist attack to the FBI?

1   A    Yes.  What happened, they issued the press release so we

2   had some advance notice, and we tried to get our ducks in a row

3   at Koch, and AFP tried to do it as well to protect the IT

4   systems.  And we reported it.  What happened was they tried to

5   attack the Koch Industries website, and this ultimately,

6   because of the information we were able to put together in

7   these attacks, led to the indictment, prosecution and guilty

8   pleas for three individuals for federal cybercrime laws after

9   they tried to shut down our website.

10      They were unsuccessful largely doing that, and they went

11  on the activist/hactivist Anonymous group to attack AFP's

12  website, and they did shut that one down through a distributor

13  denial of service, a DDOS, which I don't quite understand it,

14  but that's what they call it, and it shut down the AFP website.

15  So that was reported to the authorities.  And like I mentioned,

16  three people were indicted and ultimately pled guilty.

17  Q    Now, can you tell us about any threats or attacks or

18  harassment that you're aware of directed at David and Carlos

19  Koch in connection with their affiliation with AFP?

20  A    There have been a lot since 2009 to the present, and it's

21  been across the spectrum.  There's been -- you know, whether

22  it's phone calls, we have had phone call death threats right

23  around the time of the Wisconsin event.  Someone phoned in a

24  death threat saying they were going to put a bullet in the head

25  of both Charles Koch and David Koch, and we reported that to

1    the FBI.  And they investigated it, and it was an individual in

2    Northern California.  He was not prosecuted.

3         There have been two other people who have made death

4    threats against Charles and David that have been prosecuted by

5    the authorities after the FBI investigated it.  But we have had

6    all kinds of different death threats, really awful, just

7    unhinged things that are said about them and their families.

8         There was a death threat made against one of the

9    grandchildren in an anonymous poem at the end of 2012 that was

10   very unhinged.  There's been just several of them.  We have had

11   threats of a terroristic attack against our Enid, Oklahoma

12   fertilizer facility.  That happened in 2012.  It was such a

13   serious matter.  The Oklahoma City FBI drove up to Wichita,

14   called me on the phone.

15              THE REPORTER:  Hold on.  Slow down.

16              THE WITNESS:  Sorry, I get going.

17        It was a very serious matter.  And the Oklahoma City FBI

18   called me up and said they wanted to come up in person, three

19   of the agents and one of the U.S. attorneys, to discuss it.

20   And they disclosed that as part of an event that was going to

21   happen over President's Day in Wichita called Occupy Koch Town,

22   K-o-c-h Town.  There was going to be another anonymous attack,

23   and it was going to be a fire-bombing of our Oklahoma facility.

24   So those are some that come to mind.

25   Q    I am just going to direct your attention to Trial Exhibit

1  226, just for identification purposes only.

2          THE COURTROOM DEPUTY:  226 is identified and placed

3  before the witness.

4      (Exhibit 226 for identification.)

5          THE WITNESS:  I see it.

6  BY MR. BURCK:

7  Q    Do you recognize this document?

8  A    Yes.

9  Q    Can you tell us what it is?

10 A    This is a compilation of different threats and negative --

11 where the messages, e-mails, tweets, whatever that was put

12 together by the security team at Koch.

13 Q    Security team at Koch?

14 A    Yes.

15 Q    And you are the general counsel of Koch, and I think you

16 testified that the security group reports to you.

17 A    Yeah.  The head of that group is Ed McCormick.  He is a

18 direct report of mine, and I work with the whole team, yes.

19 Q    And did you ask them to put this together?

20 A    What we have been -- yes.  We wanted to get -- we do

21 random or periodic surveys, different points in time of what,

22 you know, what it looks like out there in the landscape and

23 social media with regard to Koch and any groups that might be

24 tied to us, like AFP, just to see what's going on to try to

25 stay ahead of issues, if we can, and find trends.  And to the

# Exhibit 3

**Tim Phillips**
**December 22, 2015**

```
            UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
            WESTERN DIVISION

                            Case No. 2:14-CV-09448

AMERICANS FOR PROSPERITY FOUNDATION,        :
                                            :
                                            :
            Plaintiff,                       :
                                            :
                                            :
              vs.                            :
                                            :
                                            :
                                            :
                                            :
KAMALA HARRIS, in her official capacity     :
as attorney general of the State of         :
California,                                  :
                                            :
            Defendant.                       :
                                            :
                                            :


        ------------------------------------
        DEPOSITION UNDER ORAL EXAMINATION OF:
                  TIM PHILLIPS
               December 22, 2015
                 -----------
     REPORTED BY:  JENNIFER L. WIELAGE, CCR, RPR, CRR
                 -----------
```

1

**Tim Phillips**
**December 22, 2015**

1          TRANSCRIPT of the deposition of the

2     above-named witness, called for Oral Examination in

3     the above-entitled matter, said deposition being

4     taken pursuant to Federal Court Rules, by and before

5     JENNIFER WIELAGE, Certified Shorthand Reporter and

6     Notary Public of the State of New Jersey, License No.

7     XI01916, at the office of QUINN EMANUEL URQUHART &

8     SULLIVAN, LLP, 51 Madison Avenue, 22nd Floor, New

9     Jersey 10010, on Tuesday, December 22, 2015,

10     commencing at 10:00 in the forenoon.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          2

Tim Phillips
December 22, 2015

1
      A P P E A R A N C E S:
2

3      QUINN EMANUEL URQUHART & SULLIVAN, LLP
       777 6th Street NW
4      11th Floor
       Washington, DC 20001
5      (202) 538-8000
       BY:  KEITH FORST, ESQ.
6      BY:  CAROLYN HART, ESQ.
       keithforst@quinnemanuel.com
7      Attorneys for the Plaintiff

8

       STATE OF CALIFORNIA
9      Department of Justice
       Government Law Section
10     455 Golden Gate Avenue
       Suite 11000
11     San Francisco, California 94102-7004
       (415) 703-5781
12     BY:  ALEXANDRA ROBERT GORDON, ESQ.
       alexandra.robertgordon@doj.ca.gov
13     Attorneys for the Defendant, State of California

14

15

16          ALSO PRESENT - JAMES SOTO, Videographer

17

18

19

20

21

22

23

24

25

                                                          3

**Tim Phillips**
**December 22, 2015**

```
 1                    PHILLIPS - BY MS. GORDON

 2          A.     I think so, yeah.

 3          Q.     And so -- you think so?

 4          A.     I think so, yeah.

 5          Q.     Who do you think that person is?

 6          A.     It would probably be -- well,

 7   I -- I always deal with Vic, and then Vic

 8   deals with the security folks, or Luke

 9   Hilgemann.  I don't deal with our security

10   folks that much.

11          Q.     So do you know if threats are

12   tracked?

13          A.     Yes.

14          Q.     And by who?

15          A.     That would be a question for Vic.

16          Q.     So you know that they're tracked.

17   And would it also be a question for

18   Mr. Bernson whether they're tracked

19   separately for Americans for Prosperity and

20   Americans for Prosperity Foundation?

21          A.     That would be a question for Vic,

22   I think.

23          Q.     So you mentioned the Anonymous

24   hack or --

25          A.     Attempted.
```

126

**Tim Phillips**
**December 22, 2015**

```
 1              PHILLIPS - BY MS. GORDON
 2        Q.    Attempted hack.  So when was
 3   that?
 4        A.    I don't remember the exact date.
 5        Q.    Do you have a ballpark sense?
 6        A.    A few years ago, two or three
 7   years ago.
 8        Q.    Two or three years ago?
 9        A.    I don't remember the exact date.
10        Q.    And you said "attempted," so was
11   it not successful?
12        A.    If I remember, they were able to
13   impact the operation of our website.  I do
14   not think they were able to enter our e-mail
15   system.
16        Q.    And when you say "our website,"
17   is that Americans for Prosperity or Americans
18   for Prosperity Foundation?
19        A.    I'm not sure which ones they
20   impacted, whether it was both or either-or.
21        Q.    And how did -- I mean, actually
22   strike that.
23              When you say they were able to
24   impact the operation of one or both websites,
25   what does that mean "impact"?  What did they
```

127

**Tim Phillips**
**December 22, 2015**

```
1              PHILLIPS - BY MS. GORDON

2      do?

3          A.    If I remember correctly, it -- we

4      had -- they froze up.  I don't think they

5      were able to insert like awful language or

6      anything like that.  I think they were able

7      to impact, you know, the actual operation, if

8      I remember correctly.

9              But that's probably a better

10     question for Vic and the lawyers as to what

11     exactly happened.

12         Q.    Do you remember what Americans

13     for Prosperity or the foundation's response

14     was to this hack or attempted hack?

15             MR. FORST:  Objection;

16         objection; vague and ambiguous as to

17         response.

18             You can answer.

19             Calls for speculation.

20         A.    We tried to fix it, and we tried

21     to strengthen security over time to make sure

22     that our proprietary information was

23     protected.

24         Q.    Was it your sense that Anonymous

25     was actually able to gain some of your
```

# Exhibit 4

From:        Tracy Henke
Sent:        Mon 3/07/2011 5:34 PM (GMT-00:00)
To:          !AllAFP
Cc:
Bcc:
Subject:     IT Changes effective tomorrow morning
Attachments: security_findings_final.doc

TX NO. 347

Case No. 2:14-CV-09448
*Americans for Prosperity Foundation*
*v.*
*Kamala Harris*

Date I'D:_____  Date Adm:_____

All:

As a result of the February 28th attack on our system, a working group was convened to recommend some immediate first steps that need to be taken to better protect our IT security.  The working group has made policy recommendations that are included in the attached memo and implementation will start tomorrow.

The working group included the following individuals:

Nansen Malin, Washington State Director

Jeff Crank, Colorado State Director

Teresa Oelke, Arkansas State Director

Rich Myslinski, Senior Online Strategy Manager

Heather de la Riva, Director of Human Resources

Erik Telford, Director of Online Strategy

Please review the attached recommendations and call either FedSolutions, Rich, or another member of the working group for assistance.  Your ability to access email will be impacted, so please make certain you read the attached documents because changes will go into place tomorrow, Tuesday, morning.  Also, if you have ideas or recommendations on other issues related to IT security, please share those ideas with members of the working group.

I cannot stress enough how important data security is for this organization and for individuals.  As we continue to move our mission forward, we will be under more attacks.  The attached policy is just a first step as we undertake a more comprehensive review and work to deploy best business practices…and maybe set the standard on what those practices should be.

Thanks to Nansen, Jeff, Teresa, Rich, Heather, and Erik for their quick analysis and recommendations.  Thanks in advance to everyone for your patience and cooperation on this policy and transition to implementation.

Tracy

**TX347-0001**

                                                                                  AFPF000471

Tracy A. Henke

Chief Operating Officer

Americans for Prosperity

**TX347-0002**

CONFIDENTIAL

AFPF000472

# AMERICANS FOR PROSPERITY®

# MEMORANDUM

**TO:** Tracy Henke, COO
**FROM:** IT Security Working Group
**DATE:** March 4, 2011
**SUBJECT:** POLICY RECOMMENDATIONS FOR AFP/AFPF IT SECURITY

At your request, an IT Security Working Group was convened to examine and recommend policies to improve the IT security of AFP/AFPF given recent events.  The group sought council from a number of sources on the best practices that could be implemented, as well as a number of well-published studies relating to issues at hand.

## BACKGROUND ON THE ATTACKS

On Sunday, February 28, 2011, starting at approximately 8 p.m., the Americans for Prosperity website was the target of an attack by a group of hackers known as Anonymous. The group pulled together a tremendous amount of resources to launch a Distributed Denial of Service attack (known as DDOS) to try to flood the AFP cloud with requests to shutdown the website. The site was only down for approximately two hours.

Additionally, the group attempted a number of hacking techniques to access the website database (which contains user and password information), and to take control of the servers so they could deface the AFP website.  These attempts were not successful.

We know this threat is not going away any time soon.  These forces are organized, committed for the long-term, and out to hurt AFP by obtaining sensitive data and disseminating it for public consumption. Anonymous is extremely capable of damaging AFP; when a security organization used by the FBI tried to go after them, their corporate emails were dumped online, their CEO's social profiles were hijacked and his personal information revealed online, and the company was forced to have severe layoffs due to fallout.

Given this threat, it's imperative that the organization adopts the IT best business practices outlined in this document. In addition, we recommend continued monitoring and vigilance to ensure the integrity of our IT Systems.

## CHANGES TO EMAIL PASSWORDS

Starting on Tuesday, March 8, 2011, employees will have 24 hours to change the password to access their email address.  Employees who do not change their email passwords within that time frame will be locked out of their email address. The following conditions will also apply:

**TX347-0003**

CONFIDENTIAL

AFPF000473

1. To provide an easy mechanism for remote employees to change their email password, a link will be emailed Monday to a simple webform that ties into our email system. Remote employee will be able to change their email passwords instantly through the form after inputting their current password. National employees can either use the form or hold CTRL+ALT+DELETE and click "Change Password" to use the windows interface to change their password. **Remote employees should make note that now the password they use to login to their computer will be different from the password they use for email**

2. Passwords will have to be a minimum of (8) characters with at least (1) capital letter, (1) numeral, and (1) special character.  Passwords will have to be changed every 90 days and an email will be sent reminding remote employees of this. Users will not be able to reuse an old password. National employees will receive a reminder through the FedSolutions agent icon.

3. If an employee needs to have their password reset by FedSolutions support for any reason, they will need to provide a verbal password to their phone support team. This password will be provided on Monday. It is imperative this password is not disseminated unnecessarily.

4. In approximately two weeks, AFP will be implementing an email purge policy. Emails older than 90 days will automatically be permanently deleted from the AFP servers. Only a small group of operations individuals are expected to be exempt from this policy. This is an insurance policy to make sure that even if hackers are able to infiltrate one account, there is a limited amount of information that they glean from that account.

5. Contractors not using an AFP computer with the FedSolutions agent will not be allowed a desktop email client (Outlook, Entourage, Thunderbird) - they will only have access through the web OWA interface.  This prevents emails from being stored on a computer where we cannot verify if the best security practices are being followed.

6. Only employees and current contractors will be given email addresses.  The HR Director must approve all new addresses.  The HR Director will also be responsible for doing a weekly audit of email addresses.

7. If you are having trouble coming up with a password, please use the following tool: https://www.microsoft.com/security/pc-security/password-checker.aspx

**CHANGES TO YOUR AFP WEBSITE PASSWORD**

To change your password on the AFP website: use your login as normal, and then click the "My Account" tab in your admin menu once you are logged in.  Then proceed to click the "Edit" tab just below your name in the center of the screen.  Your password must use these parameters that follow best practices within the industry:

1. DO NOT MAKAE YOUR PASSWORD THE SAME AS YOUR EMAIL PASSWORD (AFP OR PRIVATE ACCOUNTS).  Your password for the website and for your email account should be different from each other and ANY OTHER PASSWORD FOR OTHER ACCOUNTS YOU HAVE.  If a hacker compromises your personal email or Facebook account, you do not want them to be able to have easy access to the AFP website or your AFP email account.

2. Passwords should be at least 8 characters long, using at least (1) capital letter, (1) number, and (1) special character.

**TX347-0004**

3. Avoid using publicly assessable data such as dates of birth, family names, and other biographical or familial information.
4. Avoid too much repetition of letters or numbers.
5. DO NOT use just one long word that can be found in the dictionary – Brute Force dictionary attacks can easily break those passwords.

Users who do not change their passwords within 48 hours (from Monday, March 7, 2011) will be locked out from the website and have to call Rich Myslinski to have their access reset.

**PROVIDE AN IT INVENTORY**

Send Erik Telford and Rich Myslinski (newmedia@afphq.org) a list of all microsites, social media accounts, and other online services/accounts you have on behalf of AFP.

1. DO NOT SEND SENSTIVE PASSWORD INFORMATION VIA EMAIL.
2. This list will be compiled to monitor breaches in security so that action can be taken against defacements.
3. Make sure you change passwords on these accounts using the best practices outlined above.

**PASSWORD PROTECT YOUR MOBILE DEVICE**

You should be vigilant that this group may try to target your phone and take it physically.  It is imperative we be prepared for these attacks by password protecting mobile devices

How to password protect a blackberry device

How to password protect an Android device.

How to password protect an iPhone.

FedSolutions can also assist you in this process of password protecting your mobile device.

FedSolutions can be reached at (202) 730-9701.

**PASSWORD PROTECTING YOUR LAPTOP**

**Remote Employees should again note that their login to their computer will stay the same, while their login for their email will change given the previously outlined changes to email passwords**

As with phones, laptops may also be targeted.  You should also be wary of public WIFI networks (such as those in Starbucks, Hotels, or provided by municipalities) – hackers will be able to use those networks to access your computer's contents.

**TX347-0005**

AFPF000475

This working group is currently researching with FedSolutions a patch that will come through the FedSolutions agent that will automatically lock computers after 2 minutes of idle time, or after they have been opened up from hibernating.

Contactors or employees that do not have computers with a FedSolutions agent can call FedSolutions for instructions on how to enable this protection manually through their operating system.

FedSolutions can be reached at (202) 730-9701.

**SECURE REMOTE OFFICE IT**

For states that have their own offices running a wireless network, make sure your network is secure.  It should be using WPA security (DO NOT USE WEP Security), with a password that follows the general guidelines outlined in this document. Unsecure networks will allow hackers access to your network and computer from a distance.  Amateur hackers can easily crack networks that use WEP security or have weak passwords, so this is extremely important.

If you'd like to discuss network security in your office, please contact Rich Myslinski at rmyslinski@afphq.org.

**TX347-0006**

AFPF000476

# Exhibit 5

TX  NO. 306

Case No. 2:14-CV-09448
*Americans for Prosperity Foundation*
*v.*
*Kamala Harris*

Date I'D:_____   Date Adm: _____

From:        Tracy Henke
Sent:        Mon 8/22/2011 5:20 PM (GMT-00:00)
To:          !AllAFP
Cc:
Bcc:
Subject:     Emergency Plan Preparedness--Start...
Attachments: isc_safe_mail_handling-2007.pdf; Bomb Threat Check List.PDF


All:

Some of you might have already heard that the National office received a bomb threat on the office voice mail last evening.  As a result, police were contacted this morning, police requested the office to be evacuated, and the canine bomb unit swept the office.  Nothing was found and the building was deemed safe to reenter by the Arlington County Police Department.


This serves as a reminder that certain protocols/practices need to be in place.  If a threat is made in voice mail or in person, the first act is to notify the local police.  If a threat is left on voice mail please make certain to save the message.  Do not delete.  Please stay calm and follow all instructions provided by the local public safety authorities.  In addition, please find the attached document related to safe mail handling and suspicious packages as well as a bomb threat checklist.


Please feel free to contact myself or Heather with any questions.


Tracy


   AFPF000584

**TX306-0001**

# Exhibit 6

1                UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3                HONORABLE MANUEL L. REAL

4            UNITED STATES DISTRICT JUDGE PRESIDING

5                        - - -

6

7   AMERICANS FOR PROSPERITY FOUNDATION,  )
                                         )
8                        Plaintiff,      )
                                         )
9         vs.                            )  CASE NO. CV 14-9448-R
                                         )
10  KAMALA HARRIS, in her Official       )       VOLUME I
    Capacity as Attorney General of      )     (Pages 1 - 84)
11  California,                          )
                                         )
12                       Defendant.      )
    _____)

13

14

15            REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

16                  COURT TRIAL - DAY ONE

17                LOS ANGELES, CALIFORNIA

18               TUESDAY, FEBRUARY 23, 2016

19                     10:01 A.M.

20

21

22   _____

23            SHAYNA MONTGOMERY, CSR, RPR, CRR
              FEDERAL OFFICIAL COURT REPORTER
24           312 NORTH SPRING STREET, ROOM 410
              LOS ANGELES, CALIFORNIA 90012
25                  (213) 894-2665


                UNITED STATES DISTRICT COURT

1                    **APPEARANCES OF COUNSEL:**

2

  **FOR THE PLAINTIFF:**

3
       QUINN EMANUEL URQUHART & SULLIVAN LLP
4      BY: DEREK SHAFFER
            WILLIAM BURCK
5           ERIC C. LYTTLE
            KEITH H. FORST
6           Attorneys at Law
       777 Sixth Street NW, 11th Floor
7      Washington, DC 20001
       (202) 538-8000
8

9

  **FOR THE DEFENDANT:**
10
       STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
11     OFFICE OF THE ATTORNEY GENERAL
       BY: ALEXANDRA ROBERT GORDON
12          EMMANUELLE SARAH SOICHET
            JOSE A. ZELIDON-ZEPEDA
13          Attorneys at Law
       455 Golden Gate Avenue, Suite 11000
14     San Francisco, California 9410-7004
       (415) 703-5509
15

16     STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
       OFFICE OF THE ATTORNEY GENERAL
17     BY: KEVIN A. CALIA
            Attorney at Law
18     1300 "I" Street
       Sacramento, California 95814
19     (916) 322-6114

20

21 **ALSO PRESENT:**

22     SCOTT DUVAL
       EMILY GARGIULO
23

24

25

1   Q    And from there?

2   A    I was promoted to chief operating officer in 2013, and

3   then again promoted in 2015 to chief executive officer.

4   Q    And what is your role, Mr. Hilgemann, as CEO?

5   A    I help set the mission/vision goals and strategy of the

6   organization, as well as have interaction with a group of

7   high-profile donors to help fundraise for our efforts.

8   Q    And so you do interact with the Foundation's donors?

9   A    Yes, I do.

10  Q    And roughly about how many, sir?

11  A    About 40 to 50 are in my portfolio.

12  Q    And has there been turnover from time to time in that

13  portfolio?

14  A    There is.  Consistently probably 20 to 30 of those folks

15  stem from my relationships in Wisconsin.

16  Q    And what is the nature of your interactions with those

17  donors, sir?

18  A    I talk to them regularly about our mission, our vision,

19  our goals and our objectives, as well as understanding what

20  their interests are, to partner them with investments in our

21  capabilities.

22  Q    And do you meet with them face-to-face?

23  A    I do.

24  Q    And do you chat in other ways with them?

25  A    Yeah.  I have a regular communication with them through

1   phone, through e-mail, through other various ways.

2   Q     And can you describe the content of your typical

3   communications with them and what they say to you?

4   A     Sure.  A lot of the communications are around, again, the

5   mission, goals, objectives, some of the accomplishments that

6   we've seen at the Foundation.  One of the topics that often

7   comes up is their confidentiality.

8   Q     And that's a concern that they raise, the donors, with

9   you?

10  A     Yes, especially prospective donors and currently the

11  donors who have that concern.

12  Q     And how do you address that Mr. Hilgemann?

13  A     I stress the importance and the systems protocols that we

14  have in place to make sure that their anonymity is something

15  that we see as one of our top priorities for partnerships with

16  our donors.

17  Q     And what are the practices that the Foundation does put in

18  place regarding that anonymity?

19  A     So we have very limited exposure to the names, identities

20  and interests of those donors.  It's something that we take

21  very serious precautions to prevent being leaked or being

22  discussed outside of a small group of people internally.  We

23  also stress the importance with all of our employees of keeping

24  that confidentiality as something that is a top priority, not

25  just within the institution but outwardly as well.

```
 1   Q     And you personally as CEO, is that something that you do

 2   and undertake?

 3   A     Yes, absolutely.

 4   Q     In what ways?

 5   A     Again, it's something that, you know, we -- I rarely have

 6   access to a full list of our donors.  It is a very small group

 7   of people, again, that I operate with or communicate with.  And

 8   I can honestly say that as CEO for the last year and a half,

 9   I've yet to see a full list of our donors.

10   Q     Okay.  And why is, as CEO, protecting that donor

11   information so important to you and the organization?

12   A     Because they really are the lifeblood of our organization.

13   We are a donor-driven institution that receives donations

14   across the board.  And again, they are the folks that keep the

15   lights on and the machines going.

16   Q     And so when these conversations come up about anonymity

17   with donors, what do you specifically tell them?

18   A     I walk them through the process and the priority that we

19   place on it; that each one of the dollars that they invest with

20   us is something we see as our duty and an expectation from them

21   to make sure that we keep their identities secret; and that

22   it's not something that is broadly shared in the institution.

23   Q     Now, sir, as CEO, are you familiar with the Schedule B

24   Form 990?

25   A     Yes, I am.
```

1    Q    And what is that?

2    A    It is an IRS document that we share that lists the names

3    of our top donors to our foundation.

4    Q    And have you ever discussed, you yourself, Schedule B with

5    donors?

6    A    Yes, I have.

7    Q    And in what context?

8    A    Just a couple weeks ago -- this is a conversation that

9    comes up quite frequently -- but they referenced this case.  I

10   was at an event, invite-only event in Utah, multiple donors who

11   were first-time attendees at an AFP Foundation event.  One of

12   them asked specifically about this case and the priority we

13   were placing on keeping the names of our donors private.

14   Q    And what did you say to the donors?

15   A    Again, I explained to them the importance and the priority

16   that we place on that information; that it is not only an

17   expectation, but it's also a process and protocol situation

18   that we constantly and consistently are looking to keep those

19   things private.

20   Q    And has the donor who asked the question about the

21   litigation contributed to the foundation to date?

22   A    No.

23   Q    How have donors expressed to you their concerns about

24   appearing on Schedule B, if at all?

25   A    It's something that comes up quite frequently.  Again,

1    with the leaks that we've seen at the IRS, groups like ours

2    being targeted, individuals being targeted by government

3    entities, it's a concern that's always on their mind.  And I

4    think the biggest concern that I've seen is from the donor

5    group that I had interactions with in Wisconsin where a group

6    of those folks were targeted by the opposition who were outed

7    and were boycotted; their businesses were boycotted.  There

8    were personal threats that were lobbied against themselves,

9    their businesses and their employees.

10   Q    And in what ways were they outed, sir?

11   A    It was something that the opposition had pulled together a

12   list of suspected donors to the Foundation because of their

13   interactions with groups like ours in the past that had been

14   publicized.  They boycotted their businesses.  They made

15   personal and private threats against them, their families and

16   their businesses and their employees.

17   Q    And was this in a certain geographic location?

18   A    It was.  It was localized to generally across the state of

19   Wisconsin folks that they had, again, believed were supporters

20   of the AFP Foundation.

21   Q    And what time frame was that?

22   A    That was approximately in 2012.

23   Q    Do you know, sir, of instances where purported donors of

24   the Foundation have actually been identified publicly beyond

25   this instance that you just described?

```
 1   A     Yes.  There was a National Law Journal story that came out

 2   in 2012 or 2013 when I was chief operating officer of AFP

 3   Foundation that listed the names of multiple top donors,

 4   including the amounts of money that they had given our

 5   organization.

 6   Q     And, Mr. Hilgemann, I think there's a binder -- or if

 7   somebody can ask -- the binder there.

 8             MR. FORST:  Your Honor, I also believe that you have

 9   a witness binder for Mr. Hilgemann.

10             THE COURT:  Yes, I do.

11             MR. FORST:  Okay, great.

12   Q     (BY MR. FORST)  Mr. Hilgemann, if you can turn to the

13   first tab in your binder, which should be labeled Exhibit

14   Number 396.  Do you recognize that document?

15   A     Yes, I do.

16   Q     And what is it?

17   A     The story that I referenced about one of our Schedule Bs

18   that a reporter had received and outed the names of multiple

19   donors to our Foundation.

20   Q     And do you recall reading it at the time?

21   A     I do.

22   Q     And discussing it within the Foundation?

23   A     Yes, I do.

24             MR. FORST:  Your Honor, we would respectfully move

25   Exhibit Number 396 for admission into evidence.
```

49

```
 1  where we had about 4- or 500 of our activists who were with us
 2  that day talking about the importance of limited government and
 3  lowering taxes for citizens in that state.  And I was giving a
 4  speech at the time, and there were several thousand protesters
 5  that had surrounded that event that were chanting, making
 6  threats at our activists and myself.  And shortly after I got
 7  done speaking that day, I walked off the podium to go and greet
 8  my parents who were also a part of the event that day.  And
 9  there was a protester that approached me, made multiple slurs
10  and, you know, used some foul language to describe his thoughts
11  of me and what we were doing.
12       And I -- I was talking to my parents and tried to grab
13  them and move them away from the situation.  As I turned back
14  around, he spit in my face and called me a bunch of other
15  names.
16  Q    And what'd you do in response?
17  A    I -- at that point I wanted to deescalate the situation as
18  much as possible, so I wiped the spit off my face, grabbed my
19  dad, because I was concerned that he was going to, you know,
20  retaliate for what had been done, and move him away from that
21  situation.
22  Q    So beyond these two events in Wisconsin that you've now
23  described, are there other events that stand out from your time
24  in the Foundation?
25  A    Yes.
```

1   Q     And what are those?

2   A     There was an event in 2000 -- late 2012 that was revolving

3   around the Right to Work conversation or that was being had in

4   Michigan.  And I was asked, as state director in Wisconsin at

5   the time, to come over and speak to the activists in Michigan

6   about the experiences we had with a similar type of policy

7   engagement.

8   Q     And so how was that event set up on the grounds of

9   Michigan?

10  A     There was --

11         MS. GORDON:  Objection, Your Honor.  Lacks

12  foundation.  My belief is this is actually a (c)(4) event, and

13  it is irrelevant to the current action.  The (c)(4) is a

14  separate legal entity that is not a party in this action.

15         THE COURT:  The objection is overruled.

16  Q     (BY MR. FORST)  And so again, Mr. Hilgemann, the question

17  I posed was, what was -- how was the event set up on the

18  grounds in Michigan?

19  A     There was an events tent that was set up for kind of a

20  rallying point for our activists who were joining us at the

21  capitol that day.  We were encouraging them to go and speak to

22  their legislators about our support for Right to Work

23  legislation that was being considered in the legislature.  So

24  it was an events tent.  We had multiple speakers that were a

25  part of that event.  We also had refreshments in the tent for

```
 1   our activists.

 2   Q     And how many activists attended?

 3   A     I think there was probably about 60 to 70 folks at the

 4   height of our gathering, and then it was disbursed throughout

 5   the day as they were going to speak with their legislators.

 6   Q     And were there even non-AFP activists or AFP activists

 7   there?

 8   A     Yes.  There were thousands of pro-union protesters who

 9   were also on the capitol grounds that day.

10   Q     And where were those protesters located?

11   A     They were -- I mean, it was a large crowd, so they were

12   kind of taking over the whole capitol grounds.  But there were

13   several hundred of them that had surrounded our tent and were

14   trying to shut us down, intimidate us, intimidate our

15   activists.

16   Q     And did the protesters do anything else?

17   A     They did.  At one point I remember standing outside of the

18   tent and seeing multiple protesters approach with knives or

19   box-cutters cutting at the ropes of the tent, trying to

20   collapse the tent.

21   Q     And did they, in fact, collapse the tent?

22   A     They did.

23   Q     And do you recall hearing anything else from the

24   protesters?

25   A     Yeah.  There was -- shortly after they had cut the ropes
```

1    and collapsed the tent, there were actually people that were

2    left inside of the tent, multiple activists, probably more than

3    a dozen, including some of our elderly activists who couldn't

4    get into the capitol because of their limitations.  And so I --

5    as soon as the tent was collapsed, I remember going over to the

6    side, because I could see the people underneath it, lifting up

7    the tent, trying to pull them out to safety.

8    Q     And did you take video recording of that event?

9    A     I did.  I was actually using my cell phone to take video

10   of the protesters before they were cutting at the ropes and

11   making sure we had evidence of that.

12   Q     And have you otherwise watched footage of that event as

13   you recall seeing it?

14   A     Yes, I do.

15   Q     Did you watch it contemporaneously, what happened,

16   afterwards?

17   A     I did.  I watched it that day.

18   Q     Mr. Hilgemann, if you turn to the second tab in your

19   binder, which is Exhibit 380.

20          THE COURTROOM DEPUTY:  Exhibit 380 is identified and

21   placed before the witness.

22   Q     (BY MR. FORST)  Are you there?

23   A     I am.

24   Q     And do you recognize what's on this document?

25   A     I do.

1    Q    And what is it?

2    A    It's a recorded video of the protesters collapsing our

3    tent and destroying our property during that rally.

4    Q    And do you recall watching that video?

5    A    I do.

6         MR. FORST:  With Your Honor's permission, it's a

7    very short video, we would like to play that.

8         THE COURT:  All right.

9         MS. GORDON:  We object for lack of foundation and

10   authentication and that this video was not produced during

11   discovery.

12        THE COURT:  The objection is overruled.

13        (Exhibit 380 played in open court.)

14        THE COURT:  I think that's enough, Counsel.

15   Q    (BY MR. FORST)  Now, Mr. Hilgemann, does that video

16   accurately reflect what happened as you witnessed it?

17   A    It does.

18   Q    I didn't see any police in this video.  Were there any

19   present?

20   A    Not at that point in time.

21   Q    And so did they arrive at any point in time?

22   A    They did.  When I witnessed the protesters starting to cut

23   at the ropes, I sent one of our other staff members to try and

24   seek law enforcement's help, and it took approximately 30 to 40

25   minutes after they had actually collapsed the tent for law

1    enforcement to show up on scene.

2    Q    And were there any non-AFP-injured -- people injured, if

3    you know?

4    A    There were.  Amongst our -- again, the activists that I

5    discussed were under the tent when it collapsed.  I do remember

6    seeing a Fox News contributor at the time, who was among one of

7    the groups of people that were sheltering away from the

8    situation, who had blood on his face.

9    Q    And when did you see him?

10   A    It was shortly after the tent had collapsed.

11   Q    And do you have any understanding of what happened to him?

12   A    Yeah.  I found out later that day, through the news that I

13   had watched, that he had actually been punched or assaulted by

14   one of the protesters.

15   Q    And you recall watching that news footage that same day?

16   A    I do.

17   Q    If you turn to the next tab in your binder, sir, it's

18   Exhibit Number 573.

19         THE COURTROOM DEPUTY:  Exhibit Number 573 is

20   identified and placed before the witness.

21   Q    (BY MR. FORST)  Do you recognize what's on that exhibit?

22   A    I do.

23   Q    And what is it?

24   A    It is the news story of that contributor who was attacked

25   or assaulted shortly after the tent collapsed.

```
1    A      And is that the news story that you watched?

2    A      Yes, it is.

3            MR. FORST:  Your Honor, we would respectfully move

4    Exhibit Number 573 into evidence.

5            MS. GORDON:  And Your Honor, we would respectfully

6    object because it lacks foundation and authenticity, and it was

7    not produced during discovery.

8            THE COURT:  573 in evidence.

9       (Exhibit No. 573 received into evidence.)

10           MR. FORST:  And we have another video of that, Your

11   Honor.  But with your permission, it's another -- about a

12   minute and a half.  We can show it or -- I really defer to

13   whether you want to see another video.

14           THE COURT:  For what it's worth.

15           MR. FORST:  Let's play it.

16      (Exhibit No. 573 played in open court.)

17           THE COURT:  That's enough, Counsel.

18           MR. FORST:  Now, Your Honor, I think I forgot

19   actually to formally request that Exhibit 380, the video

20   before, be moved into evidence.  I just want to make that

21   request now.

22           MS. GORDON:  We object, Your Honor.

23           THE COURT:  380 in evidence.

24      (Exhibit No. 380 received into evidence.)

25   Q     (BY MR. FORST)  Now, at this event, Mr. Hilgemann, did you
```

1   fear for your life?

2   A     I did.

3   Q     And for others'?

4   A     Yes.  It was the first instance of many that I've been a

5   part of since my time with the Foundation where I truly feared

6   for the lives of not only myself but our activists, our staff,

7   who were a part of that event.  And I think one of the things

8   that's crystal-clear in my mind and one of the things that I'll

9   always remember was the fact that as the tent was going over,

10  the group of the angry protesters was right in front of me as I

11  was trying to pull people out of the tent.  And they made the

12  comment that, Let's trample these mother-f'ers.

13        And it was at that point that I realized that lives were

14  in jeopardy; that the level of violence and anger has risen to

15  a point where people's lives were definitely in danger.

16  Q     And in your meetings with donors, have they told you that

17  they have seen these events?

18  A     Yes.

19  Q     And what have those discussions been?

20            MS. GORDON:  Objection, hearsay, Your Honor.

21            THE COURT:  The objection is overruled.

22            THE WITNESS:  Other donors are seriously concerned

23  not only for the well-being of our staff and our activists, but

24  they're also concerned that we're taking the proper protocols

25  to protect our staff, our activists, any of our folks who

**UNITED STATES DISTRICT COURT**

1    attend similar events in the future.

2    Q     (BY MR. FORST)  Now, Mr. Hilgemann, are there other

3    personal threats, for example, that you have experienced?

4    A     Yes, I have.

5    Q     And can you describe it?

6    A     The one that I think is most personal to me and, again,

7    the one that's probably most numbing to what I've experienced

8    during my time with the Foundation is in 2013 I was alerted by

9    our security staff that they had received some postings that

10   were made on another liberal blog about someone who was working

11   inside of our institution and making frequent posts about how

12   they were inside the belly of the beast; and that they could --

13   they were right outside of my office; and that they could

14   easily walk in and slit my throat.

15   Q     And how did you react to learning that?

16   A     Again, it's one of those situations that you don't think

17   you're going to have to endure working in the business that I

18   work in, but it was another one of those frightening moments

19   that unfortunately I had to share with my wife, because the

20   security staff had also told me at the time that the person was

21   found, the actual person who was making those posts was found

22   in our parking garage taking pictures of license plates,

23   including my personal vehicle.

24   Q     And what did you and your family do in response?

25   A     We considered our options and, again, making sure that we

Q     And you saw no need to report this to law enforcement;

correct?

A     No.  Again, this is something that unfortunately had

become pretty much an everyday thing for us during our

activities and what we were doing in the course of our work in

Wisconsin; that the opposition and the protesters did this on a

pretty frequent basis, unfortunately.  And it was just another

instance that I remember it personally happening to me.  So no,

I didn't contact law enforcement.  They were on the scene, but,

again, I wanted to deescalate it and move out of the situation

as quickly as possible.

Q     And by this happening, you mean when you were at public

events, this was common that people would protest or say things

to you that were disparaging?

A     Sure.  I mean, we held a series of events across the state

where we had protesters that would show up at all of those

events, and it was the same kind of behavior at each one of

them.

Q     And I believe you said that there are -- you regularly --

or it's a regular occurrence when you were in Wisconsin that

threatening e-mails or mail would show up at the office; is

that correct?

A     Yes, that is correct.

Q     And your offices are generally visible, right, to the

public?

```
 1   A     Yeah.  We had field offices that were definitely visible
 2   to the public.  When I was state director, I worked out of an
 3   office that was a block away from the capitol.  Less visible
 4   than our community-centered offices, but yes.
 5   Q     And are you aware of any member of your staff in the
 6   Wisconsin office donating in excess of $250,000 to the
 7   Foundation?
 8   A     Not as a member of our staff, but we did have many
 9   committed folks who were donors to the institution that took
10   part as activists as well where they were out knocking on
11   doors, making phone calls, helping us spread the message of
12   freedom across the state.  So we did have that happen on a
13   pretty regular basis.
14   Q     And I also heard you testify that with respect to the
15   disclosure of the 2003 Schedule B, that there can be very
16   serious consequences; correct?
17   A     Yeah.  I mean, there's no doubt about it, unfortunately.
18   I think that there's an appetite out there from the press and
19   the opposition who are constantly and consistently looking for
20   the names of our donors.  And unfortunately, I don't think it's
21   something that they're -- they're looking for that information
22   to give them a badge of honor for being engaged in civil
23   discourse.  I think it's more along the lines of them trying to
24   intimidate and attack and cause fear amongst the people who
25   support institutions like ours.
```

```
 1   Q    I understand that, but as CEO, Mr. Hilgemann, you actually

 2   now sign the Foundation's IRS Form 990; correct?

 3   A    Yes, I do.

 4   Q    And you review it before you sign it; correct?

 5   A    Yes, I do.

 6   Q    So you're probably aware, then, that in 2014 the

 7   Foundation received close to $21 million in contributions;

 8   correct?

 9   A    Yes, I believe that's correct.

10   Q    And I believe you also would have seen the list of

11   Schedule B donors as a part of this process; correct?

12   A    Yes, absolutely.

13            MS. GORDON:  I have nothing further for this

14   witness.

15            THE COURT:  Redirect?

16            MR. FORST:  No questions, Your Honor.

17            THE COURT:  All right.  You may step down.

18            THE WITNESS:  Thank you.

19            THE COURT:  Call your next witness.

20            MR. BURCK:  Thank you.  Your Honor, plaintiff calls

21   Mark Holden.

22            THE COURTROOM DEPUTY:  Please step forward.  Stop

23   right there, turn around.  Please raise your right hand.

24        (The witness, MARK VINCENT HOLDEN, was sworn.)

25            THE COURTROOM DEPUTY:  Please take a seat.  And
```

# Exhibit 7

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE MANUEL L. REAL

4        UNITED STATES DISTRICT JUDGE PRESIDING

5

6  AMERICANS FOR PROSPERITY FOUNDATION,  )
                                        )
7                     Plaintiff,        )
                                        )
8       vs.                             )  CASE NO. CV 14-9448-R
                                        )
9  KAMALA HARRIS, in her Official       )       Volume II
   Capacity as Attorney General of the  )     (Pages 1 - 116)
10  State of California,                 )
                                        )
11                    Defendant.        )
   _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS
                 JURY TRIAL - DAY TWO
15              LOS ANGELES, CALIFORNIA
             WEDNESDAY, FEBRUARY 24, 2016
16                   10:56 A.M.

17

18

19

20

21  _____

22          CAROL ZURBORG, CSR, CCRR
           FEDERAL OFFICIAL COURT REPORTER
23         312 NORTH SPRING STREET, ROOM 414
            LOS ANGELES, CALIFORNIA 90012
24                (213) 894-3539

25

```
1                        APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

     QUINN EMANUEL URQUHART & SULLIVAN LLP
4    BY:  DEREK SHAFFER
     BY:  WILLIAM BURCK
5    BY:  ERIC C. LYTTLE
          Attorneys at Law
6    777 Sixth Street NW, 11th Floor
     Washington, D.C. 20001
7    (202) 538-8000

8

9    FOR THE DEFENDANT:

10   STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
     OFFICE OF THE ATTORNEY GENERAL
     BY:  ALEXANDRA ROBERT GORDON
11   BY:  EMMANUELLE SARAH SOICHET
     BY:  JOSE A. ZELIDON-ZEPEDA
12        Attorneys at Law
     455 Golden Gate Avenue, Suite 11000
13   San Francisco, California 94102
     (415) 703-5509

14

15   STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
     OFFICE OF THE ATTORNEY GENERAL
16   BY:  KEVIN A. CALIA
          Attorney at Law
17   1300 I Street
     Sacramento, California 95814
18   (916) 322-6114

19

20   ALSO PRESENT:

21   SCOTT DUVAL
     EMILY GARGUILO

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1    North Carolina and the leading daily in the state of North

2    Carolina.

3    Q    And was there an article called "The Man Who Would Be

4    King"?

5    A    No, there was not.  There was an article that day.  That

6    was not the title of it.

7    Q    Was it about it you, though?

8    A    It was about me, and I think it referred to me as a one-

9    man equalizer.

10   Q    What -- did it reference anything with respect to the

11   Americans for Prosperity Foundation?

12   A    Yes, sir, it did.

13   Q    So when you read this you understood this to be a

14   reference to you and Americans for Prosperity Foundation?

15   A    Among other things, yes, sir.

16   Q    And then Variety Wholesalers, what is that?

17   A    Variety Wholesalers, Inc. is my family business.

18   Q    Thank you.

19        You can put that aside, please?

20        Now, beyond Mr. Protzman's articles or the articles that

21   appear on his blog, are there other threats that you've

22   received based on your affiliation with the Americans for

23   Prosperity Foundation, as far as you know?

24   A    Oh, yes, sir.

25   Q    Can you describe?  Give us an example of one.

```
 1   A     Well, one major one is the following year I was at the

 2   Americans for Prosperity Foundation offices in -- I believe

 3   it's September of 2011, and Tracy Henke who was our chief

 4   operating officer, referred to her as the COO, came to me very

 5   upset and concerned, brought to my attention a video of a video

 6   game of people killing AFP employees at our offices in

 7   Virginia.

 8   Q     So I'm clear, it's a video of a video game in which AFP

 9   employees are being killed, not really killed, just part of the

10   video game?

11   A     Correct, it was a part of a video game, yes, sir.

12   Q     Can you turn to Trial Exhibit 378, please.

13   A     Yes, sir.

14          THE COURTROOM DEPUTY:  378 is identified and placed

15   before the witness.

16          (Exhibit 378 for identification.)

17   BY MR. BURCK:

18   Q     Mr. Pope, do you recognize that?

19   A     Yes, sir.

20   Q     Can you just tell us what it is.

21   A     It's a screen shot of a YouTube video of the video game.

22   It appears to be the same one that Tracy Henke showed me when I

23   was at the AFP offices in 2011.

24   Q     And do you recall actually watching this video with

25   Ms. Henke at the time?
```

```
 1   A     Yes, sir.  When Tracy came and talked to me about

 2   expressing concerns, I said, "What are you talking about?  Show

 3   me."  So we literally walked to her office, and I literally

 4   looked over her shoulder when she played it, and this is what

 5   it showed.

 6          MR. BURCK:  Your Honor, we would offer into evidence

 7   Trial Exhibit Number 378.

 8          MR. CALIA:  We object.  It lacks foundation, and it

 9   was not produced during discovery.

10          THE COURT:  378 in evidence.

11       (Exhibit 378 received.)

12          MR. BURCK:  Your Honor, we have a very brief,

13   20-second clip that we would like to show.

14          THE COURT:  All right.

15          MR. BURCK:  Thank you.

16       (Video played in open court.)

17          MR. BURCK:  Thank you.

18   Q     Now, in that clip, although it's hard to see here, but for

19   the record, there is a banner that says "Americans for

20   Prosperity"?

21   A     Yes, sir.

22   Q     And you saw that at the time that you saw the video game?

23   A     Yes, sir.

24   Q     And did you think this was a joke?

25   A     No, sir.  I thought it was horrible.
```

1  A     No, sir, it is not.

2  Q     Have you ever denied climate change?

3  A     No, sir.

4  Q     Does it also mention Americans for Prosperity in this

5  article?

6  A     Yes, sir.

7  Q     So again, how did you view this article in terms of how it

8  was portraying you to the world?

9  A     Well, I actually served on North Carolina general

10 assembly, and when I was in the legislature, I received a 100

11 positive rating for the 2001 session for the League of

12 Conservation Voters, Conservation Counsel.  I was also endorsed

13 by the Sierra Club when I ran for reelection in 2002.  I have a

14 very good voting record, public record on environmental issues.

15     This takes that and totally flips it, and makes it look

16 like again, the connotation of global-warming denier with the

17 Holocaust deniers is extremely negative, so it misleads people

18 to what I believe, and it really misleads what the

19 organization -- what they actually do, because Americans for

20 Prosperity, while it addresses -- Americans for Prosperity

21 Foundation, while they address economic issues, including the

22 pros and cons and consequences of a cap-and-trade system or a

23 carbon tax, AFP Foundation has never engaged in -- what the

24 science is on global warming or lack of global warm or climate

25 change.

```
1    Q     Can you take that down?

2          Thank you.

3          Are you aware of any other -- or are you present for any

4    events in which -- for the Americans for Prosperity Foundation

5    or AFP in which you saw acts of violence or threats?

6    A     Yes, sir.

7    Q     Can you tell us what that was?

8    A     In the fall of 2011, I attended the Americans for

9    Prosperity Foundation's Defending the American Dream Summit,

10   and it was an annual summit.  It took place in Washington,

11   D.C., and there were protests, attempts to enter the building

12   and disrupt our summit, our dinner, our speakers.  And then

13   they changed tactics, and the protesters tried to push and

14   shove and keep people in the building, including myself and

15   many other people that I observed.

16   Q     Were you there present for this?

17   A     I was there in person, yes, sir.

18   Q     And you saw protesters pushing or keeping you in the

19   building?

20   A     Yes, sir.

21   Q     You?

22   A     I personally could not get out of the building.  I was

23   trying to help other people get out of the building as well.

24   Q     Do you recall that this event, this protest, received some

25   press coverage?
```

```
 1   A     Yes, sir.

 2   Q     Just for identification purposes, please take a look at

 3   Trial Exhibit 684.

 4           THE COURTROOM DEPUTY:  Exhibit 684 is identified and

 5   placed before the witness.

 6       (Exhibit 684 for identification.)

 7           THE WITNESS:  Yes, sir.

 8   BY MR. BURCK:

 9   Q     Do you recognize this?

10   A     Yes, sir.

11   Q     And can you tell us what it is?

12   A     It's a screen shot of a video taken at the protest.

13   Q     And what is the title?

14   A     "Occupy DC Pushes Grandma Down Stairs."

15   Q     What is Occupy DC?

16   A     Occupy was the umbrella group or one of the groups that

17   took credit for organizing the protests at the Defending

18   American Dreams Summit.

19           MR. BURCK:  Your Honor, we would offer into evidence

20   Trial Exhibit Number 684.

21           MR. CALIA:  We have no objection.

22           THE COURT:  684 in evidence.

23       (Exhibit 684 received.)

24           MR. BURCK:  Your Honor, we have a very brief clip

25   that we would like to show.
```

```
 1        (Video played in open court.)
 2   BY MR. BURCK:
 3   Q    Mr. Pope, do you recall seeing that woman on the floor?
 4   A    No, sir.  I personally did not see the woman on the floor.
 5   I was elsewhere in the building at that time.  And when we
 6   were -- "we" being the AFP Foundation were reviewing what
 7   happened, what we could do to prevent it, I saw it on the
 8   YouTube video after the fact.
 9   Q    Did you feel personally threatened when you were at this
10   event?
11   A    Yes, sir.
12   Q    And did you believe that the people that were there
13   protesting were there in part because of your affiliation with
14   Americans for Prosperity?
15   A    The whole event was Americans for Prosperity Foundation
16   event.  That's exactly why they were there.
17   Q    Do you have any doubt in your mind?
18   A    No, I don't have any doubt in my mind, no, sir.
19   Q    Now, sir, you said that you did not give for two years --
20   or the foundation did not give for two years, the family
21   foundation did not give for two years to the Americans for
22   Prosperity Foundation.
23   A    That's correct, sir.
24   Q    Have you ever considered -- but you have since then?
25   A    Yes, sir.
```

1   Q     Have you ever considered stopping funding or providing

2   support to Americans for Prosperity Foundation?

3   A     Yes, sir, I have considered it.

4   Q     And why?

5   A     Well, because of the resulting threats on my life,

6   boycotts on my business.  I was having to constantly defend my

7   reputation, what I actually believed in, what I have actually

8   done as an elected legislator.  My wife wanted me to keep a

9   lower profile.  The people at my business weren't real happy

10  about it.  So yes, I did consider not giving any more, trying

11  to give some other way.

12  Q     Why have you considered -- why have you continued to give

13  despite these threats?

14  A     Well, it's too late.  Back in 1986, when we formed the

15  John William Pope Foundation, I knew then that routinely

16  private foundations will list their grantees.  And for over 20

17  years that was noncontroversial; no one thought twice about it.

18  As I said earlier, it really started in 2006, it really took

19  off in 2009, 2010, when these grants and what the grants were

20  allegedly used for, historic used for became public and were

21  used to attack me and justify attacks on me, it was already

22  done.  The grant history was already out there.

23        And also, once somebody is in a private foundation, then

24  any subsequent donation -- and we had already accumulated funds

25  from gifts and donations and our investments in the foundation,

# Exhibit 8



TX  NO. **684**

Case No. 2:14-CV-09448
*Americans for Prosperity Foundation*
*v.*
*Kamala Harris*

Date I'D:_____ Date Adm:_____



Exhibit 684:

"Occupy DC Pushes Grandma Down Stairs,"

https://www.youtube.com/watch?v=xgcRlrt2ZL4

# Exhibit 9





Exhibit 378:

YouTube video entitled "Tea Party Zombies Must Die Game is Propoganda!"

https://www.youtube.com/watch?v=gU-wxYML35s

# Exhibit 10

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

--------------------------X

AMERICANS FOR PROSPERITY

FOUNDATION,

        Plaintiff,

v.                              Case 2:14-CV-09448

KAMALA HARRIS, in her Official

Capacity as Attorney General

of the State of California,    Honorable Manuel

        Defendant.        L. Real

--------------------------X

  **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**


VIDEOTAPED DEPOSITION OF

AMERICANS FOR PROSPERITY FOUNDATION

through its corporate representative

and in his individual capacity

CHRISTOPHER FINK


Washington, DC 20001

Friday, November 13, 2015


By:  Denise D. Vickery, RMR, CRR   Job No. 158248

1

1

2

3                          Friday, November 13, 2015

4                              9:00 a.m.

5

6

7    VIDEOTAPED DEPOSITION OF AMERICANS FOR PROSPERITY

8    FOUNDATION through its corporate representative

9    and in his individual capacity, CHRISTOPHER FINK,

10   held at the offices of:

11

12

13   QUINN EMANUEL URQUHART & SULLIVAN LLP

14   777 6th Street NW

15   11th Floor

16   Washington, DC 20001

17

18

19

20   Pursuant to notice, before Denise D. Vickery,

21   Registered Merit Reporter, Certified Realtime

22   Reporter, and Notary Public in and for the

23   District of Columbia.

24

25

2

Christopher Tuttle

November 13, 2015                                    Confidential

```
1                    A P P E A R A N C E S

2

3     For the Plaintiff and the Witness:

4     QUINN EMANUEL URQUHART & SULLIVAN LLP

5            777 6th Street NW

6            11th Floor

7            Washington, DC 20001

8            202.538.8146

9     BY:    JONATHAN G. COOPER, ESQ.

10           jonathancooper@quinnemanuel.com

11    BY:    SEAN DELPHEY, ESQ.

12           seandelphey@quinnemanuel.com

13

14    For the Defendant:

15    STATE OF CALIFORNIA, DEPARTMENT OF JUSTICE

16           Office of the Attorney General

17           Civil Division

18           Government Law Section

19           1300 I Street

20           Sacramento, CA 95814

21           916.322.6114

22    BY:    KEVIN A. CALIA, Deputy Attorney General

23           Kevin.Calia@doj.ca.gov

24

25    Also Present:    Maribeth Powers, Videographer
```

3

1      Q.    I want to direct your attention to

2   paragraph 5 of the same declaration that's been

3   marked as Exhibit 67.

4           That paragraph begins:

5            "A large portion of our donor base

6   is extremely concerned about having their

7   contributions to the Foundation become public

8   knowledge."

9           Do you see that?

10      A.    Yes.

11      Q.    When you say "A large portion of

12   our donor base," are you talking about all

13   donors --

14      A.    Yes.

15      Q.    -- or specific subset of donors?

16      A.    I mean, I'm referring to my

17   experience with the donors I've interacted

18   with.  So obviously I have not met with all

19   whatever donors are out there.

20      Q.    But you didn't mean to limit this

21   sentence to only those donors who would appear

22   on Schedule B, for example?

23      A.    No.

24      Q.    And it's a small portion of the

25   overall donor base who would actually appear on

213

1   Schedule B; isn't that right?

2        A.    That's correct.

3        Q.    10 or fewer people per year?

4        A.    Yeah.  So up to date, yes.

5        Q.    Out of a donor base that is many

6   times that size; correct?

7        A.    Yes.

8        Q.    When you say "A large portion of

9   the donor base is extremely concerned," how

10  many people have personally told you that they

11  were "extremely concerned" about having their

12  contributions become public?

13       A.    I would have to speculate.

14       Q.    Well, give us your best estimate of

15  how many donors have -- have told you that

16  specific thing.

17       A.    Probably be in the hundreds.

18             And rephrase that to prospective

19  donors and donors.  Prospect and donors.

20  Please.

21       Q.    How many people have refused to

22  make donations because of this concern?

23       A.    I couldn't tell you the exact

24  number.

25       Q.    What's your best estimate of people

214

1    who you tried to recruit to make a contribution

2    and told you, "I'd really love to make a

3    contribution, but I'm not going to because I'm

4    afraid that my contribution may become public"?

5        A.    Somewhere between a dozen and a

6    couple dozen.

7        Q.    And when you've had that

8    conversation, what did you do next?  Do you

9    accept no at face value?

10       A.    I try to explain to them that we

11   spend a lot of time, and we are dedicated to

12   keeping your contribution anonymous and that we

13   don't disclose information that's not demanded

14   on us by the law.

15       Q.    In response to that type of

16   conversation, have you ever told a donor that

17   if they made the donation through a

18   donor-advised fund, they could assure their

19   anonymity?

20       A.    I probably would not say it in

21   those words, no.

22       Q.    Would -- would you describe a

23   similar concept using different words?

24       A.    Sure.  I'm trying to think through

25   conversations I've had.

215

# Exhibit 11

1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE MANUEL L. REAL

4        UNITED STATES DISTRICT JUDGE PRESIDING

5

6   AMERICANS FOR PROSPERITY FOUNDATION,   )
                                           )
7                       Plaintiff,         )
                                           )
8        vs.                               )   CASE NO. CV 14-9448-R
                                           )
9   KAMALA HARRIS, in her Official         )        Volume I
    Capacity as Attorney General of the    )     (Pages 1 - 116)
10  State of California,                   )
                                           )
11                      Defendant.         )
    _____)

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS
                   JURY TRIAL - DAY ONE
15               LOS ANGELES, CALIFORNIA
                TUESDAY, FEBRUARY 23, 2016
16
                       1:08 P.M.
17

18

19

20

21

22   _____

23           CAROL ZURBORG, CSR, CCRR
           FEDERAL OFFICIAL COURT REPORTER
           312 NORTH SPRING STREET, ROOM 414
24           LOS ANGELES, CALIFORNIA 90012
                   (213) 894-3539
25

```
 1                       APPEARANCES OF COUNSEL:

 2

     FOR THE PLAINTIFF:
 3
         QUINN EMANUEL URQUHART & SULLIVAN LLP
 4       BY:  DEREK SHAFFER
         BY:  WILLIAM BURCK
 5       BY:  ERIC C. LYTTLE
         BY:  KEITH H. FORST
 6            Attorneys at Law
         777 Sixth Street NW, 11th Floor
 7       Washington, D.C. 20001
         (202) 538-8000
 8

 9   FOR THE DEFENDANT:

10       STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
         OFFICE OF THE ATTORNEY GENERAL
11       BY:  ALEXANDRA ROBERT GORDON
         BY:  EMMANUELLE SARAH SOICHET
12       BY:  JOSE A. ZELIDON-ZEPEDA
              Attorneys at Law
13       455 Golden Gate Avenue, Suite 11000
         San Francisco, California 94102
14       (415) 703-5509

15
         STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
16       OFFICE OF THE ATTORNEY GENERAL
         BY:  KEVIN A. CALIA
17            Attorney at Law
         1300 I Street
18       Sacramento, California 95814
         (916) 322-6114
19

20   ALSO PRESENT:

21       SCOTT DUVAL
         EMILY GARGUILO
22

23

24

25
```

1    one of us."  So those are ongoing conversations from elected

2    officials and just in the press, public -- I would call it

3    public bullying, trying to intimidate me.

4         When -- you know, just this last Thanksgiving -- I have

5    nine brothers and sisters.  There's ten of us, and my mom is

6    still living.  Of my nine brothers and sisters, seven have been

7    audited.  Myself and my husband have been audited, and my mom

8    received her audit notice this fall.

9    Q    Is that something you hear about from your family?

10   A    Yes.  My sister-in-laws, two of the audits had closed out,

11   and their comments to me was, "Teresa, do we have you to thank

12   for this?"

13   Q    Have any donors specifically expressed concerns about the

14   prospect they have been or they might be subject to organized

15   boycotts?

16   A    Yes.  As people who are assumed to be donors of ours have

17   been publicly targeted in the press, our chairman of our

18   foundation, David Koch, the, you know, calls for boycotts, the

19   death threats that he faces that are sent to his family, and

20   not just him personally, but his family and his children, the

21   public boycotts for his businesses.

22        There's also our former (c)(4) chairman, Art Pope, who has

23   been targeted in press stories to boycott his business.  But

24   then in addition to that, I can give you an example of a donor

25   whose business was targeted by an association, a reputable

1    association in that state.  A letter was sent to all the school

2    boards in that state encouraging all the school boards to

3    discontinue awarding this individual's business contracts

4    because of his assumed association with Americans for

5    Prosperity and Americans for Prosperity Foundation.

6    Q     Did that in any way impact the donor's continuing

7    association?

8    A     That individual reduced his contributions in half, so from

9    $500,000 annually to 250,000 based on the pressure from his

10   board that remains in place today.

11   Q     And as the vice president of state operations, do you play

12   any role in monitoring and responding to threats against the

13   foundation or AFP employees?

14   A     I do.  If a threat is sent to one of our employees in the

15   state chapters, I am included on the first e-mail that goes to

16   security.  So I would be one of the first individuals notified

17   by e-mail or text, and help mitigate those and try and

18   determine how to move forward to ensure that our employees are

19   safe.

20   Q     To what extent do such threats arise and get reported to

21   you?

22   A     I will just go down the list.  There's October of 2015,

23   there's a fire bomb in the dumpster behind our Tennessee

24   headquarters.  Our Louisiana office had someone threaten to

25   drive down and ensure that they would no longer be able to come

1    by their house and knock on the doors again.  That was a threat

2    deemed credible by our security team.  There was a stalking

3    incident in Des Moines.  Our Iowa office was broken into.

4        This is just specific threats of violence or physical

5    safety.  This doesn't cover the level of bullying that our

6    employees face, so the number of, you know, hateful mail that

7    we receive, the public comments that not only target our

8    employees, but their spouses and their family members, the

9    descriptive voicemails that are left.

10   Q    What, if anything, does the foundation do to protect its

11   employees in their offices or in the field?

12   A    Our offices -- you know, we are a grass-roots

13   organization, so we want our offices to be accessible to

14   citizens, to the public.  So we often look for storefront

15   offices that have good parking, windows across the front, but

16   this also has a security risk with it.  So we make certain we

17   have security systems in place in those offices.  We are

18   currently getting ready to reassess whether those security

19   systems currently in place in areas of heightened threat are

20   enough, so we reevaluate continuously.

21       We have event checks in place that our employees submit

22   the list of people attending our events in advance to our

23   security team to try and look for individuals who may pose a

24   threat so we can address that on the front end.  We often

25   coordinate -- encourage them to coordinate on larger events to

1    one of us."  So those are ongoing conversations from elected

2    officials and just in the press, public -- I would call it

3    public bullying, trying to intimidate me.

4         When -- you know, just this last Thanksgiving -- I have

5    nine brothers and sisters.  There's ten of us, and my mom is

6    still living.  Of my nine brothers and sisters, seven have been

7    audited.  Myself and my husband have been audited, and my mom

8    received her audit notice this fall.

9    Q    Is that something you hear about from your family?

10   A    Yes.  My sister-in-laws, two of the audits had closed out,

11   and their comments to me was, "Teresa, do we have you to thank

12   for this?"

13   Q    Have any donors specifically expressed concerns about the

14   prospect they have been or they might be subject to organized

15   boycotts?

16   A    Yes.  As people who are assumed to be donors of ours have

17   been publicly targeted in the press, our chairman of our

18   foundation, David Koch, the, you know, calls for boycotts, the

19   death threats that he faces that are sent to his family, and

20   not just him personally, but his family and his children, the

21   public boycotts for his businesses.

22        There's also our former (c)(4) chairman, Art Pope, who has

23   been targeted in press stories to boycott his business.  But

24   then in addition to that, I can give you an example of a donor

25   whose business was targeted by an association, a reputable

1   association in that state.  A letter was sent to all the school

2   boards in that state encouraging all the school boards to

3   discontinue awarding this individual's business contracts

4   because of his assumed association with Americans for

5   Prosperity and Americans for Prosperity Foundation.

6   Q      Did that in any way impact the donor's continuing

7   association?

8   A      That individual reduced his contributions in half, so from

9   $500,000 annually to 250,000 based on the pressure from his

10  board that remains in place today.

11  Q      And as the vice president of state operations, do you play

12  any role in monitoring and responding to threats against the

13  foundation or AFP employees?

14  A      I do.  If a threat is sent to one of our employees in the

15  state chapters, I am included on the first e-mail that goes to

16  security.  So I would be one of the first individuals notified

17  by e-mail or text, and help mitigate those and try and

18  determine how to move forward to ensure that our employees are

19  safe.

20  Q      To what extent do such threats arise and get reported to

21  you?

22  A      I will just go down the list.  There's October of 2015,

23  there's a fire bomb in the dumpster behind our Tennessee

24  headquarters.  Our Louisiana office had someone threaten to

25  drive down and ensure that they would no longer be able to come

1   by their house and knock on the doors again.  That was a threat

2   deemed credible by our security team.  There was a stalking

3   incident in Des Moines.  Our Iowa office was broken into.

4        This is just specific threats of violence or physical

5   safety.  This doesn't cover the level of bullying that our

6   employees face, so the number of, you know, hateful mail that

7   we receive, the public comments that not only target our

8   employees, but their spouses and their family members, the

9   descriptive voicemails that are left.

10  Q    What, if anything, does the foundation do to protect its

11  employees in their offices or in the field?

12  A    Our offices -- you know, we are a grass-roots

13  organization, so we want our offices to be accessible to

14  citizens, to the public.  So we often look for storefront

15  offices that have good parking, windows across the front, but

16  this also has a security risk with it.  So we make certain we

17  have security systems in place in those offices.  We are

18  currently getting ready to reassess whether those security

19  systems currently in place in areas of heightened threat are

20  enough, so we reevaluate continuously.

21       We have event checks in place that our employees submit

22  the list of people attending our events in advance to our

23  security team to try and look for individuals who may pose a

24  threat so we can address that on the front end.  We often

25  coordinate -- encourage them to coordinate on larger events to

# Exhibit 12

1       UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE MANUEL L. REAL

4       UNITED STATES DISTRICT JUDGE PRESIDING

5

6   AMERICANS FOR PROSPERITY FOUNDATION,   )
                                           )
7                     Plaintiff,           )
                                           )
8        vs.                               )   CASE NO. CV 14-9448-R
                                           )
9   KAMALA HARRIS, in her Official         )        Volume I
    Capacity as Attorney General of the    )     (Pages 1 - 108)
10  State of California,                    )
                                           )
11                    Defendant.           )
    _____)

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS
                   JURY TRIAL - DAY THREE
15               LOS ANGELES, CALIFORNIA
                THURSDAY, FEBRUARY 25, 2016
16                    9:09 A.M.

17

18

19

20

21

22   _____

23            CAROL ZURBORG, CSR, CCRR
            FEDERAL OFFICIAL COURT REPORTER
24        312 NORTH SPRING STREET, ROOM 414
            LOS ANGELES, CALIFORNIA 90012
25                (213) 894-3539

```
 1                    APPEARANCES OF COUNSEL:

 2

     FOR THE PLAINTIFF:
 3
         QUINN EMANUEL URQUHART & SULLIVAN LLP
 4       BY:  DEREK SHAFFER
         BY:  WILLIAM BURCK
 5       BY:  ERIC C. LYTTLE
         BY:  KEITH H. FORST
 6            Attorneys at Law
         777 Sixth Street NW, 11th Floor
 7       Washington, D.C. 20001
         (202) 538-8000
 8

 9   FOR THE DEFENDANT:

10       STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
         OFFICE OF THE ATTORNEY GENERAL
11       BY:  ALEXANDRA ROBERT GORDON
         BY:  EMMANUELLE SARAH SOICHET
12       BY:  JOSE A. ZELIDON-ZEPEDA
              Attorneys at Law
13       455 Golden Gate Avenue, Suite 11000
         San Francisco, California 94102
14       (415) 703-5509

15
         STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
16       OFFICE OF THE ATTORNEY GENERAL
         BY:  KEVIN A. CALIA
17            Attorney at Law
         1300 I Street
18       Sacramento, California 95814
         (916) 322-6114
19

20   ALSO PRESENT:

21       SCOTT DUVAL
         EMILY GARGUILO
22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1   the breadth of concern about it, that it was something they

2   didn't take lightly and that they wanted to have exist

3   sometimes more than even in their charitable realm, the

4   political realm as well.

5   Q    And, Dr. Schervish, did that conversation, in fact,

6   confirm those things?

7   A    Yes.

8   Q    Dr. Schervish, did you speak with any of the foundation's

9   donors?

10  A    Yes, I did, just -- oh, did I speak with any of them?

11  Q    Yes, sir.

12  A    Oh, I see.  No, I did not speak with any of them, and

13  indeed, I didn't need to at this -- for my expert opinion in

14  this case.

15  Q    Why not?

16  A    Well, I was happy to find case material that, as I said,

17  already provided me with more information from a broad range of

18  individuals, hundreds of individuals for some of these

19  informants, if not thousands:  People that they have spoken to,

20  people that they have spoken in front of, people that they have

21  contacted, people whose names that they know.

22       And what happened in this particular instance, all roads

23  led in the same direction:  From my personal interviews with

24  donors and wealth holders to what I heard from the other

25  research paper from the development officers, what I heard in

```
1   the popular press and in the media about the contentiousness
2   and dangers in our political environment and what I heard from
3   these expert informants and from one donor himself.
4   Q    You said they all run in the same way?
5   A    Yes.
6   Q    What do you mean by that?
7   A    The vectors or the arrows all point in the same direction
8   that I have brought together as my expert opinion in this case.
9   Q    Does that mean they are all telling a consistent story?
10  A    Excuse me.  Yes, that's right.
11  Q    Based on your experience and work in this case, do the
12  foundation's donors reasonably desire anonymity?
13  A    They reasonably desire it.  They expect it, not just
14  desire it, and they are extremely cautious to preserve it.
15  Q    Dr. Schervish, based on your experience and your work in
16  this case, do the foundation's donors fear disclosure of the
17  foundation's Schedule B -- reasonably fear disclosure of the
18  foundation's Schedule B to the California attorney general?
19  A    Yes.
20  Q    Why is that?
21  A    The nation, as I said, is extremely politicized.  The
22  attorney general of California is an elected official.  The
23  attorney general is running for a senate seat currently.  The
24  situation is one in which people who are hired by the
25  foundation themselves could be highly politicized.  The
```

```
 1   interns, as far as I can see, there is no way to stop a
 2   Schedule B from being walked out of the office, put on a thumb
 3   drive, e-mailed to somebody.  And this is more likely given the
 4   youth, the inexperience, perhaps even the rationale for being
 5   hired into the attorney general's office in order to get this
 6   information.
 7   Q    Correct.  You said they are hired by the foundation?
 8   A    Excuse me.  By the attorney general's office.
 9   Q    Okay.  What, if anything, would donors, in your
10   experience, take from the registry's inability, as we have
11   seen, to keep Schedule B confidential?
12   A    I would put two things together:  One is their inability
13   to keep it confidential, and the dramatic efforts that are
14   being exerted to get ahold of what is kept in those Schedule
15   Bs, not only in California, but we saw one instance in
16   Massachusetts where this became published, I think in The
17   National Journal.  We saw that a donor list was so happily
18   gotten ahold of and published by Mother Jones.  This would not
19   only be something that they fear, but there would be groups
20   actively looking for these and searching them out.
21   Q    So is it your opinion, Dr. Schervish, that opponents of
22   the foundation would specifically seek out the foundation's
23   Schedule B if they were available?
24   A    Yes.  They would look for them, and other controversial
25   groups as well.
```

**UNITED STATES DISTRICT COURT**

1   Q     For all these reasons that you discussed today,

2   Dr. Schervish, is it your opinion that there would be a

3   chilling effect on the foundation's donors if the foundation's

4   Schedule B was disclosed to the California attorney general?

5   A     There would be a chilling effect, in my opinion, and this

6   chilling effect would extend to not only people who have been

7   associated, ceasing to associate, people that are now ceasing

8   to associate or not associate at the same level of intensity or

9   contribution, and it would affect people who had considered or

10  are considering participation in the future.

11  Q     I want to quickly break that down a little bit,

12  Dr. Schervish.  Is it your opinion -- is it -- you're aware

13  that there is a certain number of donors listed on Schedule B,

14  correct?

15  A     Yes.

16  Q     And there are other donors to the foundation that are not

17  listed on Schedule B?

18  A     That is correct.

19  Q     Is it your opinion that the donors who are actually listed

20  on Schedule B would be chilled with disclosure to the attorney

21  general?

22  A     Yes.  And I think we heard that the people on -- I don't

23  know myself whether the small number that you said that are on

24  Schedule B are the same people every year, whether they will be

25  the same people in the future.  We also don't know whether the