UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AMERICANS FOR PROSPERITY**, <br><br> Plaintiff, <br><br> v. <br><br> **GURBIR GREWAL**, in his official capacity as Attorney General of New Jersey, **ERIC H. JASO**, in his official capacity as Chairperson of the New Jersey Election Law Enforcement Commission, **STEPHEN M. HOLDEN**, in his official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, and **MARGUERITE T. SIMON**, in her official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, <br><br> Defendants. | Civil Action No. 3:19-cv-14228 <br><br><br> ECF Case <br><br><br> Return Date: August 5, 2019 <br><br><br> **Oral Argument Requested** <br><br><br> Document Electronically filed. |

**DECLARATION OF NICHOLAS DUNN**

I, Nicholas Dunn, declare as follows:

1. I am the Senior Vice President of Development at Stand Together Chamber of Commerce ("Stand Together"), a 501(c)(6) organization affiliated with Americans for Prosperity ("AFP"), a 501(c)(4) organization committed to the ideals

1

of economic freedom and limited government. I have led the development capability for what is now Stand Together Chamber of Commerce since 2017.

2. As Senior Vice President of Development at Stand Together, I oversee the Development Department, a group of approximately seventy employees who carry out the organization's fundraising efforts through direct mail, investor updates, online solicitation, events, corporate fundraising, and direct solicitation. My group acts as a non-paid agent to assist AFP in managing its fundraising activities and donor relations.

3. ***Development Department and Fundraising.*** During my time at the Development Team, our fundraising process has evolved. Initially, fundraising was primarily event-driven: donors were invited to large events, called Seminars or Summits, briefed on the organization's strategy for change, and then solicited for contributions.

4. Although Stand Together still engages in event-based fundraising, the organization also raises funds through word-of-mouth referrals from current donors and solicits contributions through direct marketing.

5. The Development Department focuses on four issue areas: communities, K-12 education, college education, and government policy. That last area—government policy—is the issue area in which AFP primarily engages. The development team helps identify donors who are interested in furthering Stand

Together's mission in these areas, which may include supporting organizations like AFP and others that share Stand Together's goals. Sometimes donors broadly give to Stand Together; on other occasions, donors make recommendations for particular projects that Stand Together supports. For example, some donors take special interest in Stand Together's government policy objectives, and our development team will help those donors make a contribution directly to AFP, which furthers our shared ideals of economic freedom and limited government.

6. More than 100 donors directly contribute at least $10,000 or more to AFP each year. Of those, in 2018, fewer than ten had addresses in New Jersey, and fewer still have earmarked recommended contributions for public policy activities in New Jersey specifically.

7. ***Donor Concerns About Confidentiality***. Over the years, I have personally interacted one-on-one with more than 1,000 actual and potential donors to AFP. The first time a member of our team sits down with a current or potential donor, we typically start by discussing what that individual is interested in and what they are trying to accomplish with their giving. We then look to connect them with the things AFP does that match the donor's goals. After talking about goals, we typically also discuss the donor's concerns or hesitations and how we can alleviate them.

8. Over the past 24 months, on behalf of AFP, our team has asked upwards of 1,000 donors to financially support AFP. Throughout that time, a concern many donors have voiced is whether their identities will remain confidential if they donate to AFP. Donors have expressed that the pervasive discussion of "dark money" in the press has made the issue of donor anonymity a top concern—especially for our major donors. Even if donors do not raise it themselves, it is important for us to discuss with donors the confidentiality of their information and make sure they understand the harassment that can result if they publicly disclose that they contribute to AFP.

9. Donors tell our team that the main reason they are concerned about disclosure of their identities is a fear of threats, harassment, and reprisals, both from members of the public and from government officials. They say they are concerned not just about attacks on themselves but also threats, harassment, and reprisals against their family members, their businesses, and their employees. Their concerns are grounded in a long history of such threats and harassment against people who are associated with AFP. Donors see the attacks that have been made against, for example, Charles Koch and David Koch, and they do not want to have to deal with the same thing in their own lives. Indeed, each time there is public disclosure of donors to other public advocacy organizations, such as during the IRS

4

scandal several years ago, there is a spike in donor concerns about confidentiality as they see the fallout for the donors who are named in those leaks.

10. In particular, some prospective donors with active businesses fear that their businesses will face economic consequences if they donate. Donors with retail business in particular fear boycotts if their giving was disclosed. Other donors with management positions in publicly-held corporations have expressed concern that giving to AFP and exposing their corporation to subsequent risk could violate their fiduciary duty.

11. Accordingly, a number of donors have said that they would not give if they thought their information would be publicly disclosed. In some cases, donors' reluctance to be publicly disclosed is manifest not just in what they tell us, but also in the actions they take to ensure their privacy is protected, even as to AFP. Indeed, even with all the precautions AFP takes, a number of potential donors have said that they would like to contribute to AFP but are too fearful of backlash and reprisals to do so. In most cases, though, donors are satisfied that the risk of disclosure to AFP is sufficiently low, given the strong information security measures AFP takes and the fact that it is not required to disclose its donors. But if AFP were forced to disclose its donors, there is nothing we could say to alleviate their concerns.

12. ***Confidentiality Protocols.*** When donors raise concerns about confidentiality, we usually explain to them how seriously we take the confidentiality

of the identities of supporters, and walk through many of the steps we take to protect confidentiality.

13. These steps are necessary, because people outside of AFP have shown an extremely high interest in identifying AFP's donors. The media routinely publishes stories about potential donors to AFP. For example, in 2014, Mother Jones published an article about a confidential document it obtained listing private meetings between potential donors and officials from AFP. Mother Jones also published the document itself. There have also been repeated unauthorized, surreptitious recordings of private AFP events that were then publicly released.

14. To protect against just these types of incidents, we have adopted a number of strict confidentiality measures. These confidentiality measures fall into three categories: information technology security, careful communications, and events security.

15. As for information technology measures, confidentiality is protected by storing donor information in a database called SalesForce. Access to donor information in SalesForce is highly restricted and granted only on a need-to-know basis. Only donor relationship managers and a few others (for example, select members of the finance team) are able to view sensitive donor information. The approved user list is reviewed regularly, and any employee who no longer requires access is restricted from the database.

16. Any requests for access are rigorously vetted. Employees who seek to view donor information must fill out an appropriate form, establish a need to access the data, and obtain approval from their direct supervisor and the database administrator.

17. Without access rights, would-be users are prevented from viewing confidential information stored in the database. Stand Together has implemented two-factor authentication for the SalesForce login, which significantly reduces the chance of unauthorized access.

18. Donor information is kept secured within the SalesForce database. Employees are generally prohibited from removing sensitive data and storing it on spreadsheets or sending it via emails, except for a valid business purpose. When employees need to view the data, they must use secured links to the SalesForce database itself.

19. Even for those with SalesForce credentials, their access is limited to the particular segments of SalesForce that the employee needs in order to complete his or her job. Each employee with SalesForce credentials is grouped into one of several profiles, which provide the employee with the limited access needed. Several users receive lower tier access to more limited sets of confidential data.

20. Even within SalesForce, there are certain donors who have requested complete confidentiality and thus are identified in the system only by numbers. There are at most a dozen employees who know the identity of these donors.

21. Our organization also protects donor confidentiality through careful communication practices. Confidentiality is a cornerstone of AFP's and Stand Together's culture. From an employee's very first day on the job, supervisors ingrain the importance of protecting sensitive donor information. These norms are emphasized during an employee's onboarding process, and supervisors periodically reemphasize these protocols to their subordinates at team meetings.

22. There are several specific practices every employee observes to ensure donor confidentiality. Among other things, employees are forbidden from publicly discussing donor names or leaving donor information out on their desks. We never mention donor names to other potential donors without the express permission of that donor. If at all possible, we do not share donor information through unsecured electronic channels like email. Instead, if we need to share such information, the first choice is to use links that require SalesForce login credentials and the second choice is to use secure file transfer platforms. In the rare circumstances where donor information is printed on documents, those documents must be collected and shredded.

23. Finally, donor confidentiality is maintained through tight security protocols at donor events. These events employ extensive precautions to protect donor confidentiality. For example, our organization typically rents out entire sections of the properties where we host our events so that only our guests will have access, thereby minimizing the risk that privacy-conscious donors will be publicly disclosed. We also takes steps to ensure information is not improperly leaked, such as by using noise machines to disrupt unauthorized audio recordings, requiring attendees to check in their phones before attending some sessions in order to reduce the chance of unauthorized recordings from being made in the first place, and watermarking, collecting, and destroying documents containing sensitive information. Additionally, for some donors who request an extra measure of confidentiality at events, our organization provides an identifiable lapel pin instead of a nametag, so that those donors can make it through security without publicly disclosing their identities.

24. For years, we completely denied the press access to donor events to protect confidentiality. There have been many examples of journalists and bloggers going to great efforts to discover who our donors are—from surreptitiously recording donor events to photographing license plates of donors as they arrive at donor conferences.

25. Nevertheless, three years ago, we eased that restriction to increase transparency and correct misunderstandings about our mission and purpose. Even so, we continue to protect donor confidentiality with the utmost care. Any reporter who requests access our events must expressly agree that they may report on anything they see or hear *but cannot* report or disclose donor names, unless they receive specific permission from a donor to disclose that donor's name.

26. On its face, Senate Bill No. 150 ("S150") would negate all of our efforts to maintain donor confidentiality. The sweepingly broad provisions of the law would require AFP to disclose its donors nationwide, regardless of whether those donors donated to advocacy efforts in New Jersey, or have any other connection to New Jersey. Despite AFP's own extensive efforts to safeguard donor information, there is little I or AFP can do to assuage donors' fears that their information will become public under S150's requirements.

27. S150's broad language will force AFP to disclose confidential donor information, even though it only engages in public policy advocacy within the state, even though a small fraction of its donors live in New Jersey, and even though a smaller fraction earmark contributions for activities in New Jersey. Nationwide disclosure would significantly chill AFP's donors, causing many to stop giving to AFP.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 24, 2019
in Arlington, VA.

Nicholas Dunn
*Senior Vice President of Development*
*Stand Together*

11