UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AMERICANS FOR PROSPERITY**, <br><br> Plaintiff, <br><br> v. <br><br> **GURBIR GREWAL**, in his official capacity as Attorney General of New Jersey, **ERIC H. JASO**, in his official capacity as Chairperson of the New Jersey Election Law Enforcement Commission, **STEPHEN M. HOLDEN**, in his official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, and **MARGUERITE T. SIMON**, in her official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, <br><br> Defendants. | Civil Action No. 3:19-cv-14228 <br><br> ECF Case <br><br> Return Date: August 5, 2019 <br><br> **Oral Argument Requested** <br><br> Document Electronically filed |

**DECLARATION OF EMILY SEIDEL**

I, Emily Seidel, declare as follows:

1. I am the Chief Executive Officer for Americans for Prosperity ("AFP"). I have served as CEO since November, 2017. Prior to that, I served as a board member and Executive Vice President of Freedom Partners Chamber of Commerce

from 2013 to 2017. The facts and information below are based on my personal knowledge obtained in my capacity as AFP's CEO.

2. As CEO, I am responsible for overseeing all of AFP's operations nationwide, including public policy development and issue advocacy campaigns. When I first became CEO, I primarily managed the organization's grassroots efforts across the country. Now, however, I spend less of my time engaged in grassroots management work and more time representing AFP in collaborations with other like-minded nonprofits.

3. In my previous roles as board member and Executive Vice President of Freedom Partners Chamber of Commerce, I managed the organization's development, communications, grant-making, and policy teams, and grew the organization from five employees to approximately 140.

4. *AFP and New Jersey*. AFP's mission is to inspire people to embrace and promote principles and policies of economic freedom and liberty, and to educate and train citizens to advocate for the ideas, principles, and policies of a free society at the local, state, and federal levels. AFP qualifies as a social welfare organization under Section 501(c)(4) of the Internal Revenue Code.

5. AFP's advocacy in New Jersey is primarily run through AFP's New Jersey chapter. In New Jersey, AFP does not engage in partisan politics. Instead,

it works with a variety of groups and individuals from across the political spectrum to advocate on public policy issues that are consistent with AFP's principles.

6. For example, the New Jersey chapter recently advocated to reform an occupational licensing law that required hair braiders—many of whom are immigrants and the sole breadwinners in their families—to pay almost $20,000 for over 1,000 hours of cosmetology schooling that has nothing to do with hair braiding. The New Jersey chapter partnered with affected hair braiders, a public interest law firm, grassroots activists, and legislators on both sides of the aisle to promote a reform bill that passed both houses of the legislature with unanimous, bipartisan support.

7. Through these efforts, the New Jersey chapter has provided a model of engagement for our other chapters. Each state chapter works closely with our Policy Team, which provides centralized policy expertise on AFP's core issues. That expertise includes both a deep understanding of public policy issues in theory as well as the best strategies to advance them in practice. Time and again, the Policy Team has gleaned lessons from the New Jersey chapter's victories and used them to repeat those successes in other states. To return to the prior example, state chapters have followed the New Jersey chapter's model to challenge hair braiding licensure by forming strategic partnerships and bipartisan coalitions.

8. More generally, New Jersey's approach of building bipartisan coalitions around principled public policy positions is a model approach for AFP as an organization. We want to find *nonpartisan* solutions to issues. We want to support people who are willing to work with us on public policy issues where we can find a principled common ground, no matter what party they are in and regardless of whether we disagree on other issues. And we especially want to support those who are willing to stick their necks out to do what is right, even at the expense of partisan gain.

9. ***Donor Confidentiality***. AFP's activities in New Jersey and nationwide are possible only because of the generous contributions of AFP's donors. More than 100 donors contribute in excess of $10,000 each year to AFP to fund its initiatives. Without these contributions, AFP would lack the resources it needs to pursue its mission. Donors are the lifeblood of AFP.

10. As a regular part of my job, I speak to donors, whether individually or on conference calls. The vast majority of these donors require confidentiality as part of their giving. Even though I am not these donors' primary point of contact with AFP—that is generally left to the Development Team—some still raise concerns over confidentiality when I speak to them. Those concerns are understandable—we have, as an organization, seen and lived numerous unfortunate (and sometimes scary) episodes in which our employees and donors have been

threatened, harassed, boycotted, *etc*. Some donors will refrain from giving to the extent doing so exposes them to the risk of public disclosure.

11. **Threats and Harassment**. Donors have good reason to insist on confidentiality. AFP's known associates often face threats, harassment, and violence. In my role as CEO, I have been informed of numerous incidents that concerned the safety of AFP's employees and donors.

12. For example, Erica Jedynak, who recently served as AFP's New Jersey State Director, and her husband have been the recent recipients of a number of death threats and hate mail because of her association with AFP.

13. I am also aware of the long history of threats and harassment that pre-date my time as CEO. Over the years, AFP has suffered a cyberattack and received bomb threats. The Federal Bureau of Investigation has also investigated (and deemed credible) death threats made against AFP's associates, particularly against two of AFP's founders, Charles Koch and David Koch, who have received numerous death threats against them and their families, including grandchildren.

14. There have also been incidents at AFP events. For example, at one event in Washington, D.C., protestors tried to force their way inside the building where the event was being held and then blocked attendees from leaving the event, and even knocked an elderly attendee down the stairs. At another event in Lansing, Michigan, protestors cut the ropes holding the tent up where the event was occurring,

causing the tent to collapse on top of several attendees, after which one protestor threatened to trample the attendees.

15.   As an institution, AFP is well aware of these safety risks and has established various security protocols to address them.  All employees receive training on how to survive an active shooter on their first day on the job.  We also send reminders to our employees of basic security steps they should take, such as questioning people who do not look familiar in the office and giving visitors security badges.  Some employees are also given panic buttons at their desks.

16.   The threats are so serious that I have taken additional steps beyond what AFP requires to ensure my family's safety, even though I have never been very public-facing, even in my role as CEO.  When I began working for AFP, I was encouraged to scrub my social media of any content depicting my family members to help protect them from threats and harassment.  We also scrubbed my social media so that you cannot see my home.  I have even given my parents talking points that they can use if and when they are accosted at parties due to my affiliation with AFP.  These steps that I have proactively taken are indicative of the risks and vitriol that people with any association with AFP face.

17.   ***AFP's Confidentiality Measures***.  Given these threats, donor confidentiality is a top priority at AFP.  Accordingly, we have instituted a number of internal protocols to ensure that donor information is protected.

6

18. Even among AFP employees, donor information is disclosed on a need-to-know basis. Very few employees are given access to AFP's donor database. Even as CEO, I cannot access the database without special permission. Outside of Charles Koch and David Koch, most employees will know the names of maybe a couple of other donors. Even when engaging in fundraising and donor outreach, employees often will not know the names of donors. For example, AFP employees sometimes help the Development Team write letters to donors without ever knowing the donors' names.

19. One particular example comes to mind to spotlight just how seriously AFP and its donors take anonymity, and how AFP's need-to-know policy can create potential hiccups for AFP's own donors. On one occasion, a corporate donor made a significant contribution to AFP after learning about a particular state chapter's plans, but was only willing to donate on the condition of total anonymity. The corporation did not want AFP to invite it to any AFP-sponsored events or otherwise reach out to it in any way after it made its donation—it wanted complete and total anonymity. As a result, only a handful (at most) of AFP personnel knew the identity of the corporate donor and their support of the state chapter overall. Because AFP kept the identity of this corporate donor on a need-to-know basis, the employees responsible for developing AFP's public policy advocacy did not know the corporation's identity and its views. As it turned out, the same AFP chapter, for

which the corporation made its donation, later criticized the corporation's practices and called out the corporation by name, completely unaware that the corporation had directly donated to AFP. This example goes to show just how seriously AFP takes donor confidentiality, sometimes to a degree that AFP may even unknowingly criticize its major donors.

20. Donor information is likewise protected from other donors. For example, during conference calls for donors, the identities of call participants are kept anonymous unless any of the callers chooses to announce themselves.

21. ***S150 and the New Jersey Chapter***. Because confidentiality is a priority, laws that compel disclosure of donor identities are cause for great concern at AFP. Public disclosure will discourage donations, draining resources otherwise available to sustain AFP's continuing expression and activities.

22. Some disclosure laws apply only if organizations engage in electioneering activities. Under these laws, AFP can continue its public policy advocacy while protecting donor confidentiality simply by avoiding campaign advocacy that would trigger the law's disclosure requirements. Thus, while election disclosure laws impose some burdens on AFP, the organization does not see them as an existential threat, because it can tailor its public policy advocacy to fit the law's requirements.

23. In contrast, the plain language of New Jersey Senate Bill No. 150 ("S150") is so broad that basically any public policy advocacy would trigger the law's disclosure requirements. Under S150, virtually all of AFP's advocacy could trigger disclosure of confidential donor information. All of our advocacy concerning public questions, regulations, or legislation would put donors' information at risk nationwide. As I understand it, S150 would compel disclosure even if we share basic facts about any of these topics to the public; simply sharing the New Jersey chapter's efforts in online press releases would trigger disclosure.

24. Because the disclosure is of all AFP's donors nationwide, the impact of New Jersey's law stretches beyond the state's borders. If AFP's donors are required to be disclosed because of S150, that will reduce AFP's donations nationwide, which will impact the public policy advocacy that AFP engages in throughout the country.

25. Because continued operation in New Jersey could pose an unacceptably high risk to the organization as a whole, S150 could mean the end of AFP's chapter in New Jersey. AFP cannot put at risk its donors or its nationwide policy agenda.

26. Closing the New Jersey chapter will harm AFP's advocacy beyond the state itself. AFP's New Jersey chapter serves as a model for success and bipartisan advocacy that state chapters can follow to advance AFP's mission across the country. By forcing this model to close down, S150 may cause AFP to become less effective

9

at building bridges in our divided country and advocating for reform that will benefit all citizens, regardless of party.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 24, 2019
in Arlington, VA.

Emily Seidel
*Chief Executive Officer*
*Americans for Prosperity*