UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICANS FOR PROSPERITY, <br><br> Plaintiff, <br><br> v. <br><br> GURBIR GREWAL, in his official capacity as Attorney General of New Jersey, ERIC H. JASO, in his official capacity as Chairperson of the New Jersey Election Law Enforcement Commission, STEPHEN M. HOLDEN, in his official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, and MARGUERITE T. SIMON, in her official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, <br><br> Defendants. | Civil Action No. 3:19-cv-14228 <br><br><br> ECF Case <br><br><br><br> Return Date: August 5, 2019 <br><br><br> **Oral Argument Requested** <br><br><br><br> Document Electronically filed. |

## DECLARATION OF ERICA JEDYNAK

I, Erica Jedynak, declare as follows:

1. I am currently the Director of Employment Initiatives at Stand Together, a 501(c)(6) chamber of commerce, an organization affiliated with Americans for Prosperity ("AFP"), a 501(c)(4) social welfare organization. I assumed that role on May 20, 2019, and before that I was briefly the Director of

1

Employment Initiatives for AFP between April 15, 2019 and May 20, 2019. Prior to that role, I served as the New Jersey State Director for AFP, a position I held for over four years after joining AFP on March 23, 2015. The facts and information in this declaration are based on my personal knowledge obtained in my capacity as AFP's New Jersey State Director.

2. As the head of the New Jersey chapter, I oversaw all of AFP's operations in New Jersey. In this role, I managed a group of up to two full-time and four part-time employees. My responsibilities included leading our public policy advocacy, including grassroots lobbying, meeting with legislators, creating legislative scorecards, hosting public policy education events, writing advertisements, penning editorials, tracking bills, and coordinating a network of grassroots activists throughout the state. By the end of my tenure, AFP's advocacy efforts had reached thousands of New Jersey residents. I was also responsible for engaging in fundraising to support the New Jersey chapter.

3. ***AFP's New Jersey Chapter***. During my time as State Director, AFP's New Jersey chapter did not engage in partisan campaigns or electoral politics. Instead, the New Jersey chapter promotes its message on New Jersey public policy issues through direct mail, phone banks, door-to-door canvassing, online press releases and updates to the public on the status of bills, laws, regulations, and other issues of public importance. It neither endorses candidates for public office in New

Jersey nor otherwise publicly advocates for or against the election of any candidate for office in New Jersey. Those types of electioneering efforts have not been the focus of our efforts in New Jersey.

4. Our chapter spends its resources building coalitions in New Jersey and promoting public policy issues that draw support from both sides of the political aisle.

5. For example, the New Jersey chapter championed a variety of criminal justice reforms, such as the Dignity for Incarcerated Primary Caretaker Parents Act, which would prohibit shackling incarcerated women who are in labor, among other things. Currently, no law in New Jersey prevents staff at state or county correctional facilities from applying restraints to women who are giving birth—a practice the American Medical Association has denounced as "barbaric" and the American Congress of Obstetricians and Gynecologists has criticized as "demeaning and unnecessary." One of the bill's sponsors, Assemblywoman Vainieri Huttle, a Democrat, remarked, "I cannot imagine women having to go through hours of labor while shackled to a hospital bed, or a baby being brought into this world under such

3

circumstances."[1]   As Assemblywoman Vainieri Huttle further explained, "This is not just about these women, but the health of their babies."[2]

6.      The Dignity for Incarcerated Primary Caretaker Parents Act, which passed the New Jersey Assembly and is currently under consideration in the Senate, would block this dangerous practice.   To support this bill, the New Jersey chapter has been working with a bipartisan coalition of groups, including Women Who Never Give Up and the American Civil Liberties Union.   In particular, AFP's New Jersey chapter issued public letters that urged state legislators to support the bill and encouraged grassroots volunteers to do the same.

7.      The New Jersey chapter also advocated for occupational licensing reform for hair braiders.  Previously, hair braiders who wanted to practice their trade in the state first had to obtain a cosmetology license, which costs almost $20,000 for 1,200 hours of schooling that had almost no connection to hair braiding whatsoever.   Many of the affected hair braiders were immigrants from West Africa who could not readily afford the cost of schooling or the time away from work. Nevertheless, New Jersey fined unlicensed braiders thousands of dollars and shut

---

[1]    Press Release, Valerie Vainieri Huttle, Assembly Panel Approves Vainieri Huttle Bill To Ban Use Of Restraints On Pregnant Inmates During Labor & Delivery (Feb. 5, 2018), *available at* http://www.valeriehuttle.com/assembly_panel_ approves_vainieri_huttle_bill_to_ban_use_of_restraints_on_pregnant_inmates_dur ing_labor_delivery.
[2]    *Id*.

4

down their businesses in inner cities where braiders could serve clientele who could not receive the same service at other salons. New Jersey's approach in this regard was particularly crushing for many hair braiders who were single parents or the only breadwinners in their homes.

8. In response to the onerous regulations, AFP's New Jersey chapter partnered with the public interest firm Institute for Justice along with a number of state legislators to bring common-sense reform to licensing for hair braiders. I partnered with Senator Declan O'Scanlon, a Republican, when he was an assemblyman in 2016 to introduce a bill completely exempting hair braiders from cosmetology licensure. I then contacted a number of senate and assembly Democrats to promote the bill and introduced them to hair braiders who could share their personal struggles with the licensing regulations. On April 19, 2018, AFP activists organized a community meeting where Assemblywoman Angela McKnight, a Democrat, demanded reform and captured national attention. The New Jersey chapter also partnered with the Institute for Justice and dozens of activists to organize hair braiders to attend committee hearings.

9. Thanks in part to these efforts, the bill passed both the Assembly and the Senate with unanimous and bipartisan support. It was not a complete victory, however: the Governor conditionally vetoed the bill and proposed numerous changes. Fortunately, the revised bill—which the Legislature later approved—

5

dramatically rolled back licensure requirements to 40-50 hours of relevant coursework and waived all prior fines. Although less than we hoped for, the revised bill took a large step toward lightening the regulatory burden for hair braiders who rely on their trade to provide for their families.

10. Recently, the New Jersey chapter has also called for pension reform. The State of New Jersey is facing a $220 billion pension crisis, and a recent report by the American Legislative Exchange Council ranked the state's unfunded pension liability per capita and funding ratios at 42nd and 46th worst among the 50 states. To prevent the coming crisis, AFP's New Jersey chapter called upon state legislators to take action and lauded Senate President Sweeney's "Path to Progress" plan that promises to cut spending on pensions.

11. The New Jersey chapter has also pushed back on home-baking bans that prohibit the sale of cottage food products. New Jersey is currently the only state in the union that completely bans the for-profit sale of home-baked goods, including foods that do not require refrigeration, such as cookies, muffins, bread, and cakes. First-time offenders face up to $1,000 fines. The law particularly burdens single, stay-at-home parents who could otherwise earn a living while staying home with their children. Partnering with home-bakers across the state, AFP's New Jersey chapter supported a bill that would loosen the restrictions on selling

home-baked goods and successfully pushed it out of committee in the New Jersey Assembly.

12. As these examples illustrate, AFP's New Jersey chapter is not a partisan player in the state. Rather, the chapter exclusively focuses on the issues it promotes and then partners with a wide array of New Jerseyans from across a variety of professions, backgrounds, and political parties to advance its mission.

13. Even when AFP's New Jersey chapter mentions candidates, it does so only to promote its core issues and advance legislative goals. For example, the chapter's press releases sometimes mention legislators who champion bills that the chapter supports, such as when Assemblywoman McKnight pushed the hair braiding reform bill.

14. Consistent with this approach, the New Jersey chapter produces an annual scorecard rating public officials on their record of supporting or opposing the issues that AFP advocates. The scorecard, which is released in February or March of each year—eight months before any general election—does not advocate for or against any particular candidate. Rather, the scorecard uses the chapter's key policy issues as touchstones to enable the public to evaluate legislators' voting records.

15. **Donor Confidentiality**. AFP's efforts in New Jersey are funded by contributions of its donors, both nationwide and in New Jersey.

16. As State Director, I was sometimes responsible for raising donations for the chapter's annual budget. To raise the necessary funds, I personally met with dozens of current and prospective donors during my time with AFP.

17. Almost invariably, the donors with whom I met asked about AFP's confidentiality policy. They regularly expressed that they wanted to donate anonymously, and that they wanted to discuss whether, and to what extent, their identities would be publicly revealed. Current and potential donors, as expressed to me, had concerns that they could face unwanted blowback for being associated with AFP. Some donors feared that they would lose business or even their jobs if the public knew they were associated with AFP. Others were afraid that they would become targets of harassment and threats. I assured them their personal information would remain completely confidential.

18. I was confident giving donors this assurance because I know first-hand how much AFP emphasizes donor confidentiality. Confidentiality is ingrained and emphasized from day one at AFP. We never share a donor's identity with anyone outside of the organization unless we receive express permission from that donor. Even within the organization, donor information is disclosed on a need-to-know basis; only employees directly involved with particular donors know their identities and access to the donor databased is strictly controlled. I, personally, never had access to AFP's entire donor database, nor would I be permitted access to donors

outside of New Jersey. Moreover, while I knew the identities of some of the donors whom I met within New Jersey, I do not know almost any donors outside the state.

19. **_Threats and Harassment_**. The donors' concerns over confidentiality are understandable. Individuals that are publicly associated with AFP face threats and harassment.

20. I myself have experienced such threats and harassment firsthand. I have received numerous harassing messages both online and in the mail because of my connection to AFP. I have received mail with a large middle finger on it, been called graphic names, and told to "eat shit and die."

21. On one occasion, union protestors surrounded me inside the New Jersey State House, screaming insults and threats. I feared for my safety until I escaped through a State House tunnel to find a state trooper.

22. AFP's opponents have also targeted my husband, Jeremy Jedynak, who served as Mayor and Council President of Rockaway Township, with death threats and harassment. Some of the instigators linked my husband to AFP in a disturbing video posted online.

23. That same disturbing video called my husband a tyrant and depicted him wearing a Nazi hat, surrounded by Nazi propaganda. The video specifically suggested that he was under AFP's control. Linking him to AFP in this way is

unfair, as he has never worked for AFP. Attached as Exhibit A is a copy of this video.

24. These threats to me and my husband forced me to request additional security at our state headquarters. For example, our security team advised me to install a video camera at the entrance and gave our chapter instructions on how to react in emergency/threatening situations. My husband and I also installed a video camera security system at our personal residence.

25. ***S150 and the Future of the Chapter***. AFP's confidentiality policy ensures that donors who do not give money for political purposes will remain anonymous and will not be exposed to the same attacks that my husband and I have experienced. But S150 will change our ability to maintain our donor's confidentiality, and thus our ability to help ensure that they are not subject to these same attacks, or worse.

26. In my position as State Director, I monitored hundreds of bills that made their way through the New Jersey Legislature. If a bill could affect AFP's mission, either positively or negatively, I would flag it for our national leadership team.

27. Bills that compel donor disclosure are especially important to AFP. These bills discourage AFP's donors from giving, thereby draining AFP's funding and hamstringing its advocacy on other issues.

28. When I saw S150's predecessor bill introduced to the New Jersey Legislature, I knew that it would devastate our efforts in the state. The Act's broad language will force AFP to disclose its donors nationwide even though we presently only engage in public policy advocacy throughout the state.

29. Based on conversations I have had with AFP's national leadership, S150 could mean the end of AFP's New Jersey chapter if it is upheld in court. Rather than put the safety of our donors at risk, AFP may be forced to abandon the bipartisan coalitions it has spent years cultivating and promoting causes that serve the public good.

\*   \*   \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 24th, 2019
in Rockaway, NJ.

*Erica Jedynak*
Erica Jedynak
*Director of Employment Initiatives*
*Stand Together*

# Exhibit A

# Produced in Native Format