## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **AMERICANS FOR PROSPERITY**, | Civil Action No. 3:19-cv-14228 |
| Plaintiff, | |
| v. | |
| **GURBIR GREWAL**, in his official capacity as Attorney General of New Jersey, et al., | Oral Argument Requested |
| Defendants. | |
| | Motion Date:   September 17, 2019 |

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

Kevin H. Marino
John A. Boyle
**MARINO, TORTORELLA & BOYLE, P.C.**
437 Southern Boulevard
Chatham, NJ 07928
(973) 824-9300

OF COUNSEL:
Derek L. Shaffer[*]
William A. Burck[*]
Keith H. Forst[*]
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Plaintiff Americans for Prosperity*

---

[*] Admitted *pro hac vice*.

# TABLE OF CONTENTS

Introduction ....................................................................................................1

Argument........................................................................................................3

    I.      AFP Is Likely To Prevail On The Merits. ............................................3

          A.    Defendants' Non-Binding Interpretation Of The Act
                Underscores The Need For A Preliminary Injunction. ..............4

          B.    Defendants' Construction Of The Act Fails To Correct The
                Act's Constitutional Deficiencies. ..............................................7

               1.    "Political Information" Provision.....................................7

               2.    "Influencing Legislation And Regulation" Provision. .....8

               3.    "Influencing Elections" Provision. ................................11

          C.    The Act Is Unconstitutionally Underinclusive. ........................15

          D.    Defendants Do Not Rebut AFP's As-Applied Showing. ..........17

    II.     Irreparable Harm Will Result Absent An Injunction...........................19

    III.   The Balance Of Equities And The Public Interest Strongly Favor A
        Preliminary Injunction.......................................................................19

Conclusion ...................................................................................................20

# TABLE OF AUTHORITIES

**Page**

## Cases

*ACLU of New Jersey v. ELEC*,
   509 F. Supp. 1123 (D.N.J. 1981) ..................................................7, 8

*Ayotte v. Planned Parenthood of Northern New England*,
   546 U.S. 320 (2006) ......................................................................9

*Board of Education of West Windsor-Plainsboro Regional School District v. Board of Education of Township of Delran*,
   825 A.2d 1215 (N.J. Super. Ct. App. Div. 2003) ...........................4

*Brown v. Entertainment Merchants Association*,
   564 U.S. 786 (2011)................................................................ 15, 17

*Buckley v. Valeo*,
   424 U.S. 1 (1976).........................................................11, 18, 19

*Buckley v. Valeo*,
   519 F.2d 821 (D.C. Cir. 1975) ......................................................8

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ....................................................................15

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ...................................... 13, 14, 16, 17, 18

*City of Lakewood v. Plain Dealer Publishing Co.*,
   486 U.S. 750 (1988)......................................................................5

*Delaware Strong Families v. Attorney General of Delaware*,
   793 F.3d 304 (3d Cir. 2015).................................................. 13, 14

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ............................................................ 6, 19

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004).......................................................20

*Kreimer v. Bureau of Police for Town of Morristown,*
      958 F.2d 1242 (3d Cir. 1992)..........................................................6

*Kucharek v. Hanaway,*
      902 F.2d 513 (7th Cir. 1990)..........................................................5

*New Jersey Freedom Organization v. City of New Brunswick,*
      7 F. Supp. 2d 499 (D.N.J. 1997) ....................................................5

*NAACP v. Alabama ex rel. Patterson,*
      357 U.S. 449 (1958) .....................................................................18

*New Jersey State Chamber of Commerce v. ELEC,*
      411 A.2d 168 (N.J. 1980)...........................................................8, 9

*Nixon v. Shrink Missouri Goverment PAC,*
      528 U.S. 377 (2000) .....................................................................16

*Reproductive Health Services of Planned Parenthood of St. Louis Region, Inc. v.*
      *Nixon,*
      428 F.3d 1139 (8th Cir. 2005)........................................................6

*Rivera-Feliciano v. Acevedo-Vila,*
      438 F.3d 50 (1st Cir. 2006) ............................................................6

*Salvation Army v. Department of Community Affairs,*
      919 F.2d 183 (3d Cir. 1990)..........................................................19

*Stenberg v. Carhart,*
      530 U.S. 914 (2000) .......................................................................5

*Swartzwelder v. McNeilly,*
      297 F.3d 228 (3d Cir. 2002)..................................................... 7, 20

*United States v. Stevens,*
      559 U.S. 460 (2010) .......................................................................5

*Vermont Right to Life Committee, Inc. v. Sorrell,*
      758 F.3d 118 (2d Cir. 2014)..........................................................15

*Wisconsin Right To Life, Inc. v. Barland,*
      751 F.3d 804 (7th Cir. 2014)............................................7, 11, 14

## **Statutes**

N.J.S.A. 19:44A-1 *et seq.* ........................................................................3

N.J.S.A. 19:44A-3(c) .............................................................................12

N.J.S.A. 19:44A-3(i) ..............................................................................16

N.J.S.A. 19:44A-3(n) .............................................................................16

N.J.S.A. 19:44A-3(t) ..............................................................................16

N.J.S.A. 19:44A-3(u) .............................................................................12

N.J.S.A. 19:44A-6(b) ..............................................................................4

N.J.S.A. 19:44A-8(d)(2) ..........................................................................2

N.J.S.A. 19:44A-8(e) ...............................................................................2

N.J.S.A. 19:44A-8(g) ...............................................................................2

N.J.S.A. 19:44A-10 ..................................................................................2

N.J.S.A. 19:44A-11 ..................................................................................2

N.J.S.A. 19:44A-12 ..................................................................................2

N.J.S.A. 19:44A-19(b) .............................................................................2

N.J.S.A. 19:44A-21(a) .............................................................................2

N.J.S.A. 52:13C-22.1 .............................................................................10

## **Other Materials**

Conditional Veto from Governor Philip Murphy to N.J. Senate (May 13, 2019),
*available at* https://www.njleg.state.nj.us/2018/Bills/S1500/
1500_V1.PDF ...................................................................... 15, 16

## INTRODUCTION

The parties agree that Senate Bill No. 150 ("S150" or "the Act"), as enacted and poised to take effect, violates the First Amendment.   Even while attempting to defend it, the Attorney General concedes the Act is unconstitutional in important respects.   In particular, the Attorney General offers no defense of provisions restricting the flow of "political information."   The Attorney General tries to forestall a preliminary injunction only by pointing to the prospect that the Election Law Enforcement Commission ("ELEC") *may* one day adopt regulations mitigating the constitutional defect.   Meanwhile, the Attorney General refuses to make any binding commitment not to enforce, thereby leaving countless regulated entities like Plaintiff Americans for Prosperity ("AFP") facing irreparable harm starting October 15, 2019.   This Court should enter a preliminary injunction preserving the status quo and protecting First Amendment rights that will otherwise be chilled.

The case for a preliminary injunction is open and shut.   Loss of First Amendment freedoms, even temporarily, constitutes classic irreparable harm that looms large here.   As for likelihood of success, not only has AFP shown it has *some* chance of ultimately prevailing, but *the State agrees* AFP should prevail.   The Governor's conditional veto previewed why S150 would be struck down, and the Attorney General concedes that S150 is unconstitutional, in critical part, unless and until ELEC may propound curative regulations that are nowhere in sight.

1

The remainder of Defendants' arguments rest on interpretations that are not plausible and disavowals that are not binding. At best, these "interpretations" only compound the vagueness and uncertainty that threaten to chill free expression under the weight of crippling burdens and possible criminal penalties. Finally, even if Defendants' opposition brief had the force of law (and could be clearly read, comprehended, and complied with), the Attorney General's revised version of the law would *still* be unconstitutional. Defendants wrongly equate all political expression with electioneering, merely because the expression references New Jersey *officeholders*. They then saddle covered groups with daunting administrative and reporting burdens (including, but not limited to, disclosure)[1] that have no precedent outside of narrow, well-defined election windows. The stakes are clear. Issue advocacy groups of all stripes are about to be chilled in New Jersey

---

[1]   These burdens include: (1) submitting a statement of registration, N.J.S.A. 19:44A-21(a); (2) appointing a treasurer and designating a depository, N.J.S.A. 19:44A-10; (3) maintaining records of contributions and expenditures for four years, N.J.S.A. 19:44A-8(d)(2); (4) ensuring all contributions and expenditures are made solely through the treasurer or a deputy and deposited within 10 days, N.J.S.A. 19:44A-11, 12; (5) providing ELEC with details in advance about any public solicitation, regardless of any connection to New Jersey, N.J.S.A. 19:44A-19(b); and (6) reporting receipts and expenditures for any testimonial affairs, *i.e.*, fundraisers, including any contribution greater than $300 (not $10,000), regardless of any connection to New Jersey, N.J.S.A. 19:44A-8(g). These burdens *increase* before an election: in the period preceding an election, an IEC must report contributions above $500 or expenditures above $800 within 48 hours. N.J.S.A. 19:44A-8(e).

unless the status quo is maintained and enforcement of S150 enjoined while the Court adjudicates the critical First Amendment questions posed in this case.

## ARGUMENT

### I.    AFP Is Likely To Prevail On The Merits.

AFP is likely to prevail.   The sweeping language of the Act, as enacted, blows past established constitutional lines and ensnares a whole universe of expression that connects, however slightly, to New Jersey politics.   Recognizing as much, Defendants seek to rewrite the Act by "correctly interpret[ing]" it.   Opp. 2.[2] But the Attorney General's brief does not bind ELEC or anyone else who may enforce the Act.   Instead, it injects additional vagueness and uncertainty, thereby further chilling free speech and creating new defects without curing the old ones.

It bears emphasizing just how heavily the likelihood-of-success analysis tips in favor of AFP.   AFP respectfully seeks preliminary relief against **S150**, as written, enacted and set to take effect, and *everyone now agrees* that **S150** is unconstitutional. Indeed, Defendants effectively concede the Act is unconstitutional, just as the Governor warned and AFP explained.   By its plain terms, the Act obliterates the

---

[2]   "Opp." refers to Defendants' Opposition Brief, Dkt. No. 29; "Br." refers to Plaintiff's Memorandum of Law, Dkt. No. 3-1; "Dunn Decl." refers to the Declaration of Nicholas Dunn, Dkt. No. 3-3; "Seidel Decl." refers to the Declaration of Emily Seidel, Dkt. No. 3-4; and "Jedynak Decl." refers to the Declaration of Erica Jedynak, Dkt. No. 3-5.   Citations to provisions of the Campaign Contributions and Expenditures Reporting Act, N.J.S.A. 19:44A-1 *et seq.*, are as amended by S150.

core constitutional distinction between issue advocacy and electioneering.   Rather than acknowledge that reality, Defendants accuse AFP of "mischaracteriz[ing] the statute."   Opp. 2.   In fact, AFP is on the same page with the Governor and the Legislature about what S150 regulates and how, and a preliminary injunction remains essential in order to preserve the status quo.

### A. Defendants' Non-Binding Interpretation Of The Act Underscores The Need For A Preliminary Injunction.

Defendants' briefing cannot salvage an unconstitutional statute.   AFP is here seeking (and needing) certain assurance and protection, which the Attorney General refuses to supply.   Contrary to Defendants' suggestion, the "interpretations" in their opposition brief do not bind anyone for the State of New Jersey.

The Attorney General and ELEC *could* issue binding interpretations of the Act, but they have not done so.   A formal opinion from the Attorney General would at least bind Defendants and state agencies, even without binding courts.   *See Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist. v. Bd. of Educ. of Twp. of Delran*, 825 A.2d 1215, 1218 n.2 & n.3 (N.J. Super. Ct. App. Div. 2003).   Alternatively, ELEC could issue implementing regulations.   *See* N.J.S.A. 19:44A-6(b).   Yet no such formal, binding steps have been taken, nor will they before October 15.   The Supreme Court has specifically "warn[ed] against accepting as 'authoritative' an Attorney General's interpretation of state law when the Attorney General does not

bind the state courts or local law enforcement authorities." *Stenberg v. Carhart*, 530 U.S. 914, 940–41 (2000).

Excerpts from the Attorney General's opposition brief are no substitute for a preliminary injunction from this Court.   "[T]he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige.   We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010); *see also N.J. Freedom Org. v. City of New Brunswick*, 7 F. Supp. 2d 499, 513 (D.N.J. 1997) ("that the [Government] will act in good faith is not a permissible limitation on authority").   Where an Attorney General "makes no representation that his concession would bind" others, and where "he may change his mind about the meaning" or "be replaced in office," as is true here, a court cannot rely on his interpretation to obviate a preliminary injunction.   *See Kucharek v. Hanaway*, 902 F.2d 513, 518–19 (7th Cir. 1990); *see also City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 769–70 (1988).

As of now, no one can have any confidence, let alone certainty, about what will and will not trigger S150's civil and criminal penalties.   Defendants are arrogating to themselves the discretion to determine what they mean, and where to draw critical lines between regulated and unregulated political expression.   A statute so vague and so malleable runs afoul of the First Amendment, which "finds

repulsive laws that endow officials with undue discretion to determine whether a given activity contravenes the law's mandates." *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1266 (3d Cir. 1992).   The uncertainty left by Defendants' "interpretation" further offends the First Amendment, as "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (quotation omitted).

While questions about how exactly the Act will be interpreted and enforced may await final resolution, groups and donors facing chill need definitive assurance and protection now.   Relative to the Act at issue, AFP's likelihood of success is obvious.   To the extent questions remain about the statute's precise meaning, that only confirms the propriety of a preliminary injunction preserving the status quo pending a final determination.   *See, e.g.*, *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1144 (8th Cir. 2005) (upholding preliminary injunction pending state court's interpretation of statute); *Rivera-Feliciano v. Acevedo-Vila*, 438 F.3d 50, 64 (1st Cir. 2006) (upholding preliminary injunction enjoining enforcement of Puerto Rican statute pending a final interpretation).   As such, even crediting the prospect that Defendants may, for instance, later issue regulations addressing the unconstitutional scope of the restrictions on "political information," Opp. 27–28, the correct course is to issue a preliminary injunction for the time being while "leav[ing] [the Government] free to

attempt to draft new regulations that are better tailored to serve [its] interests." *Swartzwelder v. McNeilly*, 297 F.3d 228, 242 (3d Cir. 2002).

### B. Defendants' Construction Of The Act Fails To Correct The Act's Constitutional Deficiencies.

#### 1. "Political Information" Provision.

Defendants admit that the "political information" provision is unconstitutional, saying it "lacks the clarity necessary for that standard to be enforceable in the absence of further clarification by ELEC via rulemaking," Opp. 31, "leaves ambiguous what activity constitutes 'providing political information,'" *id.* at 29–30, and "use[s] the same language to define 'independent expenditure committee' that was declared unconstitutional" in *ACLU of New Jersey v. ELEC*, 509 F. Supp. 1123 (D.N.J. 1981), Opp. 30.   It is now common ground between the parties that intervention is "warranted," lest the provision "deter[] constitutionally protected speech."   *Id.* at 31.   Only a preliminary injunction can provide reliable assurance.   Defendants' non-binding word that they will not enforce this provision pending rulemaking is inadequate.   *See supra* Section I.A; *Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 831 (7th Cir. 2014) ("By not fully disclaiming the right to enforce this facially invalid statute, the Board's halfhearted concession leaves us with no assurance that it will continue to recognize its unconstitutionality.").

While conceding this provision is unconstitutional, Defendants maintain that *ACLU* has been undermined by subsequent case law.   Not so.   *ACLU* holds that

government cannot equate mere conveyance of "political information" with *electioneering*, by subjecting such conveyance to the regulations and burdens reserved for the latter.   *ACLU*, 509 F. Supp. at 1132–33.   That holding remains correct and dispositive today.   As AFP observed, *see* Br. 24, neither *ACLU* nor the portion of the D.C. Circuit's opinion in *Buckley v. Valeo*, 519 F.2d 821 (D.C. Cir. 1975) that it relied on has ever been overturned.   The intervening decisions Defendants cite, *see* Opp. 28, stand only for the proposition that government may *adjust* its line-drawing as part of a careful, conscientious effort to define and capture "electioneering communications" outside the confines of express advocacy.   *See infra* Section I.B.3.   Such cases do not help Defendants because this Act does not try to *adjust* the line that delimits electioneering.   Rather, S150 *obliterates* the line by treating the *entire universe* of political expression around officeholders, legislation, regulations, and public issues as electioneering.   No case has ever accepted that anomalous position, and *ACLU* and *Buckley* clearly reject it.

## 2.   "Influencing Legislation And Regulation" Provision.

Defendants further concede that the "influencing legislation" provision is unconstitutional as enacted.   They urge the Court to rescue it by performing the same type of "judicial surgery" the New Jersey Supreme Court performed four decades ago, *see New Jersey State Chamber of Commerce v. ELEC*, 411 A.2d 168, 179 (N.J. 1980), and limit the provision to direct lobbying, Opp. 23–24.   But it is

implausible that this Legislature meant, in 2019, to limit itself to what was *already* covered, considering that the Act was enacted against the backdrop of preexisting law in a concerted effort to *change* and *expand* the scope of activity covered.

Nor is it the proper role of a *federal* court to rewrite a *state* law. *See, e.g.*, *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (courts "restrain [them]selves from rewriting state law to conform it to constitutional requirements even as we strive to salvage it") (internal quotation and alteration omitted). The rewriting in *NJ Chamber of Commerce* was drastic yet warranted to effectuate clear legislative intent. *See NJ Chamber of Commerce*, 411 A.2d at 180 ("[W]e have been required to skirt the legislative domain and to deal with issues most properly the concern of the Legislature.").

Here, the operative legislative purpose is *irreconcilable* with the Attorney General's purported defense. This bill was passed twice (and vetoed once) with everyone's eyes wide open to prior precedent and specific constitutional concerns. Yet the Legislature *nonetheless* insisted that S150 become law in order to *change* and *expand* prior law. Notably, the Attorney General does not even pretend to identify any gap or problem with prior regulation of direct lobbying that S150 was meant to solve. Nor can any sensible connection be drawn between regulation of *direct lobbying*, and the stated legislative purpose of addressing "dark money" spending on *elections*. Indeed, the Attorney General's account of S150 altogether

blinks reality in light of uncontradicted, published reports that S150 responded *specifically* to advertisements that New Direction New Jersey ran supporting Governor Murphy's positions on pending legislation.   *See* Br. 10–11.   It is telling that the Attorney General cannot defend S150 without abandoning its defining goal.

Even if the Court might ultimately find it appropriate to undertake radical judicial surgery to save S150, a preliminary injunction would still be essential given Defendants' cryptic revision of the "influencing legislation and regulation" provision.   Defendants' suggestion, via footnote, that the new provision covers the same conduct as the lobbying law, while simply calling for quarterly rather than annual reporting, leaves hazy what exactly triggers disclosure.   Moreover, there is pointed indication that S150 adds new triggers relative to preexisting lobbying law; among other things, S150 *omits* an earmarking requirement that is part of New Jersey's current lobbying regime.   *See* N.J.S.A. 52:13C-22.1.

Most fundamentally, the Attorney General does not explain how the Act's supposed focus on direct lobbying interrelates with the Act's coverage of *regulations*.   Defendants cite no precedent or basis for equating regulatory engagement with legislative lobbying.   It is unclear whether, for instance, submitting comments on proposed regulations as invited by agencies would trigger coverage—and whether informal communications with regulators might do so.   As noted, such uncertainty adds to the warrant for a preliminary injunction.

### 3.    "Influencing Elections" Provision.

Defendants do not attempt to defend the "influencing elections" provision as enacted.[3]   This provision is wildly overbroad in regulating all manner of expression far beyond the confines of any election:   it imposes no guardrails as to time, medium, audience, or subject matter, nor is its coverage limited to advocacy. Defendants grasp to enlist the definition of "electioneering communication," claiming that reference "inform[s] Defendants' understanding of the types" of covered communications.   Opp. 20.   And they concede that "sever[ing]" the electioneering communications definition from the influencing elections provision "may raise constitutional issues."   *Id*.   Again, however, there is no binding assurance that "electioneering communications" will ***not*** remain separate.[4]

Even if the "electioneering communication" definition were imported into the influencing elections provision, the law would still be overbroad:   the Act's definition of "electioneering communication" sweeps in a wide range of pure issue advocacy wholly unrelated to any election.   Defendants trumpet the fact that the definition applies only to communications that refer to a "clearly identified candidate

---

[3]   Contrary to Defendants' suggestion, AFP is challenging the portion of this provision related to public questions, which is unconstitutional for the same reasons. *See, e.g.*, *Barland*, 751 F.3d at 815, 832–33.

[4]   To avoid constitutional overreach, the provision might be read as reaching only express advocacy.   *See Buckley v. Valeo*, 424 U.S. 1, 80 (1976) (per curiam); *Barland*, 751 F.3d at 807.   But the Attorney General is rejecting the one limitation that would be clear and secure.

for office." N.J.S.A. 19:44A-3(u). But there can be no discussion of political *issues* without referencing—however inadvertently or incidentally—political *candidates*. In New Jersey, "candidates" include both those seeking office and those *holding* office, N.J.S.A. 19:44A-3(c), and the statute by its terms does not even require that the covered candidate be running that particular year, N.J.S.A. 19:44A-3(u).[5] The upshot is that *any* reference to *any* elected official (and certainly any official who happens to be up for reelection) will trigger this fearsome Act.

The remaining requirements for "electioneering communication" add no meaningful limitation. According to Defendants, the definition "focus[es] on specific kinds of media used in New Jersey elections," Opp. 21, but it is unclear what, if any, medium escapes coverage. The provision ensnares anything

> published in any newspaper or periodical; broadcast on radio, television, or the Internet or digital media, or any public address system; placed on any billboard, outdoor facility, button, motor vehicle, window display, poster, card, pamphlet, leaflet, flyer, or other circular; or contained in any direct mailing, robotic phone calls, or mass e-mails.

N.J.S.A. 19:44A-3(u). Defendants also argue that the definition has a temporal limitation because it "focus[es] on communications between January 1 and Election Day." Opp. 21. But that is hardly a meaningful limitation considering that New

---

[5]   Although Defendants state that AFP is "incorrect" that there is no requirement that a referenced officeholder be up for reelection in the relevant election year, Opp. 21, they provide no basis whatsoever for that assertion.

Jersey holds elections **every year** and the provision covers roughly **11/12ths** of the year.    Finally, Defendants assert that communications that never reach New Jersey voters are not covered, based on an undefined "territorial presumption."    Opp. 21–22.    But the Act contains no such limitation.    Even if it did, no group pursuing issue advocacy nationally can know whether someone among its audience—receiving an email, reviewing a webpage, reading a social media post, or even wearing a button—may wind up in New Jersey.    Under Defendants' interpretation, the Act could be triggered if AFP sent an email in January referencing state legislators around the country (including New Jersey) and their respective stances on, say, sentencing reform and that email found its way into the inbox of someone in New Jersey.    Defendants' supposed comfort is no comfort at all.

Defendants argue that the electioneering communication definition compares favorably to similar definitions upheld in other cases.    Opp. 21.    For this, they cite *Citizens United v. FEC*, 558 U.S. 310 (2010) and *Delaware Strong Families v. Attorney General of Delaware*, 793 F.3d 304 (3d Cir. 2015) as rejecting the line between express advocacy (or its functional equivalent) and issue advocacy when it comes to requiring disclosure.    Opp. 17, 28.    But their argument is flawed.

First, S150 requires much more than just disclosure.    *See supra* at 2 n.1. The burdens it imposes are liable to harm operations nationwide and chill any expression in New Jersey for fear of triggering coverage.    The Act's PAC-like

burdens are transformative and likely prohibitive for many organizations; they bring the law categorically outside the cases Defendants cite, as the Seventh Circuit has specifically held in comparable circumstances.   *See Barland*, 751 F.3d at 836–38.

Second, Defendants' mistake the Supreme Court's statement in *Citizens United* that disclosure requirements are not limited to express advocacy and its functional equivalent, 558 U.S. at 368–69, for the abandonment of *any* distinction between electioneering and issue advocacy.   The Supreme Court simply recognized that legislatures have some latitude when drawing the line between electioneering and issue advocacy.   *See id.* at 369.   The Third Circuit followed suit in *Delaware Strong Families*, 793 F.3d at 308–09, in explaining why Delaware had drawn a fair and meaningful line.   New Jersey, in contrast, has *altogether ignored* the essential line—without pretending to think about where, how, or why the line should be drawn so as to leave room for pure issue advocacy.   New Jersey's definition is nothing like the carefully-considered and narrowly-tailored lines that have been upheld.[6]

---

[6]   *See Citizens United*, 558 U.S. at 321 (electioneering communication defined as (1) "any broadcast, cable, or satellite communication"; that (2) "refers to a clearly identified candidate for Federal office"; (3) is "made within 30 days of a primary or 60 days of a general election"; and (4) "is targeted to the relevant electorate"); *Del. Strong Families*, 793 F.3d at 307, 311 (electioneering communication defined as (1) made via "television, radio, newspaper or other periodical, sign, Internet, mail or telephone"; that (2) "[r]efers to a clearly identified candidate"; (3) made "within 30 days before a primary election . . . or 60 days before a general election"; and (4) is distributed "to an audience that includes members of the electorate for the office sought by such candidate"); *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118,

## C.     The Act Is Unconstitutionally Underinclusive.

Defendants' defense of the Act falls apart upon considering its underinclusiveness.   Defendants cannot explain how S150 would remove "dark money" from politics by shackling *501(c)(4)'s and 527's* but leaving *every other* type of organization—trade unions, corporations, partnerships—untouched. Although legislatures generally can proceed step-by-step, heightened scrutiny and justification are required specifically in the First Amendment context.   *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993).   When a law's underinclusiveness belies its proffered justification, it should be struck down as unconstitutional.   *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

No legislative history explains why only 501(c)(4)'s and 527's were targeted. Defendants hypothesize that 501(c)(4)'s and 527's were targeted because they have been "the biggest source of dark money in politics," citing two articles discussing ***national*** political spending.   Opp. 34.   But Defendants cite no such data from New Jersey, and ELEC's own White Paper does not single out 501(c)(4)'s.   *See* Opp., Ex. 1.   To the contrary, ELEC raised concerns about a broad range of groups, including unions, 501(c)(3)'s, and limited-liability companies, and recommended

---

133 (2d Cir. 2014) (because electioneering communications were limited to "communications that take a position on an actual candidacy" "during a campaign for public office," they "have a substantial relation to the public's 'interest in knowing who is speaking about a candidate shortly before an election'").

legislation covering "all 527 or 501(c) non-profit groups."   *Id.* at 32.   Similarly, the Governor's conditional veto pointed out the "loophole" left by "not includ[ing] limited liability corporations . . . and other for-profit corporate forms."   Conditional Veto from Governor Murphy to NJ Senate (May 13, 2019), 5.[7]   And the Legislature has *itself* recognized the need to cover the larger waterfront of relevant entities in elsewhere defining "political committees."   *See* N.J.S.A. 19:44A-3(i), (n).

Most egregiously, S150 specifically *carves out* from its coverage groups that *coordinate* with candidates.   N.J.S.A. 19:44A-3(t).   The Legislature is somehow unconcerned with political spending so long as politicians get to control the spending, which is precisely when risk of corruption peaks.   *See* Opp. 14 (justifying the Act's disclosure requirements as combating corruption); *cf. Citizens United*, 558 U.S. at 357 ("independent expenditures . . . do not give rise to corruption or the appearance of corruption").   This aspect of the law was likewise called out by Governor Murphy, only for the Legislature to cling to the omission.   *See* Conditional Veto at 6; *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 402 (2000) (Breyer, J., concurring) (cautioning against any "deference" to the legislature that would "risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge").

---

[7]   *Available at* https://www.njleg.state.nj.us/2018/Bills/S1500/1500_V1.PDF.

Notably, Defendants do not challenge public reports that S150 was driven by the Legislature's desire to extract political revenge and to skew the political landscape to favor perceived friends while disabling perceived foes.   The Act's "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."   *Brown*, 564 U.S. at 802.

### D.   Defendants Do Not Rebut AFP's As-Applied Showing.

As to the as-applied challenge, Defendants do not contest AFP's evidence showing "a reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties."   *Citizens United*, 558 U.S. at 367 (quotation omitted).   While admitting AFP faces harassment, Defendants discount this as "isolated," "clearly regrettable" incidents.   Opp. 41.   That gives short shrift to the uncontested record of extensive, appalling incidents of threats and harassment over an extended period, including in New Jersey.   *See* Br. 34–36.   ELEC itself has described the examples AFP cites as "disturbing," Opp., Ex. 1 at 33, and "reprehensible," *id*. at 34, and favorably cited *Americans for Prosperity Foundation v. Harris* as showing "courts can always intercede to restrict disclosure where they deem it necessary," *id*. at 37.

Defendants' other arguments against the as-applied challenge are unpersuasive.   First, Defendants rely upon the fact that law enforcement has

responded to AFP's calls.    Opp. 40–41.    But that does not deny the "reasonable probability . . . of threats, harassment, or reprisals," which is all that matters to the legal standard.    *Citizens United*, 558 U.S. at 367; *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (citing "economic reprisal, loss of employment, . . . and other manifestations of public hostility" as grounds for relief).

Second, Defendants argue that AFP cannot meet this test so long as AFP hosts public events and some supporters choose to publicly identify with it.    Opp. 41–42. That ***some*** supporters announce themselves publicly is beside the point, for ***many other*** supporters who value anonymity will be chilled by possible public disclosure. *See* Dunn Decl. ¶¶ 7–11; Seidel Decl. ¶¶ 9–10; Jedynak Decl. ¶¶ 17–18.

Last, Defendants argue AFP is too successful and well-funded to claim First Amendment protection.    Opp. 38–39.    That reasoning is bankrupt.    Defendants cite no evidence that the reduction will be *de minimis*.    *See Buckley*, 424 U.S. at 71–72.    To the contrary, unrebutted evidence establishes that AFP faces total withdrawal from New Jersey's public square if the Act takes effect.    Seidel Decl. ¶¶ 25–26; Jedynak Decl. ¶ 29.[8]    Nor can Defendants deny that *individual* AFP

---

[8]    As-applied challenges are not limited to "vulnerable fringe group[s] or otherwise marginalized part[ies]."    Opp. 36.    The Supreme Court asks only if "a group could show a reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals."    *Citizens United*, 558 U.S. at 367 (quotation omitted).    Although *Buckley* involved a challenge brought by minor parties and stressed their likelihood in succeeding with such a challenge, it did not

supporters will have their First Amendment rights chilled if forced to disclose their identity.    *See* Dunn Decl. ¶ 11; Seidel Decl. ¶ 21.

## II.    Irreparable Harm Will Result Absent An Injunction.

Because Defendants are wrong on the merits, they have no good argument against a preliminary injunction.    Defendants do not deny that the deprivation of First Amendment rights necessarily constitutes irreparable harm.    Although Defendants suggest that AFP cannot establish irreparable harm on the theory that AFP lacks standing to challenge portions of S150 as now construed, Opp. 43–44, Defendants' interpretations are neither binding nor fixed.    Moreover, persisting uncertainty alone chills expression and thus inflicts a First Amendment injury.    *See Grayned*, 408 U.S. at 108–09.[9]

## III.   The Balance Of Equities And The Public Interest Strongly Favor A Preliminary Injunction.

A preliminary injunction will not harm anyone.    Although Defendants insist that S150 "was enacted to provide greater transparency in election-related spending," Opp. 44, a "preliminary injunction leaves [New Jersey] free to attempt

_____

hold this to be a threshold requirement, 424 U.S. at 68–72, nor would it be sensible to add that new requirement.    Indeed, the NAACP—the prototypical as-applied challenger—is neither minor nor fringe in any objective sense.    And AFP is certainly fringe in the subjective, and fiercely-held, views of some.    *See, e.g.*, Jedynak Decl. ¶ 23.

[9]   Defendants cite *Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 192–93 (3d Cir. 1990), for the proposition that a "preliminary injunction [is] unwarranted based on [an] agency's representations regarding non-enforcement."    There, however, the agency *formally disavowed* the provisions under challenge.    *Id*.

to draft new regulations that are better tailored to serve those interests," *Swartzwelder*, 297 F.3d at 242; *see* Opp. 32 n.12 (asking that "any relief . . . give ELEC the opportunity to clarify the relevant statutory provision(s) through rulemaking"). Especially considering that Defendants themselves have yet to decide what S150 should cover or how, there is a strong, shared interest in "maintain[ing] the status quo." *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation and quotation omitted).

Finally, Defendants argue that the upcoming November election makes S150's enforcement particularly urgent, Opp. 45, but that rings false: the first report under S150 will not be due until January 2020—*after* the election. Moreover, the fact that the Attorney General is so quick to jettison entire provisions of the Act confirms the absence of any appreciable interest or value associated with this unprecedented, ill-considered law. No one will suffer and many will gain if S150 is enjoined for such time as is required to litigate and adjudicate its constitutionality.

## CONCLUSION

For the foregoing reasons, Plaintiff Americans for Prosperity respectfully requests a preliminary injunction prohibiting Defendants from enforcing the Act.

Dated:   August 30, 2019                    Respectfully submitted,

                                            MARINO, TORTORELLA & BOYLE, P.C.

                                            */s/ Kevin H. Marino*
                                            Kevin H. Marino
                                            John A. Boyle
                                            437 Southern Boulevard
                                            Chatham, New Jersey 07928
                                            (973) 824-9300

                                            QUINN EMANUEL URQUHART &
                                                 SULLIVAN, LLP

                                            _____
                                            Derek L. Shaffer[*]
                                            William A. Burck[*]
                                            Keith H. Forst[*]
                                            1300 I Street NW, Suite 900
                                            Washington, DC 20005
                                            (202) 538-8000


                                            *Attorneys for Plaintiff*
                                            *Americans for Prosperity*

---

[*] Admitted *pro hac vice*.

21