<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| | : | |
| AMERICANS FOR PROSPERITY, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Case No. 3:19-cv-14228-BRM-LHG |
| | : | |
| | : | |
| GURBIR GREWAL, *in his official capacity* | : | |
| *As Attorney General of New Jersey,* et al., | : | |
| | : | **OPINION** |
| Defendants. | : | |
| | : | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is a Motion for a Preliminary Injunction (ECF No. 3) to enjoin Defendants Gurbir Grewal, Attorney General of New Jersey, Eric H. Jaso, Chairman of New Jersey Election Law Enforcement Commission (or "ELEC"), and two ELEC Commissioners, Stephen M. Holden and Marguerite T. Simon, (collectively, "Defendants") from enforcing New Jersey Senate Bill No. 150 (also known as "S150" or "the Act"), which compels disclosure of the identities of donors to "independent expenditure committees" and enforces compliance with the Act's financial-reporting and money-handling requirements when these groups spend more than $3,000 annually for political communications during a specified reporting period. Plaintiff Americans for Prosperity ("Plaintiff" or "AFP") claims an injunction is needed because the Act unconstitutionally infringes on its First Amendment rights and because it is unconstitutional as applied to AFP as it will chill its First Amendment rights by deterring potential contributors from donating to AFP. Defendants oppose the Motion, arguing that the Act is constitutional both on its face and as applied to AFP. Pursuant to Federal Rule of Civil Procedure 78(a), the Court heard

oral argument on September 17, 2019. Having reviewed the submissions filed in connection with the motion and having heard the arguments of the parties, for the reasons set forth below and for good cause appearing, Plaintiff's Motion is **GRANTED**.

## I.    BACKGROUND AND PROCEDURAL HISTORY[1]

The New Jersey Senate passed legislation identified as S1500 on March 25, 2019.[2] (*See* Compl. (ECF No. 1) ¶ 3, n.1.) According to a statement by the Senate Budget and Appropriations Committee, this legislation was intended to update "'The New Jersey Campaign Contributions and Expenditures Reporting Act' to institute new reporting requirements on certain organizations, and increase the limits on the amount of money that may be contributed by individuals, candidates, and committees to other candidates and committees."[3] S1500 called the organizations pertinent to this action "independent expenditure committees" and amended N.J. Stat. Ann. § 19:44A-3 to define them as any person or entity "organized under section 527 of the federal Internal Revenue Code (26 U.S.C. § 527) or under paragraph (4) of subsection c. of section 501 of the federal Internal Revenue Code (26 U.S.C. § 501) that does not fall within the definition of any other organization" subject to the pre-existing requirements of N.J. Stat. Ann. § 19:44A-3 and

> engages in *influencing or attempting to influence* the outcome of any election or the nomination, election, or defeat of any person to any State or local elective public office, or the passage or defeat of any public question, or in *providing political information* on any candidate or public question, and raises or expends $3,000 or more

---

[1] Unless otherwise noted, the following facts are taken from Plaintiff's Complaint and assumed true for purposes of this Opinion.

[2] The General Assembly passed an identical version that same day, A1524, 218th Leg., available at N.J. Office of Legis. Serv., https://www.njleg.state.nj.us/bills/BillView.asp?BillNumber =A1524. The bill originally was introduced in 2016 and numbered S2430, 217th Leg. (*See* Pl. Br., (ECF No. 3-1) at 9 n.4.)

[3] *See* S1500, 218th Leg., available at N.J. Office of Legis. Serv., https://www.njleg.state.nj.us/2018/Bills/S1500/1500_S1.PDF at 1.

in the aggregate for any such purpose annually, but does not coordinate its activities with any candidate or political party.[4]

Pursuant to N.J. Stat. Ann. § 19:44A-8(d)(1) as amended by S1500, these independent groups must file quarterly with ELEC a list of all contributions of more than $10,000 and, pursuant to N.J. Stat. Ann. § 19:44A-8(d)(2), all expenditures of more than $3,000 spent on "influencing or attempting to influence the outcome" of any election, public question, legislation or regulation, or "provide any political information" on any candidate, public question, legislation or regulation. The non-exhaustive list of expenditures that count toward the $3,000 include "electioneering communications, voter registration, get-out-the-vote efforts, polling, and research." N.J. Stat. Ann. § 19:44A-8(d)(2). The Act amends § 19:44A-3 to define "electioneering communications" as

> any communication made within the period beginning on January 1 of an election year and the date of the election and refers to: (1) a clearly identified candidate for office and promotes or supports a candidate for that office or opposes a candidate for that office, regardless of whether the communication expressly advocates a vote for or against a candidate; or (2) a public question and promotes or supports the passage or defeat of that question, regardless of whether the communication expressly advocates a vote for or against the passage of the question. The term includes communications published in any newspaper or periodical; broadcast on radio, television, or the Internet or digital media, or any public address system; placed on any billboard, outdoor facility, button, motor vehicle, window display, poster, card, pamphlet, leaflet, flyer, or other circular; or contained in any direct mailing, robotic phone calls, or mass e-mails.

N.J. Stat. Ann. § 19:44A-3(u).

New Jersey Governor Phillip Murphy (the "Governor") conditionally vetoed the bill on May 13, 2019, stating that while he commended the Legislature's attempt to "ensure that so-called

---

[4] *See* S1500, 218th Leg., Fifth Reprint, at 7, §(t), available at N.J. Office of Legis. Serv., https://www.njleg.state.nj.us/2018/Bills/S1500/1500_R5.PDF (emphasis added).

'dark money'[5] is brought out into the open," he believed certain provisions "may infringe" rights of free speech and free association protected by the First Amendment of the U.S. Constitution.[6] Among the flaws identified by the Governor was that "the bill covers all issue advocacy conducted at any time, regardless of whether the advocacy is connected to an issue before the electorate."[7] As a result, the Governor stated, "It is unclear whether disclosure requirements for communications that are not connected to an election would withstand [] judicial scrutiny."[8] Accordingly, the Governor sent the bill back to the Senate and recommended substantive revisions and the correction of "drafting errors."[9]

In response, on June 10, 2019, the Senate passed a bill practically identical to S1500 that was renumbered as S150.[10] (ECF No. 1 at ¶ 3, n.1.) The Governor signed S150 into law on June 17, 2019, though he issued a signing statement reiterating the same concerns identified in his conditional veto of the prior bill, but indicating he signed S150 into law "'based on an express commitment' from the Legislature to 'pass legislation removing advocacy in connection with legislation and regulations from its parameters, thereby ensuring that the bill's disclosure

[5] "Dark money" is shorthand for political spending by groups independent of political parties and candidates that are not required to disclose the identities of their donors when they do not coordinate their activities with candidates or political parties.

[6] *See* Conditional Veto, N.J., available at Office of Legis. Serv., https://www.njleg.state.nj.us/2018/Bills/S1500/1500_V1.PDF, at 2.

[7] *Id.* at 3.

[8] *Id.* at 3.

[9] *Ibid.*

[10] The Assembly approved an identical bill, A100, that same day. *See* N.J. Office of Legis. Serv., at  https://www.njleg.state.nj.us/bills/BillView.asp?BillNumber=S150.

requirements apply to election-related advocacy, and making previously recommended technical revisions."[11] (*Id.* ¶¶ 3, 42.) To date, the legislature has not passed a so-called clean-up bill.[12]

AFP is a nonprofit corporation based in Virginia that identifies as a social welfare organization under Section 501(c)(4) of the Internal Revenue Code. (*Id.* ¶ 12.) AFP operates an office in Morris County, and its New Jersey Chapter publishes, among other things, a New Jersey Taxpayer Scorecard that "track[s] legislators' voting records on key issues ranging from criminal

---

[11] "Governor's Statement Upon Signing Senate Bill No. 150," NJ.Gov/Governor/news, available at http://d31hzlhk6di2h5.cloudfront.net/20190617/d5/6c/b5/d7/94c04a9f14b0b88b6254ca19/S150.pdf.

[12] A clean-up bill, known as A5633, 218th Leg., has been introduced in the General Assembly and has been referred to the Assembly Appropriations Committee. *See* N.J. Office of Legis. Serv., at https://www.njleg.state.nj.us/bills/BillView.asp. As can be seen from the following colloquy, the parties at oral argument agree any injunction granted by this Court would not enjoin legislative or rulemaking changes to the Act:

> THE COURT: For purposes of a hypothetical question, if I were to grant the injunction saying that the statute is facially unconstitutional, what happens next? [The Legislature or ELEC] can still try to fix it?
> PLAINTIFF/DEREK L. SHAFFER: Your Honor, we have no—we would still be there at the end of the fix-it process to express any remaining concerns, but we are not asking the Court to enjoin their efforts to fix it or to pass regulation.
> THE COURT: Nor would the Court ever think about doing that. So they can still go and try to fix it, ELEC can still
> promulgate opinions, and I guess it would be a revolving lawsuit.
> MR. SHAFFER: I think that's exactly right, Your Honor.
> THE COURT: Do you agree with that, counsel?
> DEFENDANTS/STUART M. FEINBLATT: Yeah. It would be an opportunity to deal with it later. We don't think that is necessary, and I am happy to hear that counsel here would not be seeking an injunction as to ELEC working on clarifying regulations. But for the reasons we've stated, we don't think there is any need for an injunction.
> THE COURT: Understood.

*See* Sept. 17, 2019 Oral Arg. Tr. (ECF No. 38) at 93:12-94:9.

justice reform to occupational licensing." (*Id.* ¶¶ 12, 46; *see also* ECF No. 3-1 at 14 (citing Decl. of Erica Jedynak (ECF No. 3-5) ¶ 14).) AFP says its mission "is to inspire people to embrace and promote principles and policies of economic freedom and liberty, and to educate and train citizens to advocate for the ideas, principles, and policies of a free society at the local, state, and federal levels." (ECF No. 1 ¶ 13.) AFP claims the Act violates the United States Constitution because it

> requires disclosure by groups that discuss, in any way, any issue or fact that touches on a New Jersey election, legislation, or regulation. Its astonishingly broad terms ensnare not just electioneering communications, but also pure issue advocacy and even the transmission of mere "facts" related to "any candidate or public question, legislation, or regulation.

(*Id.* ¶ 21.) These "astonishing broad terms," AFP claims, render the Act unconstitutional on its face and as applied to AFP. (*Id.* ¶ 11.) As a result, Plaintiff filed a Complaint on June 25, 2019, seeking a "declaration that S150's provisions compelling disclosure of donor information and compliance with its burdensome reporting requirements violates the First Amendment (as incorporated by the Fourteenth Amendment) both on their face and as applied to AFP, and are therefore null and void." (ECF No. 1 at 28, ¶ 3.)[13] Concomitantly, Plaintiff filed this Motion seeking to have this Court enjoin Defendants from enforcing the Act. (ECF No. 3 at 2.) Defendants filed opposition to the Motion on August 20, 2019. (ECF No. 29.) Plaintiff filed its reply on August 30, 2019. (ECF No. 32.) The Court heard oral argument on September 17, 2019. (ECF No. 38.)

---

[13] In September 2019, the American Civil Liberties Union of New Jersey and the social welfare group Illinois Opportunity Project filed actions also seeking to have the Act declared unconstitutional. *See ACLU of N.J., et al., v. Grewal, et al.*, Case No. 3:19-cv-17807, and *Illinois Opportunity Project v. Holden, et al.*, Case No. 3:19-cv-17912. By text order, this Court ordered those related actions to be held in abeyance until this Motion is decided. *See* Text Order dated September 17, 2019, on the docket for this action.

## II.   THE PARTIES' ARGUMENTS

### A.  Plaintiff's Arguments Supporting the Motion

Plaintiff contends the Act is unconstitutional on its face because it extends "formidable regulations and burdens properly reserved for electioneering" to communications focused entirely on issue advocacy or purely factual political information. (ECF No. 3-1 at 1.) Plaintiff also argues the Act is unconstitutional as applied to AFP because the disclosure requirements would chill its free speech by subjecting donors whose identities would have to be disclosed to "threats, harassment, and reprisals," a prospect that also would likely inhibit other individuals or groups from contributing to and supporting AFP's mission. (*Id.* at 33, 34.)

Plaintiff cites *Glossip v. Gross* for the four-part showing required from a party seeking a preliminary injunction: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." (*Id.* at 16-17 (quoting *Glossip*, 135 S. Ct. 2726, 2736 (2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).) In the Third Circuit, AFP notes, "a plaintiff must merely 'demonstrate that it can win,' not make a 'more-likely-than-not showing of success.'" (*Id.* at 17 (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 177 n.3 (3d Cir. 2017), *as amended,* (June 26, 2017)).) Also, Plaintiff contends, in "First Amendment cases where 'the [g]overnment bears the burden of proof on the ultimate question of [a statute's] constitutionality, [plaintiffs] must be deemed likely to prevail [when considering a preliminary injunction] unless the Government has shown'[] the statute withstands scrutiny." (*Id.* at 17-18 (citing *Reilly*, 858 F.3d at 180) (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)).)

### i.  Likelihood of Prevailing on the Merits

Plaintiff argues it is likely to prevail on the merits of its facial challenge when considering the *Reilly* standard because the Government cannot show the Act can withstand judicial scrutiny. That is because, Plaintiff contends, the Act's provisions requiring disclosure of the identity of donors contributing more than $10,000 by groups engaging solely in issue advocacy or the dissemination of political factual information "obliterate" boundaries established the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 66 (1976), defining the "narrow set of circumstances where disclosure demands meet" constitutional scrutiny. (ECF No. 3 at 19, 20 (quoting *Buckley*, 424 U.S. at 66).) Instead, Plaintiff contends, the Act "breaks new, unconstitutional ground by imposing the same onerous regulations [allowed for electioneering] upon pure ***issue advocacy*** and dissemination of mere ***political information***." (*Id.* at 21.) As authority for this conclusion, Plaintiff cites the veto of S1500, where the Governor said S1500's "compelled disclosure for groups that attempt to influence, or provide public information about, legislation or regulation that is wholly unconnected to any election or candidate" was unconstitutional and he recommended revisions to, among other changes, "eliminate [S1500's] references to legislation and regulation." (*Id.* at 11-12.) Plaintiff also cites the Governor's signing statement for S150 "reiterating his view that S150 'may infringe upon constitutionally protected speech and association rights.'" (*Id.* at 13 (citing Gov.'s Statement Upon Signing Senate Bill No. 150 (June 17, 2019)[14]).)

More textually, Plaintiff references the Act's language defining the organizations it calls independent expenditure committees that fall under the Act's disclosure umbrella as groups:

> that engage in *influencing or attempting to influence* the outcome of any election or the nomination, election, or defeat of any person to any State or local elective public office, or the passage or defeat of

---

[14] *See supra* n.11.

> any public question, legislation, or regulation, or in *providing political information* on any candidate or public question, legislation, or regulation.

(*Id.* at 6 (quoting N.J. Stat. Ann. § 19:44A-3(t) as amended by S150) (emphasis added).)

Plaintiff's focus for its facial challenge is threefold. First, Plaintiff contends the Act's provisions requiring disclosure of donor rolls by groups providing "political information" run afoul of *ACLU of N.J. v N.J. Election Law Enf't Comm'n*, a 1981 case in which a District of New Jersey Court struck down as unconstitutional what AFP says were "effectively identical" provisions applied to "political information organizations." (*Id.* at 21 (citing *ACLU of N.J.*, 509 F. Supp. 1123, 1131-33 (D.N.J. 1981).[15]) This Act is unconstitutional, Plaintiff argues, because it "disregards the constitutional line cabining disclosure requirements to electioneering and resurrects the predecessor provision struck down" in *ACLU of N.J.* (*Id.* at 24.)

Second, Plaintiff contends the Act's provisions requiring disclosure of donor rolls of groups "influencing legislation" are contrary to *New Jersey State Chamber of Commerce v. New Jersey Election Law Enf't Comm'n*, a 1980 case in which the New Jersey Supreme Court found "effectively identical" provisions "so constitutionally offensive that it had to perform 'judicial surgery' to salvage any shred of constitutional regulation." (*Id.* (citing *N.J. Chamber of Commerce*, 411 A.2d 168, 177-80 (N.J. 1980).[16]

---

[15] At issue in *ACLU of N.J.* was N.J. Stat. Ann. § 19:44A-8, whose then-version required what the statute referred to as political information organizations "to report the names and addresses of all persons who contribute more than $100 during a calendar year and to itemize all expenditures made during the year, 'whether or not such expenditures were made, incurred, or authorized . . . to seek to influence the content, introduction, passage or defeat of any legislation.'" 509 F. Supp. at 1129. A three-judge panel of the U.S. District Court for the District of New Jersey ruled the State could not require reporting of contributions and expenditures with respect to political information that did not expressly advocate passage or defeat of legislation or a ballot question. *Id.* at 1131-33.

[16] The *New Jersey State Chamber of Commerce* Court examined the New Jersey Campaign Contributions and Expenditures Reporting Act of 1973, which "impose[d] a wide range of

9

Third, Plaintiff contends, "the 'influencing elections' provision expands the meaning of campaign advocacy far beyond what the Supreme Court has indicated is constitutionally acceptable," meaning when communications center on "electioneering—particularly around *candidates*—and direct lobbying." (*Id.* at 19, 21 (citing *Buckley*, 424 U.S. at 66-67 and *U.S. v. Harriss*, 347 U.S. 612, 625 (1954)).)

AFP also argues S150 overreaches by requiring disclosure of any qualifying donor "whether or not that donor intended their donation to be used for issue advocacy in New Jersey, or has any other connection with New Jersey." (*Id.* at 2.)[17]

---

restraints, including financial reporting and disclosure, upon persons who seek to influence the election of political candidates, the outcome of elections for the passage or defeat of public questions, and the content and fate of legislation." *N.J. State Chamber of Commerce*, 411 A.2d 168, 170 (1980). The Court ultimately narrowly interpreted the word "influence," a term it said had "amoebic contours," to mean "activity which consists of direct, express, and intentional communications with legislators undertaken on a substantial basis by individuals acting jointly for the specific purpose of seeking to affect the introduction, passage, or defeat of, or to affect the content of legislative proposals." *Id.* at 179.

[17] Plaintiff identifies other burdens triggered by the Act including:

> (1) submitting a statement of registration, N.J. Stat. Ann. § 19:44A-21(a); (2) appointing a treasurer and designating a depository, N.J. Stat. Ann. § 19:44A-10; (3) maintaining records of contributions and expenditures for four years, N.J. Stat. Ann. § 19:44A-8(d)(2); (4) ensuring all contributions and expenditures are made solely through the treasurer or a deputy and deposited within 10 days, N.J. Stat. Ann. § 19:44A-11, 12; (5) providing ELEC with details in advance about any public solicitation, regardless of any connection to New Jersey, N.J. Stat. Ann. § 19:44A-19(b); and (6) reporting receipts and expenditures for any testimonial affairs, i.e., fundraisers, including any contribution greater than $300 (not $10,000), regardless of any connection to New Jersey, N.J. Stat. Ann. § 19:44A-8(g). These burdens increase before an election: in the period preceding an election, an IEC must report contributions above $500 or expenditures above $800 within 48 hours. N.J. Stat. Ann. § 19:44A-8(e).

(ECF No. 32 at 2 n.1.)

Plaintiff argues it is likely to succeed on the merits of its as-applied challenge because AFP's issue advocacy and dissemination of factual political information such as a "NJ Taxpayer Scorecard" would subject it to disclosure and financial-reporting and record-keeping requirements historically limited to "electioneering communications that advocate for or against any particular candidate for office." (*Id.* at 13-14.) That compelled disclosure of its currently anonymous contributors, Plaintiff contends, "will chill the associational activity of AFP and its donors, because they reasonably fear that threats, harassment, and reprisals will result from any disclosure of their donations." (*Id.* at 15.) As a result, Plaintiff argues, Defendants cannot establish as required by the "exacting scrutiny" standard the Supreme Court calls for when courts review electioneering statutes such as S150 that there is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." (*Id.* at 19 (citing *Doe v. Reed*, 561 U.S. 186, 196 (2010) (quoting *Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010)).)[18]

### ii. Irreparable Harm

Plaintiff contends that carrying the first *Reilly* prong on its facial challenge to S150 requires a finding that AFP also has identified an irreparable harm as contemplated by *Glossip* because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

---

[18] At oral argument, Plaintiff briefly advocated the position that strict scrutiny ought to be applied in this Court's review of S150 because the Act is "really shackling organizations, and it's potentially ending their ability to communicate and express themselves in this state. And it's doing it in a way that is really disfavoring certain groups," though it ultimately conceded exacting scrutiny applied, describing this standard as a "very searching and heightened scrutiny that looks for the actual purpose of the law, determines whether it's sufficiently compelling, and whether the state has arrived at a means of achieving that interest that are closely drawn around the interest." (ECF No. 38 at 34:5-24.) Defendants said that because disclosure requirements are a "much less restrictive alternative to more comprehensive regulations of speech" the Supreme Court applies exacting scrutiny and that "under that task there has to be a substantial relation between the disclosure requirement and a sufficiently important government interest." (*Id.* at 51:7-19.)

irreparable injury." (*Id.* at 37 (citing *K.A. ex. Rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).)

Regarding the as-applied challenge, Plaintiff argues it satisfies this prong because AFP and its donors will be harmed by enforcement of the Act. (*Id.* at 38.) Such enforcement would destroy the carefully protected anonymity of its donors located not only in New Jersey but also across the country because the Act extends disclosure typically reserved to electioneering communications to the issue advocacy and dissemination of political factual information AFP claims it only engages in. (*Id.*) Plaintiff lists a number of instances in which it says AFP itself and its donors have been subjected to harassment ranging from death threats to cyberattacks to violent protests at AFP events. (*Id.* at 34-36 (*citing* Decl. of Erica Jedynak (ECF No. 3-5)[19]).) AFP cites an appeal to the Ninth Circuit from a Central District of California case in which the appellate court concluded AFP's "evidence undeniably shows that some individuals publicly associated with the Foundation have been subjected to threats, harassment or economic reprisals." (*Id.* at 36 (citing *Americans for Prosperity Found. v. Becerra*, 919 F.3d 1177, 1178 (9th Cir. 2019) (Ikuta, J., dissenting from the denial of rehearing *en banc*).) Plaintiff further cites *Salvation Army v. Dep't of Cmty. Affairs of State of N.J.*, where the Third Circuit stated, "forced disclosure may chill individuals from associating with a group engaged in expression protected by the First Amendment." (*Id.* at 38 (*Salvation Army*, 919 F.2d 183, 201 (3d Cir. 1990)).) Lastly, Plaintiff cites *Stilp v. Contino* for the conclusion that "injunctive relief [is] 'clearly appropriate' where 'First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought.'" (*Id.* at 37-38 (quoting *Stilp*, 613 F.3d 405, 409 n.4 (3d Cir. 2010) (quoting *Elrod*, 427 U.S. at 373).)

---

[19] Ms. Jedynak is Director of Employment Initiatives at Stand Together, a 501(c)(6) group affiliated with AFP, after holding a variety of other roles since joining AFP in March 2015. (*See* ECF No. 3-5 ¶ 1.)

### iii.  Balance of the Equities

Plaintiff argues the balance of the equities favors AFP on both its facial and as-applied challenges because, in contrast to the "risk of irreparable injury looming over AFP and its donors, New Jersey faces no appreciable harm from an injunction." (*Id.* at 39.) This is because the disclosures required by the Act have not been sought before in New Jersey, thus there is no risk of disruption to the capturing of this information, Plaintiff says, and the "legislative record reveals no pressing need for 501(c)(4) donor information." (*Id.* at 39.) Plaintiff emphasizes that disclosure in compliance with the Act would "destroy the anonymity of AFP's donors ***throughout the United States*** . . . after which there would be no clawing donor identities back from the public domain in the event a preliminary injunction is denied but Plaintiff prevails in the underlying litigation." (*Id.* at 38-39.) Finally, Plaintiff cites *Klein v. City of San Clemente* for the proposition that "[w]here First Amendment rights are at stake, the 'balance of equities' 'tip[s] sharply in favor of' enjoining the offending governmental action." (*Id.* at 38 (citing *Klein*, 584 F.3d 1196, 1208 (9th Cir. 2009)).)

### iv.  The Public Interest

Plaintiff claims this prong also favors AFP on both its facial and as-applied challenges. As to the facial challenge, Plaintiff contends, this prong requires the granting of the Motion because "the enforcement of an unconstitutional law vindicates no public interest." (*Id.* (quoting *K.A. ex rel. Ayers*, 710 F.3d at 114 (citing *ACLU v. Ashcroft,* 322 F.3d 240, 251 n.11 (3d Cir. 2003)) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.") (citation and international quotation marks omitted)).)

As to its as-applied challenge, Plaintiff argues an injunction would serve the public interest by allowing "important legal issues decided by courts, precisely as the requested preliminary relief will permit." (*Id.* at 40 (citing *United States v. Mendoza*, 464 U.S. 154, 160 (1984) (noting that

"[g]overnment litigation frequently involves legal questions of substantial public importance" and "the development of important questions of law" should not be thwarted)).)

### B.  Defendants' Arguments Opposing the Motion

Defendants posit S150 is constitutionally sound on its face and as applied to Plaintiff, that each of Plaintiff's arguments rely on an overbroad reading of the statute, and that its "election-related disclosure requirements" are similar to those "courts have upheld over the course of decades." (*See* Defs. Br. (ECF No. 29) at 16.)

Addressing the first *Reilly* prong, Defendants first contend Plaintiff cannot win on the merits because the "influencing or attempting to influence" language of the Act bears a "substantial relation to the State's important interest in ensuring that New Jersey's electorate is informed about the sources and identities behind election-related spending." (*Id.* (citing *Citizens United*, 558 U.S. at 366-69; *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 194-97 (2003); *Buckley*, 424 U.S. at 64, 66; *Del. Strong Families v. Attorney General of Del.*, 793 F.3d 304, 309-10 (3d Cir. 2015)).) Defendants further argue AFP misreads the Act, or at the least reads it in an overbroadly manner. For instance, Defendants contend the "influencing or attempting to influence the outcome of any election" in § 19:44A-3(t) as amended by the Act is not synonymous with the definition of "electioneering communication" contained in the amended § 19:44A-3(u) but rather is limited by that § 19:44A-3(u) language, and that, as a result, other, non-electioneering communications "do not necessarily trigger the statute's disclosure requirements." (*Id.* at 20.) Furthermore, Defendants state, reading S150 as they claim AFP does "may raise constitutional vagueness issues not raised by Defendants' reading." (*Id.*) And even so, Defendants argue, reading the "influencing or attempting to influence the outcome of any election" language as limited by the "electioneering communications" wording "largely answers AFP's objections to the statute's breadth." (*Id.* at 21.)

14

Reading those provisions together results in a statute that "*does* focus on communications that refer to a clearly identified candidate; *does* focus on specific kinds of media used in New Jersey elections . . . and *does* focus on communications between January 1 and Election Day for the referenced candidate(s)." (*Id.*)

Defendants further contend AFP exaggerates the Act's scope as to whether otherwise qualifying communications that reach only one or no New Jersey voters but still reach more than 50,000 voters nationwide would trigger the Act's disclosure obligations. (*Id.* (citing ECF No. 3-1 at 2, 29).) Defendants cite *Sandberg v. McDonald* for the proposition that "[l]egislation is 'presumptively territorial and confined to limits over which the law-making power has jurisdiction.'" (*Id.* (quoting *Sandberg*, 248 U.S. 185, 195 (1918)).) Indeed, Defendants contend AFP communications that do not reach the 50,000 floor of New Jersey voters would not trigger the Act's disclosure obligations. (*Id.* at 22) At oral argument, Defendants stated, "The statute specifically says it is limited in N.J. [Stat. Ann. §] 19:44A-4 [where] it's clear that the statute, the reach of the law, of course, is limited to New Jersey elections." (ECF No. 38 at 56:5-8.) As to "influencing or attempting to influence . . . the passage or defeat of any . . . legislation or regulation," or what is commonly referred to as "lobbying," Defendants contend this language mirrors wording where the Supreme Court of the United States in *Harriss* and the New Jersey Supreme Court in *N.J. Chamber of Commerce* adopted narrow interpretations "in order to avoid confronting constitutional questions that might be raised by a broader interpretation." (*Id.* at 23 (citing *Harriss*, 347 U.S. 612; *N.J. Chamber of Commerce*, 411 A.2d 168).)  More specifically, those courts limited their interpretation of "influencing legislation" to include only communications intended for legislators, not the general public. *Id.* Reading the Act in the same way, Defendants allege, "does not require this Court to undertake a 'judicial rewrite' of [the Act],

it requires only application of the ordinary rules of statutory interpretation and due respect for authoritative decisions of the New Jersey Supreme Court." (*Id.* at 24 (citing *Walder Sondak Berkeley & Brogan v. Lipari*, 692 A.2d 68, 73 (N.J. Super. Ct. App. Div. 1997) ("It is a principal of statutory construction that when the Legislature re-enacts a statute that has been judicially construed, it adopts that judicial interpretation.") (quoting *Smith v. U.S. Pipe & Foundry Co.*, 467 A.2d 584 (N.J. Super. App. Div. 1983), *aff'd sub nom.*, *Poswiatowski v. Standard Chlorine Chemical*, 475 A.2d 1257 (N.J. 1984)).) Defendants further claim this reading comports both with the interpretation of S150 by the Attorney General's office, which would enforce the Act, and a 2002 ELEC advisory opinion of similar wording in New Jersey's Lobbying Act, N.J. Stat. Ann. § 52:13C-18, *et seq.* (*Id.* at 25-26 (citing *Broadrick v. Oklahoma*, 413 U.S. 601 (1973) (rejecting a First Amendment overbreadth challenge to a state statute based in part on narrowing constructions advanced by the state attorney general and a state agency) and ELEC Advisory Opinion No. 03-2002 (June 20, 2002)).[20])

Finally, Defendants assure the Court that while

> courts have recognized since *N.J. Chamber of Commerce* that states may require disclosures for certain "indirect" lobbying . . . the legislative history of S150 indicates that [while] the Legislature likely intended the statute to require disclosure with respect to some indirect lobbying . . . the Legislature addressed such conduct in S150's "providing political information" provision.

(*Id.* at 26.) Furthermore, Defendants contend, this "political information" provision "will not be enforced by Defendants until it is clarified through regulations [so] preliminary relief from this part of the statute is unnecessary." (*Id.* at 27.)

---

[20] Available at https://www.elec.state.nj.us/pdffiles/ao/2002/ao032002.pdf.

Defendants do not concede the unconstitutionality arguments of AFP. Indeed, Defendants say AFP's attack on S150 is misplaced in its reliance on *ACLU of N.J. v. ELEC* because "intervening case law," specifically *McConnell*, *Citizens United*, and *Delaware Strong Families*, "demonstrate that the constitutional line drawn by the *ACLU* court in 1981" making a distinction between express and issue advocacy "is no longer tenable." (*Id.* at 29 (citing *ACLU of N.J.*, 509 F. Supp. 1123; *McConnell*, 540 U.S. 93; *Citizens United*, 558 U.S. 310; and *Delaware Strong Families*, 793 F.3d 304)).)

Still, Defendants concede rulemaking is required to clarify the Act, specifically the "providing political information" language. (*Id.* at 27.) Defendants say the Act "leaves ambiguous what activity constitutes 'providing political information' but does not already fall within the scope of [S150's] provisions on efforts to influence elections, public questions, legislation and regulations." (*Id.* at 29.) Also, Defendants state, the definition of "independent expenditure" does not reference "political information," while the definition of "independent expenditure committee" omits any reference to "independent expenditure." (*Id.* at 30.) Defendants contend "rulemaking would be the most appropriate forum to address the apparent mismatch between S150's definitions of 'independent expenditure,' 'independent expenditure committee' and 'political information.'" (*Id.* at 30.)

Notably, even while attacking AFP's reliance on *ACLU of N.J.*, Defendants concede "it is not insignificant that the Legislature more or less used the same language to define 'independent expenditure committee' that was declared unconstitutional when used to define 'political information organization'" by the *ACLU of N.J.* Court. (*Id.*) Defendants state, "In light of *ACLU* and the constitutional concerns articulated in the Governor's conditional veto statement, Defendants believe rulemaking to clarify S150's use of the phrase 'providing political information'

is warranted to avoid deterring constitutionally protected speech that might arguably fall within the sweep of the statute." (*Id.* at 30-31.) Finally, Defendants acknowledge, "if construed broadly, the 'providing political information' part of the statement may be viewed as covering election- and legislation-related activity that is relatively peripheral to the core issues the Legislature sought to address." (*Id.* at 31.) Defendants maintain rulemaking is the best avenue for correcting this deficiency in the Act, too. (*Id.*)

As to the other prongs of the preliminary-injunction test, Defendants contend AFP cannot show irreparable harm, nor can AFP carry the balance-of-the-equities and public-interest prongs. Defendants argue AFP faces no imminent harm from the "providing political information" provisions of the Act because Defendants will not be enforcing those provisions until after any rulemaking, while it is not apparent, on the record before the Court, that AFP "even intends to engage in conduct falling within the scope of S150's 'influencing elections' and 'influencing legislation' provisions—as construed by Defendants." (*Id.* at 43-44.) Defendants further contend the balance of the equities and the public interest both favor denying relief. The State would be harmed by any judicial rewrite of the Act before a final determination of the merits of the case, Defendants argue, while delayed enforcement would deny voters of information on "how much independent expenditure groups spent in the 2019 election cycle, or who funded their activity." (*Id.* at 44-45 (citing *Maryland v. King*, 567 U.S. 1301 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")).)

## C.  Plaintiff's Reply

Plaintiff interprets Defendants' arguments regarding the lack of clarity of the "political information" provisions of the Act as an implicit recognition of the Act's facial unconstitutionality.

(*See* Pl. Reply (ECF No. 32) at 1.) AFP argues ELEC is not bound to "adopt regulations mitigating the constitutional defect," nor is the Attorney General's office legally bound by any statements contained in its brief not to enforce the Act, "leaving countless regulated entities [such as AFP] facing irreparable harm starting October 15, 2019," the beginning of the first period during which activity covered by the Act would be enforced. (*Id.* at 1.) Therefore, Plaintiff says, a preliminary injunction is required to "preserv[e] the status quo and protect[] First Amendment rights that will otherwise be chilled." (*Id.*) Meantime, AFP contends, the "remainder of Defendants' arguments rest on interpretations that are not plausible and disavowals that are not binding." (*Id.* at 2.) Denial of the Motion would leave Defendants in the position of "arrogating to themselves the discretion to determine what they mean, and where to draw critical lines between regulated and unregulated political expression." (*Id.* at 5.) Plaintiff argues, "To the extent questions remain about the statute's precise meaning, that only confirms the propriety of a preliminary injunction preserving the status quo pending a final determination." (*Id.* at 6 (citing *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1144 (8th Cir. 2005) (upholding a preliminary injunction pending a state court's interpretation of a statute)) and *Rivera-Feliciano v. Acevedo-Vila*, 438 F.3d 50, 64 (1st Cir. 2006) (upholding a preliminary injunction enjoining enforcement of Puerto Rican statute pending a final interpretation)).)

Plaintiff defends arguments made in its Brief in Support of the Motion grounded in *ACLU of N.J.*, contending that neither *ACLU of N.J.* "nor the portions of the D.C. Circuit's opinion in *Buckley v. Valeo*, 519 F.2d 821 (D.C. Cir. 1975) that it relied on has ever been overturned." (*Id.* at 8.) And, Plaintiff says, the intervening decisions on which Defendants rely "stand only for the proposition that government may *adjust* its line-drawing as part of a careful, conscientious effort to define and capture 'electioneering communications' outside the confines of express advocacy."

(*Id.*) But, Plaintiff contends, the "Act does not adjust the line that delimits electioneering. Rather, S150 *obliterates* the line by treating the *entire universe* of political expression around officeholders, legislation, regulations, and public issues as electioneering." (*Id.*)

Plaintiff claims Defendants' argument that the "influencing legislation" provisions require a narrow interpretation to survive is an implicit admission that the Act is facially unconstitutional. (*Id.*) Also, Plaintiff argues, this narrow interpretation limits the Act to territory already covered by prior legislation. (*Id.* at 9.) It is not, Plaintiff also contends, "the proper role of a *federal* court to rewrite a *state* law." (*Id.* (citing *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (noting that courts "restrain [them]selves from rewriting state law to conform it to constitutional requirements even as we strive to salvage it")).)

In addition, Plaintiff argues further ambiguity remains regarding what triggers disclosure since "there is pointed indication that S150 adds new triggers relative to preexisting lobbying law; among other things, S150 omits an earmarking requirement that is part of New Jersey's current lobbying regime." (*Id.* at 10 (citing N.J. Stat. Ann. § 52:13C-22.1).) Plaintiff emphasized this point at oral argument, stating that the lack of an earmarking provision means "[t]he donor-disclosure requirement applies to all donors nationwide, even if they have no connection to New Jersey." (ECF No. 38 at 26:2-4.) Further uncertainty, Plaintiff contends, infects the "influencing legislation and regulation" provision, which leaves open the question of whether "submitting comments on proposed regulations as invited by agencies would trigger [the Act's obligations]—and whether informal communications with regulators might do so." (ECF No. 32 at 10.)

Plaintiff states the "influencing elections" provision remains "wildly overbroad," as it "sweeps in a wide range of pure issue advocacy wholly unrelated to any election." (*Id.* at 11.) Indeed, Plaintiff argues, this section "by its terms does not even require that the covered candidate

be running [for election] that particular year." (*Id.* at 12 (*citing* N.J. Stat. Ann. § 19:44A-3(u)

(where "electioneering communication" is defined to include communications from "January 1 of

an election year" to Election Day and "refers to: (1) a clearly identified candidate for office")).)

Plaintiff argues there is similar uncertainty about whether the Act could be triggered by out-of-

state communications that, say, are redirected to the inbox of a New Jersey voter, while the Act's

limit of those communications to between January 1 and Election Day of an election year is "hardly

a meaningful limitation considering that New Jersey holds elections every year." (*Id.* at 12-13.)

### III.   LEGAL STANDARD

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only

in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d

Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer*

*Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). To obtain preliminary relief, a movant must show

"(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably

injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to

grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility

of harm to other interested persons from the grant or denial of the injunction, and (4) the public

interest. *Reilly*, 858 F.3d at 176 (citing *Del. River Port Auth. v. Transamerican Trailer Transport,*

*Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974) (citations omitted).) The first two factors are the "most

critical." *Reilly,* 858 F.3d at 179. To satisfy the first prong, a movant must "demonstrate that it can

win on the merits[,] which requires a showing significantly better than negligible but not

necessarily more likely than not." (*Id.* (internal punctuation omitted).) The Third Circuit does not

require "a more-likely-than-not showing of success on the merits because a 'likelihood' [of success

on the merits] does not mean more likely than not." *Reilly,* 858 F.3d at 179 n.3 (quoting *Singer*

*Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc) (internal punctuation omitted); *cf. Nken v. Holder*, 556 U.S. 418, 434 (2009) ("It is not enough that the chance of success on the merits be better than negligible[,]" and "more than a mere 'possibility' of relief is required.") (quotations omitted)). In First Amendment cases, "[plaintiffs] must be deemed likely to prevail [for the purpose of considering a preliminary injunction] unless the [g]overnment has shown that [plaintiffs'] proposed less restrictive alternatives are less effective than [the statute]." *Reilly,* 858 F.3d at 180 (citing *Ashcroft v. ACLU*, 542 U.S. at 666.) "This is because 'the burdens at the preliminary injunction stage track the burdens at trial,' and for First Amendment purposes they rest with the government." *Reilly,* 858 F.3d at 180 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, et al.*, 546 U.S. 418, 429 (2006).)

## IV.  DECISION

Plaintiff seeks a preliminary injunction based on its contention S150 is unconstitutional on its face and unconstitutional as applied to AFP. To summarize, Plaintiff argues the Act is unconstitutional because it brings an onerous disclosure burden, as well as money-handling and reporting regulations—historically reserved for "electioneering communications" referencing a clearly defined candidate as defined by *Buckley* and *McConnell*, among others—to communications regarding what AFP calls pure issue advocacy and the provision of nonpartisan factual political information. AFP contends this expanded regulatory regime is facially unconstitutional because it violates the protections of the right of free speech and the right to advocate anonymously provided by the First Amendment and made applicable to the states by the Fourteenth Amendment. AFP also challenges the constitutionality of the Act as applied to it, claiming S150 will impermissibly chill the organization's free speech by discouraging individuals

seeking anonymity from donating to AFP as a result of the prospect that exposure of their personal information will subject them to repercussions from violence or other threats.

Meantime, Defendants argue this Court should ignore the widely reported genesis of the Act[21] and construe the statute as it was passed by the Senate and enacted by Governor Murphy. (ECF No. 38 at 44:2-8.)[22] By its plain language, Defendants contend, the "final product" passes constitutional rigor, though they concede some interpretive machinations are required. Specifically, Defendants contend the plain language of S150's provision regarding "electioneering

---

[21] Plaintiff argues an NJ.com news article reporting that the Act grew out of a personal feud between Governor Phil Murphy and Senate President Stephen Sweeney demonstrates that the legislation is more power politics than inspired by the good government ideals of "Schoolhouse Rock." (ECF No. 3-1 at 9 & n.3 (citing Matt Arco, Murphy-Sweeney Feud Helped Fuel Legislation to Expose 'Dark Money' in Jersey Politics. It's Now on the Governor's Desk., NJ.com (Mar. 26, 2019)); available at https://www.nj.com/politics/2019/03/murphy-sweeney-feud-helpedfuel-legislation-to-expose-dark-money-in-jersey-politics-its-now-on-thegovernors-desk.html. Plaintiff contends the 501(c)(4) group that supports Governor Murphy and triggered the political feud referred to in the NJ.com article would not be subject to the Act because it coordinates its activities with Governor Murphy. (ECF No. 38 at 81:17-25.) Nevertheless, the Governor Murphy-linked group recently disclosed its donors this month. *See* Andrew Seidman, Dark Money Group Aligned with Gov. Phil Murphy Finally Discloses Donors, Philadelphia Enquirer (Sept. 12, 2019); available at https://www.inquirer.com/news/phil-murphy-dark-money-new-direction-nj-disclose-donors-20190912.html.

[22] Specifically, Defendants stated at oral argument:

> There's certainly political infighting going into any legislation. I'm reminded [of] what Otto von Bismarck once said that if you like laws and sausages, you should never watch either one being made. The idea being that it is often a dirty process, you might say, or uncomfortable process leading to legislation. And sure there are always articles in the newspaper. But we submit that we have to look at the final product. This final product was passed not because of a political feud but because of a massive change in the political landscape in New Jersey . . . . What has happened is—and there's no dispute by my adversary that now spending by independent groups far exceeds spending by political parties in New Jersey.

(ECF No. 38 at 46:1-16.)

communications" passes muster, while this Court should narrowly interpret the "influencing or attempting to influence" provisions that, among other things, define what is an independent expenditure committee. Counsel also represented that Defendants will not to enforce the "political information" provisions also defining an independent expenditure committee until rules are promulgated to bring clarity to the Act's unclear drafting.[23]

Because the parties disagree on how the Act is to be interpreted, the Court must first determine how to read the Act in order to decide whether the Act is constitutional on its face. As the attention of the parties is focused on the interplay of the phrases "influencing or attempting to influence," "providing political information" and "electioneering communications," the Court's inquiry begins by addressing these three phrases in turn.

The Supreme Court has stated, "[i]t is a familiar principle of statutory construction that courts should give effect, if possible, to every word [] used in a statute." *Connecticut Dep't of Income Maint. v. Heckler*, 471 U.S. 524, 530 n.15 (1985) (citing *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339 (1979).) As an initial matter, the Court concludes the plain language of the Act makes clear the same disclosure obligation is triggered whether a so-called independent expenditure committee engages in "influencing or attempting to influence" a direct election of individuals, in "influencing or attempting to influence" a vote to decide a ballot question, in "influencing or attempting to influence" legislators considering legislation, and in "influencing or attempting to influence" agencies drafting regulations, or whether the same group engages in

---

[23] *See* ECF No. 38 at 62:9-18 (DEFENDANTS: "... However, with regard to political information, the provision needs some clarification by the ELEC. We acknowledge that. And so at this point we are not going to enforce the–that aspect nor would ELEC do anything until they promulgate regulations for which there will be notice and opportunity to be heard. And whatever they end up doing would, of course, be enforced on a prospective basis. It would not be applied retroactively to anything going on at this time.")

"providing political information" on any candidate for office or any ballot issue or legislation up for vote in the Legislature, or on any regulation being considered by the Assembly or a state agency, whether that political information is a fact or an opinion held by the organization.

Defendants contend the phrase "influencing or attempting to influence" the outcome of any election contained in the amended § 19:44A-3 defining what constitutes an independent expenditure committee is, at the least, limited by the wording of or, at most, is synonymous with the definition of "electioneering communication" contained elsewhere in § 19:44A-3, and that other, nonelectioneering communications do not necessarily trigger the statute's disclosure requirements.

The Court is not persuaded. S150 amends N.J. Stat. Ann. § 19:44A-3 to define many of the terms introduced into the extant statute by the Act and to update existing definitions. One new definition covers independent expenditure committees, a provision constituting one sentence measuring roughly 150 words. The two primary phrases in that definition at issue here, "influencing or attempting to influence" and "providing political information," are joined by the conjunction "or." N.J. Stat. Ann. § 19:44A-3(t). It is these independent expenditure committees that are the target of the Act's disclosure provisions. The Court reads these phrases in the definition of "independent expenditure committee" to mean the Act's disclosure obligations are triggered whether an organization's communications are intended to "influenc[e] or attempt[] to influence" an election or legislation or are intended to "provid[e] political information" about an election or legislation.

The Court first will consider the phrase "providing political information." This term is defined as communications that "reflect[] *the opinion* of the members of the organization on any candidate or candidates for public office, on any public question, *or which contains facts* on any

such candidate, or public question whether or not such facts are within the personal knowledge of members of the organization." (N.J. Stat. Ann. § 19:44A-3(h)) (emphasis added*)*. S150 did not introduce this definition to The New Jersey Campaign Contributions and Expenditures Reporting Act, though it did expand the form of these types of communications to include the medium of "Internet or digital advertisements." (*Id.*)

It is clear from the plain language of the amended N.J. Stat. Ann. § 19:44A-3 that the Act's construction does not enable this Court to vacillate between a broad view of one phrase and a narrower interpretation of another phrase adjacent to it. Yet even if the Court were inclined to embark on such an exercise, there is no narrower interpretation possible of the "providing political information" phrase considering the plain text of the definition provided in § 19:44A-3(h), which corrals into the Act's disclosure regime any political information from independent groups spending more than $3,000 a year that contains either a fact or an opinion pertaining to any candidate for public office or "any public question." (*Id.*) The Court cannot read more narrowly statutory language that defines political information as broadly as any fact or opinion.

Next the Court looks to the other phrase of § 19:44A-3(t): "influencing or attempting to influence." Defendants argue this language can be read more narrowly by considering this phrase to be either limited by or synonymous with the definition of "electioneering communication" contained in § 19:44A-3(u). The Court is not persuaded.

A close review of the Act demonstrates N.J. Stat. Ann. § 19:44A-3(t) (defining an independent expenditure committee) is textually related to § 19:44A-3(h) (defining political information) because these independent expenditure committees are defined as engaging in, among other things, the provision of the political information that is then defined in § 19:44A-3(h). There is no similar nexus between § 19:44A-3(t) and § 19:44A-3(u) (defining electioneering

communication), as advocated by Defendants. The plain text of the Act says independent expenditure groups are those that engage, in part, in "influencing or attempting to influence . . . elections, public questions, legislation, or regulations." By definition, then, independent expenditure committees are not defined as engaging in electioneering communications identifying a clearly defined candidate, legislation, or regulation, but by something broader that the Act calls "influencing or attempting to influence . . . the outcome of *any* election" or "*any* public question, legislation or regulation." N.J. Stat. Ann. § 19:44A-3(t) (emphasis added).

Therefore, the Court views the Act as a statute that defines these sorts of independent groups as those that engage in one set of activities that are not defined in the Act—"influencing or attempting to influence"—and that defines electioneering communications but does not expressly state that such communications are produced by these independent groups. In short, § 19:44A-3(t) and (u) are, as Defendants concede, mismatched.

The only express connection between independent expenditure committees and electioneering communications occurs in the Act's amendment of N.J. Stat. Ann. § 19:44A-8. However, the Court is not convinced this supports the position of Defendants. The amended § 19:44A-8 requires independent expenditure committees to report all expenditures of more than $3,000 "including, but not limited to, for electioneering communications, voter registration, get-out-the-vote efforts, polling, and research." (N.J. Stat. Ann. § 19:44A-8(d)(2).) The Act thus infers electioneering communications identifying a clearly defined candidate are but a subset of, and not synonymous with, "influencing or attempting to influence" any election, as the Court construes the plain meaning of the terms "get-out-the-vote efforts" and "voter registration" to connote influencing any election by encouraging more voters to vote, even though these efforts might not identify a clearly defined candidate, legislation or regulation.

Even if the Court were inclined to read "electioneering communications" as limiting or synonymous with "influencing or attempting to influence" as Defendants suggest, the Court's conclusion would be unchanged. That is because the Act requires the same disclosure scheme whether an independent expenditure committee engages in electioneering communications identifying a clearly defined candidate, engages in "influencing or attempting to influence" any election, or engages in providing political information, which the Act makes clear includes any fact or opinion. The interplay between the definitions of "electioneering communications" and "influencing or attempting to influence" advocated by Defendants may clear up confusion otherwise evident in the Act, but it is the definition of "providing political information" that the Court views as more constitutionally troubling, as it extends disclosure regimes the Supreme Court has approved of well beyond the boundaries set by *Buckley*, *McConnell*, and *Citizens United*.

Consider AFP's NJ Taxpayer Scorecard. Plaintiff says its Scorecard "focuses squarely on the issues" and "conveys facts and opinions" as it presents "legislators' voting records on key issues ranging from criminal justice reform to occupational licensing." (ECF No. 3-1 at 14 (citing Jedynak Decl. (ECF No. 3-5 ¶ 14)).) Plaintiff contends the Scorecard "could conceivably be characterized as influencing the electoral chances of each and every legislator mentioned." (*Id.*)

Defendants at oral argument stated that whether the Scorecard fell under the auspices of the Act depended upon the details of the Scorecard.[24] Essentially, Defendants argued, a neutral,

---

[24] The Court conducted the following, edited colloquy regarding the Scorecard:

> THE COURT: The scorecard that counsel referenced in their papers.
> DEFENDANTS/MR. FEINBLATT: Yes.
> THE COURT: Does that come under this law now?
> MR. FEINBLATT: I can't answer in the—in the general. I'd have—
> I have not studied their scorecard. And
> the point is that the law and --
> THE COURT: Doesn't that get right to the point?

nonpartisan statement identifying candidates might not be subject to the Act, but if the Scorecard advocated a particular position it would trigger the Act's disclosure regime.

The Court is persuaded the Scorecard would trigger the Act's disclosure obligations by being characterized as "influencing or attempting to influence" the chances of each and every candidate mentioned, as Plaintiff contends. However, because of the way the Act defines political information, meaning as any statement reflecting the opinion of members of an independent expenditure committee *or* "contain[ing] facts on any such candidate, or public question," the Court is not persuaded by Defendants' guidance that the Act would not be triggered by a neutral, nonpartisan statement identifying the candidates. The plain language of N.J. Stat. Ann. § 19:44A-3(h) makes clear that whether or not the Scorecard advocated a particular position is a

---

MR. FEINBLATT: No.

….

MR. FEINBLATT: Since I don't have all the details on the—on the scorecard, we need to drill down to the statute.

….

MR. FEINBLATT: Scorecard. So if the scorecard is a neutral, nonpartisan statement saying here are the candidates that are up for election in November, here's what their positions are, but there's no effort in that statement to advocate a position one way or another on whether that person should be elected or not, if that's the way it's presented, it may well not be subject to the statute. If it's presented in a way that says here are the candidates, we don't like the way this person is presenting his positions, we are more whatever our political bent is, and is advocating a particular position, then that may well be subject to the statute.

THE COURT: How about a scorecard saying we give candidate X an F on their environmental stance?

MR. FEINBLATT: It depends I think on the details of the thing. But if it's deemed to be an effort to promote or support or oppose a candidate, then it would be subject to the law as was the case in the *Delaware Strong Families* case. The court there did look at a voter's scorecard and found that scorecard was subject to the law.

(ECF No. 38 at 48:14-55:12.)

distinction without a difference. A Scorecard merely listing a clearly defined candidate running in a particular election with that candidate's position on various issues, even if descriptions of those positions were absolutely neutral, still would constitute the provision by AFP of "facts on any such candidate" and meet the definition of "political information" as set out in § 19:44A-3(h), triggering the Act's disclosure and financial-reporting regime.

The Court concludes there is no practical difference in whether the language of the Act is interpreted narrowly, as advocated by Defendants, or read broadly, as Plaintiff does, or solely by the plain language of the "final product" that resulted from the Senate's drafting. Regardless of the interpretive approach, the conclusion is the same: the provision of any fact or opinion on any candidate or public question, legislation or regulation by an independent group that raises or expends more than $3,000 for that purpose annually must disclose the identities of donors who have contributed more than $10,000 annually and must disclose those expenditures. This is true whether the independent group intended to provide political information, intended to "influenc[e] or attempt[] to influence," or intended to engage in "electioneering communications" that promote or oppose a "clearly identified candidate for office" or "public question."

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019), *reh'g denied*, (2019) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989); *see also* A. Scalia & B. Garner, Reading Law 167 (2012) (noting that the "text must be construed as a whole"); *accord*, *Bailey v. United States*, 516 U.S. 137, 145–46 (1995). Thus, the Court considers the phrase "electioneering communications" in its context and with a view to its place in the overall statutory scheme.

The phrase "electioneering communications" appears twice in S150. The first reference is in the definitions section of the Act. N.J. Stat. Ann. § 19:44A-3(u). The context of this provision reveals no textual relationship to "independent expenditure committees" as defined by § 19:44A-3(t). The second reference occurs in N.J. Stat. Ann § 19:44A-8(d)(2) titled "Contributions, expenditures, reports, requirements." This reference provides only that independent expenditure committees shall disclose all expenditures made by the committee for "electioneering communications, voter registration, get-out-the-vote efforts, poling, and research." By contrast, the phrase "political information" appears eleven times in the Act, while there are five references to the phrase "influencing or attempting to influence." The majority of these sixteen references set out the disclosure or financial recordkeeping obligations imposed by the Act and objected to by Plaintiff. It is clear "influencing or attempting to influence" and "providing political information" are more the more central targets of the Act triggering disclosure than are "electioneering communications" where independent expenditure committees are concerned.

Yet the Second Circuit in *Vermont Right to Life Committee, Inc. v Sorrell* recognized that other courts have found that the language influencing or attempting to influence "requires a limiting construction to avoid impermissible vagueness." 758 F.3d 118, 129 (2d Cir. 2014) (citing *Ctr. for Individual Freedom v. Carmouche,* 449 F.3d 655, 664 (5th Cir. 2006); *N.C. Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 712–13 (4th Cir. 1999).) The Court is not persuaded narrowly construing this phrase either limits what the Court concludes is the likely unconstitutional reach of the Act or brings clarity to the vagueness inherent in the interplay between "electioneering communications" and "influencing or attempting to influence."

Having considered how to interpret the Act's plain language, the Court now must consider whether the *Reilly* factors favor granting Plaintiff's Motion or whether Defendants have carried

their burden of demonstrating the Act can survive the exacting scrutiny standard set out by the Supreme Court.

In 1976, the Supreme Court of the United States recognized the compelled identification of contributors to independent groups that expend money on political causes "can seriously infringe" the rights to privacy of association and to belief guaranteed by the First Amendment. *Buckley*, 424 U.S. at 63; *see, e.g., Gibson v. Florida Legislative Comm.*, 372 U.S. 539 (1963); *NAACP v. Alabama*, 357 U.S. 449 (1958). As a result, the Supreme Court required that legislation and rules compelling the disclosure of such contributors, as called for by S150, must undergo "exacting scrutiny," meaning the Act "can be sustained only if it furthers a vital governmental interest . . . that is achieved by a means which does not unfairly or unnecessarily burden either a minority party's or individual candidate's equally important interest in the continued availability of political opportunity." *Buckley*, 424 U.S. at 93. Exacting scrutiny is required even if any deterrent effect on contributors' First Amendment rights resulted "indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure" and not directly from government action. (*Id.* at 65 (citing *NAACP v. Alabama*, 357 U.S. at 461).) The Supreme Court determined in *Buckley* "there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the 'free functioning of our national institutions' is involved." *Buckley*, 424 U.S. at 66 (quoting *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 97 (1961)). The Court upheld provisions of the Federal Election Campaign Act of 1971, as amended in 1974, ("FECA") requiring individuals or groups, other than political committees or candidates, that contributed more than a specified amount annually to a political committee or to a candidate for office to publicly disclose those contributions to the Federal Election Commission. *Buckley*, 424 U.S. at 67-68. The *Buckley* Court explained that the disclosure

32

provisions, which were triggered only for spending above a certain level and used "for the purpose of . . . influencing" the "nomination or election of any person to federal office" served a "sufficiently important" government interest that outweighed the possibility of infringing upon First Amendment rights. (*Id.* at 61, 66 (citing 2 U.S.C. § 431(e)(1), (f)(1)).[25]) The Court determined "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." (*Id.* at 68.)

*Buckley* was superseded by the Bipartisan Campaign Reform Act of 2002 ("BCRA"), which came before the Supreme Court in 2003. *McConnell v. FEC*, 540 U.S. 93. There the Court upheld BCRA's requirement, among other provisions, calling for the disclosure of those donors contributing more than $10,000 intended for "electioneering communications" that clearly identified a candidate for federal office. *McConnell*, 540 U.S. at 194. While much of *McConnell* was overturned by *Citizens United*, BCRA's disclosure provisions were upheld in *McConnell* "on the ground that they would help citizens 'make informed choices in the political marketplace.'" *Citizens United*, 558 U.S. at 367 (quoting *McConnell*, 540 U.S. at 197). *Citizens United* left undisturbed the elements of the *Buckley* and *McConnell* decisions declaring the constitutionality of the disclosure regulations before those Courts as well as their acknowledgments that "as-applied challenges would be available if a group could show a "reasonable probability" disclosure of contributors' names "'will subject them to threats, harassment, or reprisals from either Government officials or private parties.'" *Citizens United*, 558 U.S. at 367 (citing *McConnell,* 540

---

[25] Effective September 1, 2014, the provisions of FECA codified in Title 2 were transferred to 52 U.S.C. §§ 30101–30146. This Opinion will refer to the recodified provisions when citing to FECA.

U.S. at 198 (quoting *Buckley*, 424 U.S. at 74).)[26] All three decisions examined disclosure rules triggered by "electioneering communications" identifying specific, clearly defined candidates.

Defendants contend the "influencing or attempting to influence" language of the Act bears a "substantial relation to the State's important interest in ensuring that New Jersey's electorate is informed about the sources and identities behind election-related spending." (ECF No. 29 at 16 (citing *Citizens United*, 558 U.S. at 366-69; *McConnell*, 540 U.S. at 194-97; *Buckley*, 424 U.S. at 64, 66; and *Del. Strong Families*, 793 F.3d at 309-10).)

In reviewing S150, the Court concludes the plain text does not reveal "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Doe v. Reed*, 561 U.S. at 196 (quoting *Citizens United*, 558 U.S. at 366–67). Courts have found a substantial relation for what have come to be called electioneering communications, as well as for direct lobbying, on the federal level, *see, e.g.*, *Buckley*, 424 U.S. at 64, 66; *McConnell*, 540 U.S. at 194-97; *Citizens United*, 558 U.S. at 366-69, and on the state level, *see, e.g.*, *Delaware Strong Families*, 793 F.3d at 306-07, *Vermont Right to Life*, 758 F.3d at 133, and *Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014). None of those courts faced a statute with the breadth of S150. Indeed, the Court sees few, if any, limitations in the Act.

Consider the expansive roster of media covered by the Act. S150 corrals into its ambit any communication

> published in any newspaper or periodical; broadcast on radio, television, or the Internet or digital media, or any public address system; placed on any billboard, outdoor facility, button, motor vehicle, window display, poster, card, pamphlet, leaflet, flyer, or

---

[26] *Citizens United* also left untouched the exacting scrutiny standard by which disclosure and disclaimer requirements are evaluated. *Citizens United*, 558 U.S. at 366–67 ("The Court has subjected [disclaimer and disclosure] requirements to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest.")

> other circular; or contained in any direct mailing, robotic phone calls, or mass e-mails.

N.J. Stat. Ann. § 19:44A-3(u).

Defendants contend the Act "focus[es] on specific kinds of media used in New Jersey elections, with a list of media types that is not meaningfully different from those at issue in *Delaware Strong Families* and *Vermont Right to Life*." (ECF No. 29 at 21.) In *Delaware Strong Families*, the Third Circuit upheld a Delaware disclosure law whose definition of electioneering communications broadened the roster of qualifying media from the federal BCRA's "any broadcast, cable, or satellite communication," to "television, radio, newspaper or other periodical, sign, Internet, mail or telephone." *Delaware Strong Families*, 793 F.3d at 311. The Third Circuit concluded that "media covered by the Act reflects the media actually used by candidates for office in Delaware, and thus it bears a substantial relation to Delaware's interest in an informed electorate." (*Id.*) As the Third Circuit noted, "Delaware does not have its own major-network television station" and direct mail constituted "80% of campaign expenditures in state." (*Id.*)[27]

Here, Defendants produce an ELEC White Paper showing that mass-media spending by candidates and independent groups in the state's 2015 elections totaled $12.5 million, or 37% of total spending. (ECF No. 29-1 at ¶ 3, Ex. 1 at 15). That White Paper demonstrates how this Act is distinguished from the statutory regime reviewed by *Delaware Strong Families*. One table shows

---

[27] In *Vermont Right to Life*, the statute at issue contained an expansive definition of what outlets it included in so-called mass media activity including "a television commercial, radio commercial, Internet advertisement, mass mailing, mass electronic or digital communication, literature drop, newspaper or periodical advertisement, robotic phone call, or telephone bank, that includes the name or likeness of a clearly identified candidate for office." *Vermont Right to Life*, 758 F.3d at 122–23 (quoting Vt. Stat. Ann. tit. 17, § 2901). The Second Circuit did not address the constitutional implications of this expansive list, and so this Court draws no conclusions from the opinion as to this point.

that the category "independent groups" spent 66% of their portion of that $12.5 million on television, 13% on mail, 9% on "media mixed," while spending negligible amounts or nothing on radio (2%), media-production (1%), cable television ($0), billboards ($0), printing ($0), newspapers ($0), robocalls ($0) and Internet (2%). (*Id.* at 17.) That negligible spending on cable television, billboards, printing, robocalls and the Internet means these are not media widely used by independent groups to communicate with New Jersey voters. Yet all are included in the Act's definition of what constitutes "electioneering communications" and many are included also in the Act's definition of what constitutes "political information."[28] The Court finds this text is susceptible to no limiting language or interpretation. The Court further concludes that the broad inclusiveness of the Act's definition of media bears little relation to what media are actually used by independent groups. As a result, any "substantial relation" the disclosure requirement has to New Jersey's interest in an informed electorate becomes more tenuous. Instead, practically any media spending appears to trigger the Act's disclosure and reporting regime, whether or not New Jersey voters are reached by the media listed in the Act.

Separately, through § 19:44A-3(u), the Act applies to any electioneering communications or spending occurring from January 1 through Election Day. Plaintiff rightly points out that every year in New Jersey is an election year. In 2019, all 80 seats in the General Assembly will be up for election. The following year, one-third of the U.S. Senate, including a New Jersey seat, the entire House of Representatives, and the Presidency are up for election. The year 2021 marks the

---

[28] N.J. Stat. Ann. § 19:44A-3(h)'s definition of political information is "any statement including, but not limited to, press releases, pamphlets, newsletters, advertisements, flyers, form letters, Internet or digital advertisements, or radio or television programs or advertisements." The Court concludes this is substantially similar to the media listed in N.J. Stat. Ann. § 19:44A-3(u)'s definition of the media through which electioneering communications is accomplished.

gubernatorial election in New Jersey, as well as contests for the General Assembly. In 2022, one-third of the seats in U.S. Senate and all of the House of Representatives will be contested.[29] In other words, qualifying communications occurring on 1235 of the 1461 days from January 1, 2019 through December 31, 2022, or 84.53% of the time, would trigger the Act's disclosure obligations. This stands in stark contrast to other disclosure statutes cited by Defendants for affirmative comparison, where typically only communications occurring within 30 or 60 days of an Election Day would trigger a disclosure obligation. *See, e.g., Delaware Strong Families*, 793 F.3d at 307 (citing Del. Code Ann. Tit. 15, § 8002 (West) (upholding a disclosure statute defining an electioneering communication as one publicly distributed within 30 days before a primary election or 60 days before a general election)). The FECA amendments upheld by the Supreme Court in *McConnell* similarly limited FECA's purview to electioneering communications within 60 days before a general, special, or runoff election or 30 days before a primary. *McConnell*, 540 U.S. at 194 (citing 2 U.S.C. § 304(f)(3)).[30] On the one hand, it is clear S150's time limitations are, for all intents and purposes, no limitation at all. On the other hand, it is clear that under the Act qualifying communications to influence, say, a vote on a bill before the Assembly from January 1 of any year to Election Day in November would trigger the regulatory scheme, while the same otherwise qualifying communication seeking to influence the same bill but occurring from the day after Election Day to December 31 would not. Neither the Act nor Defendants explain how the

---

[29] This list does not include municipal elections, which also would be elections and ballot questions for which electioneering communications would be subject to the Act. (ECF No. 38 at 61:23-62:3) (Defendants: "[W]hat does this law add to the lobbying law that was out there already? It adds, I think, two primary things. One is it expands disclosures from just statewide but to local lobbying, meaning county, local school district levels. There's a huge amount of lobbying activity going on at the local levels, which is covered by the statute.")

[30] Now 52 U.S.C.A. § 30104 (West)

substantial relation between the disclosure requirement and the sufficiently important government interest that Defendants contend exists for communications from January 1 through Election Day melts away for communications from the day after Election Day to December 31. Certainly, legislation and regulatory activities occur from Election Day to the end of the year. Judging from the construction of the Act, New Jersey seems uninterested in informing its citizens about who is communicating with legislators and regulators during this period. For elections, as the Supreme Court stated in *Citizens United*:

> It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held. There are short timeframes in which speech can have influence. The need or relevance of the speech will often first be apparent at this stage in the campaign. The decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others.

558 U.S. at 334.

S150 ignores the teachings of *Citizens United* yet also does not explain how communications with legislators and regulators during the first 10 months of the year merit the scrutiny that comes with the Act's disclosure requirement but not communications during the last two months of the year. The Court concludes the breadth of the time limitations that subject independent groups to the strictures of the Act undermines the disclosure requirement's "substantial relation" to New Jersey's interest in an informed electorate.

Most constitutionally troubling to the Court is the way in which, as discussed to some degree above, the Act brings communications of purely factual political information into a disclosure and financial-reporting regime historically limited to electioneering communications.

The Act defines an "electioneering communication" as any communication occurring within the prescribed time frames described above and referring to:

> (1) a clearly identified candidate for office and promotes or supports a candidate for that office or opposes a candidate for that office, regardless of whether the communication expressly advocates a vote for or against a candidate; or (2) a public question and promotes or supports the passage or defeat of that question, regardless of whether the communication expressly advocates a vote for or against the passage of the question.

N.J. Stat. Ann. § 19:44A-3(u).

Crucially, electioneering communication is not among the activities that define independent expenditure committees. Rather, the Act defines independent expenditure committees as groups engaging in "influencing or attempting to influence" an election or the passage of any public question, legislation or regulation—a category the Court concluded above is broader than electioneering communications—or that engage in "providing political information on any public question, legislation or regulation." N.J. Stat. Ann. § 19:44A-3(t).

Political information is not defined in 19:44A-3(t). Instead, it is defined as:

> any statement including, but not limited to, press releases, pamphlets, newsletters, advertisements, flyers, form letters, Internet or digital advertisements, or radio or television programs or advertisements which reflects the opinion of the members of the organization on any candidate or candidates for public office, on any public question, or which contains facts on any such candidate, or public question whether or not such facts are within the personal knowledge of members of the organization.

N.J. Stat. Ann. § 19:44A-3(h).

In other words, political information consists of communications containing any fact or opinion about a candidate or public question. Therefore, for the purposes of the Act's disclosure requirements, "providing political information" is effectively synonymous with "electioneering communications." As discussed, AFP publishes an "NJ Taxpayer Scorecard" tracking legislators' voting records on issues ranging from criminal justice reform to occupational licensing. AFP contends that though this report focuses squarely on the issues and not on supporting or opposing

39

any particular candidate, it believes this report could be characterized as influencing the electoral chances of each and every legislator mentioned therein, thus triggering the Act's disclosure obligations. The Court agrees. But, whether the Taxpayer Scorecard is an attempt to influence the election of a particular candidate or represents only the communication of "political information" is a distinction without a difference for the purpose of triggering the Act's disclosure and financial-reporting regime. If AFP raised or expended more than $3,000 on compiling or distributing this Scorecard during roughly 85% of the year, the disclosure obligation would be the same whether AFP was attempting to advocate for or against a clearly identified candidate, to influence an election, legislation or regulation, or only to educate voters about the issues it monitors and/or advocates by providing facts or opinions.

Plaintiff contends the breadth of the Act requires this Court to grant this Motion. Importantly, while Plaintiff argues the Act is unconstitutional on its face, Plaintiff does not contend the grant of a preliminary injunction should or would prevent the New Jersey Legislature from approving legislation required to correct the unconstitutional weaknesses in the Act identified by, among others, Governor Murphy.[31] Neither would an injunction prevent ELEC from engaging in rulemaking that also might bring clarity to the Act's language and to how the regulator would enforce the Act. Instead, Plaintiff suggests, a preliminary injunction would merely preserve the status quo to provide the Legislature and/or ELEC time to engage in such activity while preventing harm to Plaintiff and other independent groups in the form of disclosing information about donors in New Jersey and nationwide whose anonymity would be forever lost. (ECF No. 3-1 at 5, 39.) The Court agrees and concludes Plaintiff has met its burden of demonstrating it has a reasonable probability of winning on the merits at trial on its claim that the Act is facially unconstitutional.

---

[31] *See* supra n.10.

Concomitantly, the Court concludes the State has not met its burden of demonstrating that "the statute withstands scrutiny." *Reilly*, 858 F.3d at 180) (quoting *Ashcroft v. ACLU*, 542 U.S. at 666.)

Having reached this conclusion, it is axiomatic Plaintiff has met the other *Reilly* factors for granting a preliminary injunction. The Court concludes Plaintiff has met its burden of showing irreparable harm by meeting the "success on the merits" prong because, as stated above, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *K.A. ex. Rel. Ayers*, 710 F.3d at 113 (quoting *Elrod v. Burns*, 427 U.S. at 373.) Similarly, Plaintiff has met its burden of showing a preliminary injunction to be in the public interest because "the enforcement of an unconstitutional law vindicates no public interest." *K.A. ex rel. Ayers*, 710 F.3d at 114 (citing *ACLU v. Ashcroft,* 322 F.3d at 251 n.11 ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.")) (citation and international quotation marks omitted).)

Finally, the Court is persuaded by Plaintiff's argument that the balance of the equities favors AFP on its facial challenge because, in contrast to the "risk of irreparable injury looming over AFP and its donors, New Jersey faces no appreciable harm from an injunction." (ECF No. 3-1 at 39.) Accordingly, Plaintiff's Motion for a Preliminary Injunction enjoining Defendants from enforcing the provisions of the Act is **GRANTED**.

In the event the Court ruled against its facial challenge to S150, Plaintiff also claims the Act is unconstitutional as applied to AFP. As part of its as-applied challenge, Plaintiff contends the Act will subject its donors to "threats, harassment, or reprisals from either Government officials or private parties" after their information is disclosed and that loss of anonymity would chill its First Amendment rights through a decline in funding that would result from public disclosure of its contributors' personal information. Defendants counter that donors may be more concerned

about avoiding accountability than about public criticism or about significant harassment that will not be addressed by law enforcement. (ECF No. 29 at 41.) Defendants also argue that *Doe v. Reed* "underscore[s] the heavy burden that AFP must carry." (*Id.* (citing *Doe v. Reed*, 561 U.S. at 202-28).) Plaintiff supports its argument with declarations from officers reporting a litany of threats ranging from personal death threats and actual physical attacks to cyberattacks and other Internet-based retaliation. (ECF No. 3-1 at 15-16 (citing Decl. of Jedynak (ECF No. 3-5) and Decl. of Emily Seidel (ECF No. 3-4).) Defendants describe these as "only a few isolated–though clearly regrettable–incidents of concern over fifteen years of its operations." (ECF No. 29 at 41.)

The Court observes that the question about the extent of any threats is likely to be more favorable to Plaintiff than Defendants contend, especially amid a political climate that many say has become far more divisive than it was even in 2010 when *Citizens United* and *Doe v. Reed* were decided. Also, *Citizens United* tells us that as-applied challenges still require only a showing that there is a "reasonable probability" disclosure of contributors' names "will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Citizens United*, 558 U.S. at 370 (citing *McConnell,* 540 U.S. at 198 (quoting *Buckley*, 424 U.S. at 74)). In a climate marked by the so-called cancel or call-out culture that has resulted in people losing employment, being ejected or driven out of restaurants while eating their meals; and where the Internet removes any geographic barriers to cyber harassment of others, in addition to AFP's list of threats already experienced against those AFP stakeholders whose identities have become known, a "reasonable probability" standard strikes the Court as less burdensome as Defendants maintain. However, because the Court granted Plaintiff's Motion based on AFP's facial challenge to the Act, it need not rule on the merits of Plaintiff's as-applied challenge.

**V. CONCLUSION**

A preliminary injunction is an extraordinary remedy to be used in limited circumstances. Nevertheless, for the reasons stated above the Court concludes Plaintiff has met its burden of demonstrating that *Reilly* factors weigh in favor of an injunction. Accordingly, Plaintiff's Motion is **GRANTED**.

**Date: October 2, 2019**                    */s/ Brian R. Martinotti*_____
                                             **HON. BRIAN R. MARTINOTTI**
                                             **UNITED STATES DISTRICT JUDGE**